Counsel of Record:
Andrew M. Calamari
Amelia Cottrell
Michael Osnato
Howard Fischer
Katherine Bromberg
Karen Willenken
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place, 200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0589 (Fischer)
Email: FischerH@SEC.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

        *Plaintiff*,

    v.

LAWRENCE E. PENN, III, MICHAEL ST. ALTURA
EWERS, CAMELOT ACQUISITIONS SECONDARY
OPPORTUNITIES MANAGEMENT, LLC, THE
CAMELOT GROUP INTERNATIONAL, LLC and
SSECURION LLC,

        *Defendants*,

    - AND -

A BIGHOUSE PHOTOGRAPHY AND FILM STUDIO
LLC,

        *Relief Defendant.*

14 Civ. _____ (    )
ECF CASE

**COMPLAINT**

---

Plaintiff Securities and Exchange Commission (the "Commission"), for its complaint

against Defendants Camelot Acquisitions Secondary Opportunities Management, LLC ("CASO

Management"), Lawrence E. Penn, III ("Penn"), Ssecurion LLC ("Ssecurion"), Michael St.

Altura Ewers ("Ewers"), and The Camelot Group International, LLC ("CGI") (collectively, the

"Defendants"), and Relief Defendant A Bighouse Photography and Film Studio LLC ("Big

House" or the "Relief Defendant"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1.       In breach of their fiduciary duties, Penn and CASO Management engaged in a

fraudulent scheme to misappropriate fund assets, disadvantaging investors and elevating Penn's

and CASO Management's interest above the interests of the fund they advised.  Ewers,

Ssecurion, and CGI aided and abetted this fraudulent scheme.

2.       Penn and CASO Management, a registered investment adviser under Penn's

control, aided and abetted by Ewers, Ssecurion, and CGI, engaged in a fraudulent scheme to

misappropriate approximately $9.3 million from a private equity fund Penn and CASO

Management controlled in order to provide additional assets to Penn to spend on his business and

personal expenditures. Penn diverted $9.3 million from the fund during a period when CASO

Management had precluded investors in the fund from redeeming their interests.  Penn and

CASO Management misappropriated the moneys by directing the fund to pay purported "due

diligence" expenses from March 2010 through October 2013 to Ssecurion, an entity run by their

confederate in the scheme, Ewers.

3.       Ssecurion was not a bona fide company and provided few if any due diligence

services to the fund. Instead, Ssecurion acted as a front for Penn to siphon money from the fund

and route it back to CASO Management or to CGI, an unregistered entity adviser under Penn's

control.  Ssecurion routed almost all of the almost $9.3 million it received back to CASO

2

Management or to CGI, in some cases interposing another Ewers-owned entity, Big House, as an intermediary in the round-trip transactions.

4.      Once the money was diverted from the fund, it was commingled with management fees that were paid by the fund to CASO Management, and forwarded on to CGI. CGI used the commingled funds to pay overhead expenses, such as rent and salary, which were not permissible fund expenses under the fund's governing document, the Amended and Restated Limited Partnership Agreement of Camelot Acquisitions Secondary Opportunities, L.P., dated February 5, 2010, and as amended December 27, 2011 (the "LPA").   CGI also used the commingled funds to market the fund, to pay "finders" who brought in the fund's investors, and to establish a global presence for CGI. The sham payments of approximately $9.3 million allowed Penn to spend far more on these types of expenses than the fund's investors had anticipated or authorized, renting luxurious office space and otherwise presenting an image of a fully operational international business.

5.      In addition, Penn and Ewers actively sought to mislead the fund's auditors and administrators concerning the due diligence payments.  In 2013, when the firm's auditors and administrators requested backup documentation for the payments to Ssecurion over the previous three fiscal years, Penn and Ewers forged purported work product corresponding to the invoices and lied to the auditors to cover their tracks.

## VIOLATIONS

6.      By virtue of the conduct alleged herein, certain of the Defendants have violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)]; and Sections 204, 206(1), 206(2), and 207 of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-4, 80b-6(1), (2), and 80b-7], and Rule 204-2 thereunder [17 C.F.R. §§275.204-2].

7.     CASO Management has engaged in, and unless enjoined, will continue to engage, directly or indirectly, in transactions, acts, practices, and courses of business that constitute violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)]; and Sections 204, 206(1), 206(2), and 207 of the Advisers Act [15 U.S.C. §§ 80b-4, 80b-6(1),(2), and 80b-7], and Rule 204-2 thereunder [17 C.F.R. §§275.204-2].

8.     Penn has engaged in, and unless enjoined, will continue to engage, directly or indirectly, in transactions, acts, practices, and courses of business that constitute violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)]; and Sections 204, 206(1), 206(2), and 207 of the Advisers Act [15 U.S.C. §§ 80b-4, 80b-6(1), (2), and 80b-7], and Rule 204-2 thereunder [17 C.F.R. §§275.204-2].

9.     Ssecurion has engaged in, and unless enjoined, will continue to engage, directly or indirectly, in transactions, acts, practices, and courses of business that aided and abetted CASO Management and Penn's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)]; and Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b, 80b-6(1) and (2)].

10.     Ewers has engaged in, and unless enjoined, will continue to engage, directly or indirectly, in transactions, acts, practices, and courses of business that aided and abetted CASO Management and Penn's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)]; and Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b, 80b-6(1) and (2)].

11.     CGI has engaged in, and unless enjoined, will continue to engage, directly or indirectly, in transactions, acts, practices, and courses of business that aided and abetted CASO Management and Penn's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)]; and Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b, 80b-6(1) and (2)].

12.     Defendants should be permanently enjoined from violating the provisions of the securities laws described above.  Defendants should also be ordered to disgorge any ill-gotten gains or benefits derived as a result of their violations, whether realized, unrealized or received, and prejudgment interest thereon, and ordered to pay appropriate civil monetary penalties. Furthermore, the relief defendant should be ordered to disgorge any ill-gotten gains or benefits obtained as a result of the violations set forth herein. In addition, Ewers and Ssecurion should be permanently enjoined from accepting compensation from any private equity fund, other than as part of a class of investors receiving returns on a pro rata basis, for services provided or purportedly provided to such fund.  The Court should also order any other just and appropriate relief.

## JURISDICTION AND VENUE

13.     The Court has subject matter jurisdiction over this action pursuant to  Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)], and Sections 209 and 214 of the Advisers Act [15 U.S.C. §§ 80b-9 and 80b-14].

14.     Venue is proper in the Southern District of New York pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa], and Section 214 of the Advisers Act [15 U.S.C. §§ 80b-14].  CASO Management, Penn, and CGI maintained their principal offices in New York, New York at all relevant times, and certain of the acts, transactions, practices, and courses of business alleged herein took place in the Southern District of New York.

15.     Defendants, directly or indirectly, singly or in concert, have made use of the means or instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails and wires, in connection with the transactions, acts, practices, and courses of business alleged herein.

## DEFENDANTS

16.     **CASO Management** is a Delaware limited liability company owned and controlled by Penn.  CASO Management is based in New York, New York and became registered with the Commission on September 14, 2012.  CASO Management, directly or indirectly, is the investment adviser to Camelot Acquisitions Secondary Opportunities, LP ("Camelot LP" or the "Fund"), as well as CASO Co-Invest-A LLC, a Delaware limited liability company containing approximately $25 million in assets.

17.     **Penn**, age 43, lives in New York and is Managing Member and Managing Director of CASO Management.  Penn, who represented to investors that he had served in the U.S. Army, started CASO Management in 2007 after having worked for several well-known investment banking firms.  Under Penn's control, CASO Management's assets under management peaked at approximately $145 million in 2013.  Penn has primary responsibility for all investment and business decisions made on behalf of CASO Management and CASO Management-managed funds.

18.     **Ssecurion** is a Delaware limited liability company owned and controlled by Ewers.

19.     **Ewers**, age 42, lives in the San Francisco area and is Managing Partner of Ssecurion.  He also previously served in the U.S. Army.

20.     **CGI** is a Delaware limited liability company, with its principal place of business in New York, NY.  CGI is owned 99% by Penn and 1% by his father, and it appears to function as a parent organization of CASO Management.

### RELIEF DEFENDANT

21.     **Big House** is a Delaware limited liability company, incorporated in 2003, wholly-owned and controlled by Ewers.

### OTHER RELEVANT ENTITIES

22.     **Camelot LP**, CASO Management's flagship fund, had approximately $120 million in assets in the summer of 2013.  Camelot LP consists of capital contributions from investors and a feeder fund Camelot Acquisitions Secondary Opportunities Offshore, LP ("Camelot Offshore"), a Cayman Islands company.

23.     **TCGI Capital Group LLC ("TCGI")** is a Delaware limited liability company owned and controlled by Penn.  TCGI is based in New York, New York.

### FACTS

**I.    The Camelot Private Equity Fund and Its Purported Due Diligence Expenses**

24.     Established in 2007 and first funded in 2010, Camelot LP is a private equity fund started by, among others, Managing Director Penn.  CASO Management, registered with the Commission as an investment adviser effective September 14, 2012, was the official investment adviser for the Fund.  Penn has been Managing Director of the registered investment adviser since its inception.

25.     The Fund's stated investment strategy was to invest in companies that were in the late stages of raising private equity, and would shortly attempt a public offering. The Funds' investors include public pension funds, high net worth individuals, and overseas institutions.

26.     Investors did not immediately put up all of the capital they committed; instead, the Fund made capital calls from time to time as needed to fund investments in portfolio companies or to pay Fund expenses (including management fees, which ranged from 1.5% to 2% of each investors committed capital annually, depending on the terms of any applicable side letters).

27.     From late 2010 through the end of 2012, the Fund called 99.5% of the committed capital of approximately $120 million and had invested in six portfolio companies.  In 2012, feeder fund Camelot Offshore contributed an additional $45,450,000 to the Fund.  In 2013, the Fund took in another $2.5 million in new capital commitments, plus $2 million in loans from existing investors.

28.     In connection with each investment, the Fund would record certain purported transaction-related expenses.  With the approval of the Fund's auditors ("Audit Firm"), which was granted based on CASO Management's representations that the expenses related to the investments, the expenses relating to completed acquisitions of interests in portfolio companies were capitalized – in other words, they were added to the cost basis for the investment to which they related and were not expensed in the current period.

29.     By far the most significant purportedly investment-related expenses incurred by the Fund were characterized as payments for "due diligence" performed by Ssecurion, concerning the management and prospects of the Fund's proposed investments in portfolio companies.  The Fund did not pay due diligence expenses to any other person or entity.  The total amount of the purported due diligence expenses from 2010 through October 2013 was almost $9.3 million.

30.     Although these "due diligence" expenses were specifically identified in the Fund's general ledger, and although invoices for these purported expenses were provided to both the Fund's administrators and to Audit Firm, none of the documents provided to investors ever disclosed these due diligence-related payments.

### A. The Purported Due Diligence Payments Were a Sham.

31.     Audit Firm completed its audits of the Fund's financial statements for 2010 and 2011.  In connection with those audits, it relied on letters and other documents it received from Ewers, which were signed in Ewers' capacity as "Managing Partner" of Ssecurion.

32.     Ewers had a relationship with Penn that predated the Fund's retention of Ssecurion as its purported third-party due diligence provider.  The two men met at a function for the University of Maryland University College ("UMUC") European campus (which Penn briefly attended) in the 1990s.  When the Ssecurion bank account was opened in October 2010, both Ewers and Penn were signatories.  None of these facts was disclosed to Audit Firm in connection with the 2010 and 2011 audits.

33.     At Audit Firm's request in connection with the 2010 and 2011 audits, Ewers sent letters to Audit Firm on April 27, 2011 and April 9, 2012, each of which represented that Ssecurion had "helped clients make high-risk, high-value decisions for over 15 years."  The first letter attached a presentation that purported to summarize both Ssecurion's capabilities and the work performed for the Fund during the 2010 audit period.

34.     Audit Firm became suspicious about the bona fides of the purported due diligence payments to Ssecurion while auditing the Fund's 2012 financials in the spring of 2013.  Audit Firm then requested additional documentation of not only the 2012 due diligence payments, but the prior years' payments.

35.     When Audit Firm approached Ewers for Ssecurion work product during a July 19, 2013 in-person meeting with Ewers, Ewers said the Fund should already have them and that he could not produce them because it would violate the service contract between Ssecurion and the Fund.  Penn and Ewers told Audit Firm conflicting stories in July 2013 interviews, about where the reports were located and how they were accessed.  No copies of reports (even in redacted form) were ever produced to Audit Firm.

36.     In an interview with Audit Firm representatives on July 16, 2013, Penn showed them what he claimed were the electronic due diligence folders for each investment.  He opened a number of electronic files and discussed how the files, which purportedly had been obtained from or provided by Ewers, assisted the due diligence.  The content of the files, however, did not suggest that they had been created by Ewers; they appeared to be generic information easily obtained from the internet and/or the portfolio company.  Audit Firm was never provided with credible evidence of significant work performed by Ssecurion.

37.     In addition, Ssecurion kept almost none of the fees it received for its purportedly extensive work assisting the Fund in evaluating potential investments.  Bank records reflect that from March 2010 through October 31, 2013, Ssecurion received a total of $9,286,916.65 from bank accounts maintained in the name of Camelot LP.  All of these amounts were paid under cover of invoices purporting to correspond to due-diligence related work.  Of this amount, $9,067,004 (97.6%) was then re-directed in various round-trip transactions, either directly or indirectly (through Big House, another Ewers-owned entity) to CGI or CASO Management.

### B.  Ssecurion Round-Tripped Most of the Money it Received from Camelot LP to CGI.

38.     Ssecurion retained only a tiny fraction of the fees that were being paid to it for purported due diligence services, and returned the vast majority of the fees paid to it from

Camelot LP to Penn's entity, CGI. The Ssecurion and Big House bank account records do not reflect expenses or any other activity consistent with a legitimate due diligence firm. Ssecurion received almost no income that could relate to work for other clients, and neither entity's bank accounts reflect salary or similar expenses consistent with Ewers' claim that he used independent consultants with expertise on specific issues to perform due diligence.

39.     Once it was received by CGI, the money from the sham due diligence payments was commingled with management fees that had been paid by the Fund to CASO Management and then transferred from CASO Management to CGI. The CGI accounts were then used to pay a variety of expenses, including:

- overhead expenses of CASO Management, such as salary and rent;

- payments to "finders" of the Fund's investors (who received up to 3% of the amount of certain investors' capital commitments);

- apparent marketing expenses for the Fund, Camelot Offshore, and perhaps other CGI businesses, including travel expenses and lavish meals at New York City restaurants;

- occasional apparent personal expenses, including dry-cleaning and groceries.

The flow of funds is reflected in the schematic on the next page:



Total transferred indirectly from Camelot LP to CGI or CASO Management: **$9,067,004 (97.6%)**

### C. Penn and Ewers Tried to Conceal the True Nature of Sham Due Diligence Expenses.

40.    After becoming suspicious about the due diligence payments Camelot LP paid to Ssecurion from 2010-2013, Audit Firm attempted to obtain documentation and explanations that would support the legitimacy of the payments.

### Chronology of Penn and Ewer's Cover-Up to Conceal Fraud from Audit Firm

41.    On July 3, 2013, Audit Firm met with Penn and requested an explanation and/or documentation of the work underlying a number of specific Ssecurion invoices.  Penn's responses were vague and unsatisfactory; he claimed that he could not access the work product and suggested that Audit Firm meet with Ewers.

42.    When asked about his relationship with Ewers, Penn implied that they had an arm's-length relationship and had not worked together before Ssecurion was hired to provide due diligence services; he said he had chosen the firm based on recommendations from others and its reputation in the industry.

43.    Audit Firm pointed out to Penn that the Ssecurion website appeared to offer little substantive information about the nature of its business.

44.    On July 8, 2013, Audit Firm staff noticed that the Ssecurion website, which Audit Firm had criticized in its July 3, 2013 meeting with Penn, had been updated.  They noted that the content of some pages was now almost identical to that of a website for a legitimate investigative company and that the testimonials also were now very similar to another company's site.

45.    On July 8, 2013, at 5:44 p.m., Penn abruptly canceled the meeting scheduled for the next day and fired Audit Firm, providing no explanation for his actions.

46.    On July 16, 2013, after Audit Firm informed him that it still needed to obtain information from him concerning the legitimacy of the 2010 and 2011 due diligence payments or

it would have to declare that the earlier financial statements could not be relied upon, Penn agreed to meet with Audit Firm again.

47.     Penn  used his laptop and a projection screen to show Audit Firm files on the Camelot servers that he claimed were the due diligence folders for each investment.  Penn identified only a few documents that he could say had been provided by Ssecurion; none of them had any branding or other indication that it had been prepared by Ssecurion, and many appeared to be generic reports freely accessible from the internet.

48.     When confronted by evidence of his relationship with Ewers, Penn admitted that the two had met at a UMUC event in the 1990s.

49.     On July 19, 2013, Audit Firm met with Ewers at a Regus Business Center office in San Francisco, which had no logos or other indications that Ssecurion had a permanent office there.  Ewers refused to disclose details of his work, but he claimed to perform his work through independent contractors, saying he had "100 assets in the field;" many of whom were allegedly former law enforcement personnel.

50.     When asked about the recent changes to the Ssecurion website, Ewers claimed that an unspecified third party had made them, and that he had not reviewed the changes.

### D. CASO Management's Non-Compliance With the Commission's Examination

51.     When it was unable to obtain satisfactory evidence that the purported "due diligence" payments were legitimate, Audit Firm reported the matter to the Commission, which initiated a for-cause examination by the Investment Adviser/Investment Company section of OCIE ("Exam Staff") on August 15, 2013.  In the course of that examination, CASO Management failed to produce required books and records.  In addition, Penn repeatedly

promised to meet with Exam Staff but then failed to show up for several meetings, each time without providing notice or an explanation.

52.     CASO Management failed to provide the Exam Staff with Camelot LP's balance sheet, trial balance, cash receipts and disbursements journal, income statement, and cash flow statements as of the end of its most recent fiscal year and the most current year to date.  In addition, CASO Management failed to provide the Exam Staff with e-mails or other correspondence as required by Rule 204-2(a)(7) of the Advisers Act.  The Exam Staff was promised, in writing, on September 13, 2013, that an eData vendor would be retained to assist in identifying the electronic communications that were responsive to the Exam Staff's request and that a proposed production schedule was forthcoming, but the Exam Staff was never provided with such a schedule.

53.     Penn avoided the Camelot offices when the Exam Staff was on-site and repeatedly failed to appear for scheduled meetings with them.  After the first such meeting was arranged, and although the Exam Staff was told that Penn would make himself available, he never showed up.  The second was arranged with Penn's personal counsel, was scheduled a week in advance, and was then put off by ten days to September 27, 2013 because of a purported family emergency of Penn's.  Penn's counsel appeared at the Commission's office for the delayed scheduled meeting and was surprised to find that Penn was not present; he stated that Penn had confirmed the previous evening that he would attend.  Penn's counsel was unable to reach him that morning.  The Exam Staff was unable to meet with Penn.

54.     As a result of its inability to obtain required records and meet with Penn, the Exam Staff was unable to complete its examination.

### E. Penn and CASO Management's Filing of a False Form ADV

55.     On August 14, 2013, Penn signed and filed a Form ADV with the Commission containing material misstatements, including (1) representing that CASO Management had $175 million in assets under management when, in fact, it managed at most $150 million (its committed capital) and probably less than $131 million (the value ascribed to its advisory funds' assets at the end of 2012, plus the approximately $5 million in 2013 capital commitments and loans it received); and (2) representing that Penn received a master's degree from UMUC Europe when he did not.

### FIRST CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
(Against CASO Management and Penn)

56.     Paragraphs 1 through 55 are realleged and reincorporated by reference as if fully set forth herein.

57.     By engaging in the acts and conduct described in this Complaint, CASO Management and Penn directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, have:

   a.   Employed devices, schemes, and artifices to defraud;

   b.   Made untrue statements of material fact, or have omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

   c.   Engaged in transactions, acts, practices, and courses of business which operated as a fraud or deceit upon purchasers of securities.

58.     CASO Management and Penn engaged in the above conduct knowingly or recklessly.

59.    By reason of the foregoing, CASO Management and Penn, directly or indirectly, singly or in concert, have violated and unless enjoined will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF
### Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5
(Against Ssecurion, Ewers, and CGI)

60.    Paragraphs 1 through 59 are realleged and reincorporated by reference as if fully set forth herein.

61.    By engaging in the acts and conduct described in this Complaint, Ssecurion, Ewers, and CGI knowingly provided substantial assistance to CASO Management and Penn's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and thereby are liable under those provisions as aiders and abettors, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

62.    By reason of the foregoing, Ssecurion, Ewers, and CGI have violated and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF
### Violations of Sections 206(1) and 206(2) of the Advisers Act
(Against CASO Management and Penn)

63.    Paragraphs 1 through 62 are realleged and reincorporated by reference as if fully set forth herein.

64.    By engaging in the acts and conduct described in this Complaint, at all relevant times CASO Management and Penn were acting as investment advisers to Camelot LP within the meaning of Section 202(11) of the Advisers Act [15 U.S.C. § 80b-2(11)].

65.     CASO Management and Penn, directly or indirectly, singularly or in concert, by use of the mails or means and instrumentalities of interstate commerce, while acting as investment advisers: (a) with scienter employed devices, schemes, or artifices to defraud any client or prospective client; and/or (b) engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon any client or prospective client.

66.     As investment advisers to Camelot LP, CASO Management and Penn owed Camelot LP fiduciary duties of utmost good faith, fidelity, and care to make full and fair disclosure to them of all material facts concerning Camelot LP – including any conflicts or potential conflicts of interests – as well as the duty to act in Camelot LP's best interests, and not to act in their own interests to the detriment of Camelot LP.

67.     CASO Management and Penn breached their fiduciary duties to Camelot LP, engaged in fraudulent conduct and engaged in a scheme to violate Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1), (2)] as set forth above, and in particular, by, *inter alia*, misappropriating approximately $9.3 million from Camelot LP, as described above.

68.     By reason of the activities described herein, CASO Management and Penn violated Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1), (2)].

**FOURTH CLAIM FOR RELIEF**
**Aiding and Abetting Violations of Sections 206(1) and 206(2) of the Advisers Act**
(Against Ssecurion, Ewers, and CGI)

69.     Paragraphs 1 through 68 are realleged and reincorporated by reference as if fully set forth herein.

70.     By engaging in the acts and conduct described in this Complaint, Ssecurion, Ewers, and CGI knowingly provided substantial assistance to CASO Management and Penn's violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1), (2)], and

thereby are liable under those provisions as aiders and abettors, pursuant to Section 209(f) of the Advisers Act [15 U.S.C. § 80b-209(f)].

71.    By reason of the foregoing, Ssecurion, Ewers, and CGI have violated and unless enjoined will continue to violate, Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and (2)].

### FIFTH CLAIM FOR RELIEF
#### Violations of Section 204 of the Advisers Act and Rule 204-2 Thereunder
(Against CASO Management and Penn)

72.    Paragraphs 1 through 71 are realleged and reincorporated by reference as if fully set forth herein.

73.    By engaging in the acts and conduct described in this Complaint, CASO Management and Penn directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of the facilities of a national securities exchange, has not made and kept for prescribed periods such records as the Commission, by rule, has prescribed as necessary or appropriate in the public interest or for the protection of investors.

74.    CASO Management and Penn, while acting as investment advisers to Camelot LP, did not make and keep true, accurate and current certain records of its investment advisory business, including, but not limited to: (1) a journal or journals, including cash receipts and disbursements, records, and any other records of original entry forming the basis of entries in any ledger; (2) general and auxiliary ledgers (or other comparable records) reflecting asset, liability, reserve, capital, income, and expense accounts; (3) originals of all written communications received and copies of all written communications sent by such investment adviser relating to any recommendation made or proposed to be made and any advice given or proposed to be

19

given; and (4) arrangement and indexing of electronic books and records in a way that permits easy location, access, and retrieval of any particular record.

75. By reason of the foregoing, CASO Management and Penn violated Section 204 of the Advisers Act [15 U.S.C. § 80b-4] and Rule 204-2 thereunder [17 C.F.R. § 275.204-2].

## SIXTH CLAIM FOR RELIEF
### Violations of Section 207 of the Advisers Act
(Against CASO Management and Penn)

76. Paragraphs 1 through 75 are realleged and reincorporated by reference as if fully set forth herein.

77. By engaging in the acts and conduct described in this Complaint, CASO Management and Penn willfully made untrue statements of material facts in registration applications filed with the Commission, and willfully omitted to report material facts, which are required to be stated therein.

78. By reason of the foregoing, CASO Management and Penn violated Section 207 of the Advisers Act [15 U.S.C. § 80b-7].

## SEVENTH CLAIM FOR RELIEF
### Unjust Enrichment
(Against Relief Defendant Big House)

79. Paragraphs 1 through 78 are realleged and reincorporated by reference as if fully set forth herein.

80. Relief Defendant Big House obtained proceeds of the fraudulent scheme alleged above under circumstances in which it is not just, equitable, or conscionable for the Relief Defendant to retain these ill-gotten gains. Relief Defendant has no legitimate claim to these funds. Relief Defendant has therefore been unjustly enriched.

81.   By reason of the foregoing, Relief Defendant should disgorge its ill-gotten gains, plus prejudgment interest thereon.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests a Final Judgment:

### I.

Permanently enjoining CASO Management and Penn, their agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 204, 206(1), 206(2), and 207 of the Advisers Act [15 U.S.C. §§ 80b-4, 80b-6(1), (2), and 80b-7], and Rule 204-2 thereunder [17 C.F.R. §275.204-2].

### II.

Permanently enjoining Ewers, Ssecurion, and CGI, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating and aiding and abetting violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 206(1) and 206(2) of the Advisers Act.

### III.

Ordering CASO Management and Penn, on a joint and several basis, and Ssecurion, Ewers, and CGI to disgorge any ill-gotten gains received from their violative conduct alleged in this complaint, and to pay prejudgment interest thereon.

IV.

Ordering CASO Management and Penn to pay civil money penalties pursuant to Section

21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and Section 209(e) x of the Advisers Act

[15 U.S.C. § 80b-9]; and ordering Ewers, Ssecurion, and CGI to pay civil money penalties

pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and Section 209(e) of

the Advisers Act [15 U.S.C. § 80-9(e)].

V.

Granting such other and further relief as the Court may deem just and proper.

Dated:   New York, New York
         January 30, 2014

Respectfully submitted,

Andrew M. Calamari
Regional Director
Howard A. Fischer
Senior Trial Counsel
Attorneys for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Brookfield Place, 200 Vesey St, Ste. 400
New York, New York 10281-1022
Telephone: (212) 336-0589 (Howard Fischer)
Email: FischerH@SEC.gov

*Of Counsel:*
Amelia Cottrell
Michael J. Osnato
Karen E. Willenken
Katherine S. Bromberg