**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

LAWRENCE E. PENN, III,
et al.,

*Defendants*,

- AND -

A BIG HOUSE FILM AND
PHOTOGRAPHY STUDIO, LLC

*Relief Defendant*,

14-CV-0581 (VEC)

ECF Case

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS OR,**
**IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT,**
**AND TO DISMISS DEFENDANT PENN'S COUNTERCLAIMS**

Howard A. Fischer
Karen E. Willenken
Katherine A. Bromberg
Securities and Exchange Commission
New York Regional Office
Brookfield Place, 200 Vesey St., Rm. 400
New York, New York 10281-1022
(212) 336-1100
*Attorneys for Securities*
  *and Exchange Commission*

July 1, 2016

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................................... iii

PRELIMINARY STATEMENT .......................................................................................1

STATEMENT OF FACTS .................................................................................................3

   I.   Penn, Acting Through CASO Management and CGI, Diverted $9.3
        Million from a Fund He Advised and Failed to Account Accurately for the
        Payments ...............................................................................................................3

        A.   Penn and CASO Management Caused the Fund to Pay $9.3
             Million to Ssecurion for Purported Due Diligence Services, but
             Most of the Money Paid Was Kicked Back to CASO Management
             and CGI ......................................................................................................3

        B.   Penn Admits Mischaracterizing the Use of the Fund's Money in
             Communications with Its Auditors and Administrators ..........................4

   II.  Penn Lied to the Fund's Auditors and Evaded the SEC's Examiners ................5

   III. Penn and CASO Management Failed to Produce Relevant Documents in
        an SEC Examination ............................................................................................6

   IV.  Penn Pled Guilty to Two New York State Felonies: Grand Larceny and
        Falsification of Business Records in the First Degree .........................................6

ARGUMENT ....................................................................................................................7

   I.   The Court Should Grant the SEC's Motion for Judgment on the Pleadings
        Pursuant to Fed. R. Civ. P. 12(c) ........................................................................7

        A.   The SEC's Motion for Judgment on the Pleadings Under Fed. R.
             Civ. P. 12(c) Is Reviewed Under the Same Standard as a Motion to
             Dismiss .......................................................................................................7

        B.   The Court May Take Judicial Notice of Facts Relevant to This
             Motion .........................................................................................................8

        C.   The Court Should Deem Admitted Those Allegations Not Properly
             Denied .........................................................................................................9

        D.   The LPA Did Not Authorize Penn's Conduct ........................................12

        E.   Penn's Admissions Establish That He Violated Sections 206(1)
             and 206(2) of the Investment Advisers Act ...........................................15

F.      Penn's Admissions Establish That He Violated Section 10(b) of
        the Exchange Act and Rule 10b-5 Thereunder ......................................................20

G.      Penn's Admissions Establish That He Violated Section 204 of the
        Advisers Act and Rule 204-2 .................................................................................22

H.      Penn's Admissions Prove That He Had the Requisite Mental State
        to Violate the Advisers Act, the Exchange Act and Rule 10b-5...........................23

II.  The Court Should Grant Summary Judgment In Favor of the SEC on the
     Fraud Claims Pursuant to the Doctrine of Collateral Estoppel........................................26

     A.      Standard for Summary Judgment Under Fed. R. Civ. P. 56(a) ............................26

     B.      Penn's Guilty Plea to Grand Larceny in New York State Court
             Collaterally Estops Him from Contesting the Facts That Establish
             His Violations of Advisers Act 206(1) and (2), Exchange Act
             Section 10(b) and Rule 10b-5 ...............................................................................26

III. Penn's Counterclaims Should Be Dismissed Because Section 21(g) of the
     Exchange Act Precludes This Court from Consolidating His
     Counterclaims With the SEC's Civil Action Seeking Injunctive Relief .........................28

CONCLUSION...............................................................................................................................30

## **TABLE OF AUTHORITIES**

**Cases**

*Aaron v. SEC*, 446 U.S. 680 (1980).................................................................................. 23

*Ames v. U.S.*, 600 F.2d 183 (8th Cir. 1979) .................................................................... 29

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................... 26

*Arnold v. Hoelscher*, 2011 WL 1226901 (E.D. Missouri, March 30, 2011) ................... 29

*Arthur Lipper Corp. v. SEC*, 547 F.2d 171 (2d Cir. 1977) ................................. 19, 20, 24

*Basic, Inc. v. Levinson*, 485 U.S. 224 (1988)................................................................... 18

*Bernato v. Arthur J. Gallagher & Co.*, 2015 WL 4643165 (S.D.N.Y. August 5,
2015) ........................................................................................................................ 8

*Dawkins v. Williams*, 511 F.Supp.2d 248 (N.D.N.Y. 2007)............................................ 11

*Desiano v. Warner–Lambert & Co.*, 467 F.3d 85 (2d Cir. 2006).................................... 7

*DiFolco v. MSNBC Cable LLC*, 622 F.3d 104 (2d Cir. 2010)........................................ 8

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976)......................................................... 23

*Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38 (2d Cir. 1986) ............................................ 26

*Gibson v. SEC*, 561 F.3d 548 (6th Cir. 2009) ................................................................. 15

*Harvey Aluminum (Incorporated) v. N.L.R.B.*, 335 F.2d 749 (9th Cir. 1964)............... 10

*In re Blutrich*, 686 N.Y.S.2d 435 (App. Div. 3d Dept. 1999) ....................................... 27

*Juster Assocs. v. City of Rutland, Vt.*, 901 F.2d 266 (2d Cir. 1990) ............................... 8

*L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419 (2d Cir. 2011).............................. 8, 9

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).................... 26

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) .............................................................. 23

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595
F.3d 86 (2d Cir. 2010)......................................................................................... 19, 20

*People v. Brown*, 967 N.Y.S.2d 206 (App. Div. 3d Dept. 2013)................................... 27

*People v. Zinke*, 76 N.Y.2d 8 (1990) ......................................................................... 28, 29

*Roberts v. Babkiewicz*, 582 F.3d 418 (2d Cir. 2009)). ................................................. 8

*Roucchio v. Coughlin*, 923 F. Supp. 360 (E.D.N.Y. 1996) ........................................ 9

*SEC v. Amerindo Inv. Advisors, Inc.*, 2013 WL 1385013 (S.D.N.Y. Mar. 11, 2013). ................................................................................................................... 27

*SEC v. Aragon Capital Mgmt., LLC*, 2008 WL 216320, at *5 (S.D.N.Y. Jan. 16, 2008) .................................................................................................................... 9

*SEC v. Better Life Club of America, Inc.*, 995 F. Supp. 167 (D.D.C.1998) .............. 29

*SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180 (1963) .......................... 24

*SEC v. Chiase*, 2011 WL 6176209, at *5 (D. N.J. Dec. 12, 2011) ........................... 16

*SEC v. Constantin*, 939 F. Supp. 2d 288 (S.D.N.Y. 2013) .............................. 18, 22

*SEC v. Credit Bancorp, Ltd.*, 738 F. Supp. 2d 376, 384 (S.D.N.Y. 2010) ............... 21

*SEC v. Dimensional Entertainment Corp.*, 493 F. Supp. 1270 (S.D.N.Y. 1980) ........ 27

*SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450 (2d Cir. 1996) .......................... 23

*SEC v. Follick*, 2002 WL 31833868 (S.D.N.Y. Dec. 18, 2002) ................................ 23

*SEC v. Freeman*, 290 F. Supp. 2d 401 (S.D.N.Y. 2003) .......................................... 26

*SEC v. Garber*,  2013 WL 1732571 (S.D.N.Y. Apr. 22, 2013) ................................. 21

*SEC v. Lee*, 720 F. Supp. 2d 305 (S.D.N.Y. 2010) ................................................... 21

*SEC v. Mannion*, 789 F. Supp.2d 1321 (N.D. Ga. June 2, 2011) ............................. 16

*SEC v. McCaskey*, 56 F. Supp. 2d 323 (S.D.N.Y. 1999) .......................................... 29

*SEC v. Monarch Funding Corp.*, 192 F.3d 295 (2d Cir. 1999). ................................ 21

*SEC v. Moran*, 922 F. Supp. 867 (S.D.N.Y. 1996) ................................................... 16

*SEC v. Morriss*, 2012 WL 6822346 (E.D. Mo. Sept. 21, 2012) ............................... 19

*SEC v. Musella*, 748 F. Supp. 1028 (S.D.N.Y. 1989) ............................................... 25

*SEC v. Namer*, 2004 WL 2199471 (S.D.N.Y. Sept. 30, 2004) ................................. 27

*SEC v. Olsen*, 243 F. Supp. 338 (S.D.N.Y. 1965) .................................................... 16

*SEC v. Research Automation Corp.*, 585 F.2d 31 (2d Cir. 1978) .............................. 18

*SEC v. Steadman, 967 F.2d 636* (D.C. Cir.1992) ........................................................ 23

*SEC v. Thrasher*, 1995 WL 456402 (S.D.N.Y. Aug. 2, 1995) ...................................... 29

*SEC v. Wyly*, 117 F. Supp.3d 381 (S.D.N.Y. 2015)..................................................... 23

*Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639 (2d Cir. 1988). ............................... 8

*Sibley v. Choice Hotels Int'l, Inc.*, 304 F.R.D. 125 (E.D.N.Y. 2015) ........................... 10

*Soto v. Lord*, 693 F.Supp. 8 (S.D.N.Y. 1988) ............................................................. 10

*South Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98 (2d Cir. 2009) ............... 23

*Steadman v. SEC*, 603 F.2d 1126 (5th Cir. 1979).................................................. 18, 21

*Szulik v. Tagliaferri*, 966 F. Supp. 2d 339 (S.D.N.Y. 2013)........................................ 18

*Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11 (1979) ......................... 16

*TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) ..................................... 18

*United States v. Litvak*, 808 F.3d 160 (2d Cir. 2015) .................................................. 24

*United States v. Podell*, 572 F.2d 31 (2d Cir. 1978)................................................... 26

*United States v. Tagliaferri*, 820 F.3d 568 (2d Cir. May 4, 2016) ............................... 24

**Administrative Decisions**

*In re John J. Kenny*, Advisers Act Rel. No. 2128, 2003 WL 21078085 (May 14, 2003) ...................................................................................................................... 15

**Statutes**

Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j(b)]........................... 2, 28

Section 204 of the Investment Advisers Act of 1940 [15 U.S.C. § 80b-4] ............................ 2, 22

Section 206(1) of the Investment Advisers Act of 1940 [15 U.S.C. § 80b-6(1)] ................... 2, 28

Section 206(2) of the Investment Advisers Act of 1940 [15 U.S.C. § 80b-6(2)] ................... 2, 28

Section 207 of the Investment Advisers Act of 1940 [15 U.S.C. § 80b-7] ................................ 2

Section 21(g) of the Securities Exchange Act of 1934 [15 U.S.C. § 78u(g)]........................... 3, 29

**Rules**

Fed. R. Civ. P. 12(b) (West 2015) ................................................................................. 1

Fed. R. Civ. P. 12(c) (West 2015)........................................................................................ 1, 7, 8

Fed. R. Civ. P. 56 (West 2015)............................................................................................... 1, 26

Fed. R. Civ. P. 8(b) (West 2015) ........................................................................................... 10, 11

Investment Advisers Act Rule 204-2 [17 C.F.R. § 275.204-2] ............................................... 2, 22

Securities Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5]................................................ 2, 28

Pursuant to Fed. R. Civ. Proc. 12(b) and (c) and 56, Plaintiff Securities and Exchange Commission ("SEC") respectfully submits this memorandum of law in support of its motion for judgment on the pleadings or, in the alternative, for partial summary judgment, against Defendant Lawrence E. Penn ("Penn"), and to dismiss Penn's counterclaims against the SEC and six of its current and former employees.

## PRELIMINARY STATEMENT

On January 31, 2014, the SEC filed its complaint in this action (the "Complaint") against, among other defendants and relief defendants, Defendants Lawrence E. Penn III, Camelot Acquisitions Secondary Opportunities Management LLC ("CASO Management"), Camelot Group International, LLC ("CGI") and collectively with Penn and CGI, "the Penn Defendants") and Altura St. Michael Ewers. (SMF ¶ 1).[1] Shortly thereafter, criminal charges were filed against Penn and Ewers in New York state court, alleging grand larceny, money laundering and falsifying business records. (SMF ¶ 3).

On March 16, 2015, Penn pled guilty to grand larceny and falsifying business records in New York criminal court in a parallel criminal action. (SMF ¶ 6). His co-conspirator, Altura S. Ewers, also pled guilty and settled the SEC's action against him. (SMF ¶¶ 5, 55).

While Penn now claims, citing a New York state opinion of questionable applicability, that it was legally impossible for him to commit "larceny" against the Fund, he does not dispute

---

[1]        Factual citations are made to the relevant numbered paragraphs of the accompanying Statement of Material Facts ("SMF"). Each numbered paragraph in the SMF sets forth material facts not in dispute in accordance with Local Civil Rule 56.1, and, in turn, each paragraph of the SMF cites to the exhibits attached to the accompanying Declaration of Karen E. Willenken, dated July 1, 2016 ("Willenken Decl."). Capitalized terms not otherwise defined herein have the meanings ascribed to them in the SMF.

"Compl." refers to the SEC's Complaint filed January 31, 2014 (Dkt. No. 1). "Ans." refers to paragraphs of Penn's Answer filed April 8, 2016 (Dkt. No. 134) that directly correspond to the paragraphs of the SEC's Complaint. "Aff. Def." refers to Penn's affirmative defenses, according to the number Penn assigned to each defense. "CC" refers to the numbered paragraphs in Docket #134 that appear under the heading "Counterclaims of Lawrence E. Penn III" et al. Where an allegation of the Complaint has been admitted or should be deemed admitted, citations are made to the correspondent paragraph of the SMF.

that he engaged in the conduct underlying his criminal charges and his guilty plea – the same conduct underlying this civil action. (SMF ¶ 4, 10-12).Yet Penn not only contests civil liability, but he also asserts unfounded claims against the SEC and its personnel for defamation, interference with contractual advantage and violation of his constitutional rights, claiming that they are responsible for his (purportedly illegitimate) guilty plea, incarceration and sentencing.

In his Answer, Penn admits facts sufficient to prove each of the elements of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder ("Rule 10b-5"), as well as Sections 206(1) and (2) of the Investment Advisers Act of 1940 ("Advisers Act"). Penn also not only effectively admits the facts underlying violations of Section 204 of the Advisers Act and Rule 204-2 promulgated thereunder, but also explicitly admits the violations themselves. His purported affirmative defenses fail as a matter of law because they essentially argue that either: (a) he did not commit fraud because he had no desire to "injure" or "harm" investors; or (b) his conduct was permitted by the Limited Partnership Agreement ("LPA") that governed his relationship with the Fund. As discussed more fully herein, both arguments fail.

Accordingly, the SEC is entitled to judgment on the pleadings with respect to its claims against Penn under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Sections 204, 206(1) and (2) of the Advisers Act and Rule 204-2 thereunder. Only the claim under Section 207 of the Advisers Act is genuinely disputed.

Alternatively, the SEC is entitled to partial summary judgment based on the collateral estoppel effect of Penn's criminal conviction. The undisputed facts relevant to the motion for partial summary judgment are set forth below and in more detail in the SEC's Rule 56.1 Statement.

The SEC asks that the Court enter judgment against Penn, with the appropriate remedies, including disgorgement, a civil penalty and permanent injunctions, to be determined based on additional briefing.

Finally, the SEC asks that Penn's counterclaims against the SEC and its current and former employees, which are barred by Section 21(g) of the Exchange Act, be dismissed.

## STATEMENT OF FACTS

### I.    Penn, Acting Through CASO Management and CGI, Diverted $9.3 Million from a Fund He Advised and Failed to Account Accurately for the Payments

Unless otherwise noted, Penn explicitly admits in his Answer the facts set forth in this Section I.

### A.    Penn and CASO Management Caused the Fund to Pay $9.3 Million to Ssecurion for Purported Due Diligence Services, but Most of the Money Paid Was Kicked Back to CASO Management and CGI

The Complaint alleges that "Penn and CASO Management…engaged in a fraudulent scheme…[and] misappropriated the [$9.3 million] by directing the fund to pay purported 'due diligence' expenses from March 2010 through October 2013 to Ssecurion, an entity run by their confederate in the scheme, Ewers. (Compl. ¶ 2). Penn admits that "approximately all of the $9.3 million was sent from the Fund to CASO Management or CGI through Ssecurion…." (SMF ¶ 18).

Penn Controlled the Entities Involved

Penn admits he owned, controlled and acted through CASO Management (Defendant), CGI (Defendant) and Camelot Acquisitions Secondary Opportunities GP, LLC ("CASO GP"), not named as a defendant). (SMF ¶ 13). He owned approximately 99% of each of these entities. (SMF ¶ 14). Penn admits he "had primary responsibility for all business decisions as Managing Member and Managing Director of [CASO Management and all investment decisions as

Managing Member and Managing Director of" CASO GP. (SMF ¶ 15). "CASO Management [was a] registered investment adviser[] under Penn's control," and CGI was "an affiliate." (SMF ¶ 16).

Once Received By CGI, the Money Was Used to Pay
Overhead Expenses Such as Rent and Salaries

Paragraph 3 of the Complaint alleges that "Ssecurion acted as a front for Penn to siphon money from the fund and route it back to CASO Management or to CGI, an unregistered entity adviser under Penn's control." In paragraph 4, the Complaint alleges that the diverted funds were "commingled with management fees that were paid by the fund to CASO Management, and forwarded on to CGI. CGI used the commingled funds to pay overhead expenses, such as rent and salary, which were not permissible fund expenses under the fund's governing document…."

In his Answer, Penn admits that the $9.3 million of payments to Ssecurion were sent on to CASO Management and CGI, and that CGI paid "overhead expenses to include rent, salaries, finders, and other expenses." (SMF ¶ 19).

### B. Penn Admits Mischaracterizing the Use of the Fund's Money in Communications with Its Auditors and Administrators

Penn admits to having diverted money from the Fund and sending it through Ssecurion to CASO Management and CGI (SMF ¶ 18). He also "admits transferring money to CGI in a manner that did not characterize the use of the fund money appropriately" and that "the accounting should have accurately described the use of capital for auditors and administrators." (SMF ¶ 20-21).[2]

---

[2] The Complaint also alleges that Penn and Ewers "actively sought to mislead the fund's auditors and administrators" concerning the due diligence payments. (Compl. ¶ 5). For the reasons set forth in Section I.C of the Argument, below, this allegation should be deemed admitted, even though Penn does not explicitly admit it.

4

**II.     Penn Lied to the Fund's Auditors and Evaded the SEC's Examiners**

As discussed in Argument Section I.C below, the facts set forth in this Section II, which are taken from the SEC's Complaint, should be deemed admitted by Penn because he has not denied them as required by Rule 8 of the Federal Rules of Civil Procedure.

Penn met with the Fund's auditors (the "Auditors") on July 3. (SMF ¶ 27). In that meeting, the Auditors requested an explanation and/or documentation of the work underlying a number of specific Ssecurion invoices. (SMF ¶ 28).

On July 8, 2013, Penn abruptly canceled a meeting with the Auditors scheduled for the next day and fired them, with no explanation. (SMF ¶ 31). On July 16, 2013, after the Auditors explained they were considering declaring that the 2010 and 2011 financial statements could not be relied upon unless they obtained the information they needed, Penn agreed to meet again. (SMF ¶ 32). In that meeting, he showed them what he claimed were the electronic due diligence files for each investment. (SMF ¶ 33-34).

Ewers had a relationship with Penn that predated the Fund's retention of Ssecurion as its purported third-party due diligence provider. (SMF ¶ 23). The two men met at a university function in the 1990s. (SMF ¶ 24). When asked about his relationship with Ewers in his initial meeting with the Auditors, Penn implied that they had an arms-length relationship and that he had chosen Ewers' firm based on recommendations from others and its reputation in the industry. (SMF ¶ 29-30). It was only after the Auditors confronted him with evidence of his relationship with Ewers that Penn admitted that the two had met at a UMUC event in the 1990s. (SMF ¶ 35-36).

The SEC's examination staff attempted to schedule several meetings with Penn during its examination of CASO Management. (SMF ¶ 37). On the occasion of the third attempted interview, Penn's counsel appeared at the SEC's office and was surprised to find that Penn was

not present, because Penn had confirmed the previous evening that he would attend. (SMF ¶ 38).

Penn's counsel was unable to reach him that morning. (SMF ¶ 39).

### III.   Penn and CASO Management Failed to Produce Relevant Documents in an SEC Examination

Penn "admits to violations of Section 204 of the Investment Advisers Act . . . [and] admits to violations of Rule 204-2 of 17 CFR 275.204-2."  (SMF ¶ 22). As set forth in the Commission's Complaint, and not denied by Penn, Penn and his affiliated entities failed to provide the SEC's examination staff with standard records that were required to be maintained for the Fund, such as its balance sheet, trial balance, cash receipts and disbursements journal, income statement, and cash flow statements. In addition, they failed to produce the emails and other correspondence that they were required to maintain under the SEC's rules. (SMF ¶ 40-41).[3]

### IV.   Penn Pled Guilty to Two New York State Felonies: Grand Larceny and Falsification of Business Records in the First Degree

On approximately February 9, 2014, by way of an Indictment and related Statement of Facts, Penn and Ewers were charged in New York criminal court in a parallel criminal action (the "Criminal Case") with grand larceny in the first degree, money laundering in the first degree and twenty-nine counts of falsifying business records in the first degree.

The Complaint filed in this civil case, and the Indictment and Statement of Facts filed in the Criminal Case, contained substantially similar factual allegations. The Statement of Facts filed with Penn's indictment alleged that Penn raised $120 million for a private equity fund he advised; that he misappropriated over $9 million from the fund from October 2010 through July 2013; that he falsely characterized the payments as due diligence expenses but actually laundered

---

[3]       For the reasons set forth in Section I.C of the Argument, below, these allegations should be deemed admitted, even though Penn does not explicitly admit them.

the money through Ewers' entity Ssecurion LLC ("Ssecurion"); and that he then used the money

for his own purposes. (SMF ¶ 4).

On December 18, 2014 and March 16, 2015, respectively, Ewers and Penn each pled

guilty to the top charge of grand larceny in the first degree, as well as one count of falsification

of business records in the first degree. (SMF ¶ 5-6).

In order to plead guilty, Penn was required to swear or affirm that the statements he was

about to give the Court were the truth, the whole truth, and nothing but the truth. (SMF ¶ 8). He

then confirmed, in response to questions from the court, that he had been satisfied with his

counsel's representation and that he had adequate time to discuss the plea and sentence with him.

He also confirmed that no one was forcing him to give up his rights. (*Id.*) He then confirmed, in

response to further questions from the court, that he had, along with Ewers, from October 20,

2010 to July 12, 2013, stolen property from the Fund. (*Id.*)

Penn's subsequent motion in New York state court to vacate his criminal conviction, as

he described it to this Court, was a claim of legal impossibility, not factual innocence: a "general

partner in limited partnership cannot be found guilty of larceny for misappropriating partnership

funds." (SMF ¶ 10-12).

## ARGUMENT

**I.    The Court Should Grant the SEC's Motion for Judgment on the Pleadings Pursuant to Fed. R. Civ. P. 12(c)**

**A.    The SEC's Motion for Judgment on the Pleadings Under Fed. R. Civ. P. 12(c) Is Reviewed Under the Same Standard as a Motion to Dismiss**

Courts review a Fed. R. Civ. P. 12(c) motion for judgment on the pleadings under the

same standard used for analyzing a Fed. R. Civ. P. 12(b)(6) motion to dismiss. *Desiano v.*

*Warner–Lambert & Co.*, 467 F.3d 85, 89 (2d Cir. 2006).  "Judgment on the pleadings is

appropriate where material facts are undisputed and where a judgment on the merits is possible

merely by considering the contents of the pleadings." *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988). Under Rule 12(c), the movant bears the burden of establishing "that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law." *Juster Assocs. v. City of Rutland, Vt.*, 901 F.2d 266, 269 (2d Cir. 1990).

### B.      The Court May Take Judicial Notice of Facts Relevant to This Motion

On motion under Rule 12(c), the Court may consider "the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (citing *Roberts v. Babkiewicz*, 582 F.3d 418, 419 (2d Cir. 2009)).  Here, in addition to the pleadings, the Court may consider: (1) the Limited Partnership Agreement ("LPA"), which Penn has referenced in his Answer; (2) the guilty pleas by Penn and his codefendant, Ewers, in the parallel criminal action, and related filings; and (3) facts in the public record concerning the reactions of the Fund's limited partners to the disclosure of Penn's scheme.

The Court may take judicial notice of the contents of the Limited Partnership Agreement, attached hereto, because it is integral to Penn's pleading, which asserts repeatedly that his conduct was somehow permitted by the LPA. (*See, e.g.*, 1st Aff. Def.; 3d Aff. Def.). *See, e.g., DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) (considering document where pleadings rely "heavily upon its terms and effect, thereby rendering the document integral"); *Bernato v. Arthur J. Gallagher & Co.*, 2015 WL 4643165, at *5 n. 5 (S.D.N.Y. August 5, 2015) (considering contents of a purchase agreement that was referenced in the defendant's Answer and Counterclaims, noting that the plaintiff "was on notice and had knowledge of it"). To the extent that the contents of the LPA contradict the allegations in Penn's Answer concerning his

conduct's purported compliance with or authorization by the LPA, Penn's allegations should not be accepted as true for the purpose of this motion. *See, e.g.*, *L-7 Designs, Inc.*, 647 F.3d at 422.

The SEC also asks the Court to take judicial notice of the guilty pleas by Penn and his codefendant, Ewers, in the parallel criminal action, together with the Indictment and Statement of Facts that establish the claims against them in that action, and Penn's subsequent motion to vacate his conviction. (SMF ¶¶ 3, 5-6, 10-12). It is well established that a court may take judicial notice of filings, including guilty pleas, in other court cases. *See, e.g., SEC v. Aragon Capital Mgmt., LLC*, 2008 WL 216320, at *5 (S.D.N.Y. Jan. 16, 2008).

Finally, the SEC asks the Court to take judicial notice of facts in the public record concerning the reactions of the Fund's limited partners to the disclosure of Penn's scheme. *See Roucchio v. Coughlin*, 923 F. Supp. 360, 366 (E.D.N.Y. 1996). First, in February 2014, the Fund removed its general partner for cause pursuant to Section 7.6(b) of the LPA, which required at least eighty-five percent of the interests of the Limited Partners to find that the general partner was unfit to continue service in a management capacity. Documentation of that decision, and of Penn's non-opposition to the removal, was submitted to the Court contemporaneously by the SEC and was not disputed by Penn at that time. (SMF ¶ 53). The Fund also changed its name at that time. (*Id.*) Second, on June 20, 2016, the Fund (under its new name) sued Penn, Ewers and the relevant entities in New York Supreme Court, alleging breach of fiduciary duty, fraud, conversion and other cause of action. (SMF ¶ 56).

## C.    The Court Should Deem Admitted Those Allegations Not Properly Denied

Although Penn explicitly admits sufficient facts to establish his liability, he attempts to minimize the seriousness of his conduct by offering argumentative partial admissions and denials, or by claiming ignorance of facts clearly within his personal knowledge, in response to

9

numerous paragraphs of the Complaint. The allegations of such paragraphs should be deemed admitted.

Rule 8(b) of the Federal Rules of Civil Procedure require that a party "admit or deny the allegations asserted against it." Fed. R. Civ. P. 8(b)(1)(B). A party that intends in good faith to deny only part of an allegation must admit the part that is true and deny the rest. Fed. R. Civ. P. 8(b)(4). An allegation – other than one relating to the amount of damages – is admitted if a responsive pleading is required and the allegation is not denied." Fed. R. Civ. P. 8(b)(6).

<u>Penn's Sham Protestations of Ignorance Should Be Treated as Admissions</u>

Although a party may state that he lacks knowledge or information sufficient to form a belief about the truth of an allegation, and his statement to that effect has the effect of a denial, the statement must be honest. "An averment will be deemed admitted when the matter is obviously one as to which the defendant has knowledge or information." *Soto v. Lord*, 693 F.Supp. 8, 23 n.28 (S.D.N.Y. 1988) (internal quotation marks and citation omitted); *see also Harvey Aluminum (Incorporated) v. N.L.R.B.*, 335 F.2d 749, 758 (9th Cir. 1964); *Sibley v. Choice Hotels Int'l, Inc.*, 304 F.R.D. 125, 134 (E.D.N.Y. 2015) (striking certain responses and deeming the corresponding facts admitted).

Here, Penn claims ignorance of the following facts clearly within his personal knowledge:

- Whether he and Ewers "actively sought to mislead the fund's auditors and administrators concerning the due diligence payments" and whether he and Ewers "forged purported work product corresponding to the invoices." (Compl. ¶ 5).

- Whether he had a relationship with Ewers that predated the Fund's retention of Ssecurion, whether he met Ewers at a school event, and whether he was a signatory on the Ssecurion bank account. (Compl. ¶ 32). Whether he later admitted that he did know Ewers. (Compl. ¶ 48).

10

- When he personally met with the Auditors, what they said to him and what he said to them, whether he abruptly fired them on July 8, 2013, and whether he later agreed to meet with them after they threatened to disclaim the reliability of the Fund's 2010 and 2011 financial statements. (Compl. ¶¶ 36, 41, 42, 45, 46, 47).

- Whether he repeatedly failed to appear for scheduled meetings with the SEC's examination staff. (Compl. ¶ 53).

In each case, Penn's response to the allegation is that he "denies knowledge or information sufficient to form a belief as to the truth of" either "the allegations," or "**some of** the allegations." To the extent that he was attempting to deny knowledge or information sufficient to form a belief as to only part of a paragraph, his "broad response to that entire paragraph … violates Rule 8(b), which provides that '[d]enials shall fairly meet the substance of the averments. When a pleader intends in good faith to deny only a part or a qualification of the averment, the pleader shall specify so much of it as is true and material and shall deny only the remainder." *Dawkins v. Williams*, 511 F.Supp.2d 248, 271 (N.D.N.Y. 2007) (deeming fact admitted where the court had "trouble imagining how Defendant could not have possessed enough knowledge or information upon which he reasonably could have formed a personal belief" as to its truth). To the extent that he was attempting to deny knowledge or information as to the entire paragraph, his claim of ignorance was not made in good faith and strongly suggests that he is attempting to avoid admitting an allegation he knows to be true.

The Court therefore should deem admitted the allegations of paragraphs 32, 36, 41, 42, 45, 46, 47, 48 and 53 of the Complaint because in each case, the paragraph alleges facts concerning events in which Penn would have participated, assuming they occurred. It is therefore impossible for Penn to, in good faith, lack knowledge or information sufficient to form an opinion as to whether those events occurred.

<u>Penn's Nonresponsive Answer Should Be Treated as an Admission</u>

In response to Paragraph 5, which alleges that he and Ewers "actively sought to mislead the fund's auditors and administrators concerning the due diligence payment" and that they forged purported work product in response to a request for backup documentation, Penn "admits that the accounting should have accurately described the use of capital for auditors and administrators." (Ans. ¶ 5). He then disclaims information sufficient to form a belief as to the truth of "some of" the allegations of that paragraph, despite the fact that it involves his personal conduct. Because his admission that "the accounting should have accurately described" does not fairly respond to the allegation that he actively sought to mislead the auditors, and because his claim of ignorance as to unspecified portions of the paragraph is a sham, the allegations of the paragraph should be deemed admitted in full.

Penn offers a similarly non-responsive answer to Paragraph 52, which alleges that CASO Management failed to produce required books and records in the SEC's examination, stating that he "admits knowledge or information sufficient to form a belief as to the truth of some of the allegations." This nonresponsive answer should be deemed an admission of Paragraph 52.

### D.    The LPA Did Not Authorize Penn's Conduct

In defense of his admitted diversion of assets from the fund, Penn claims that the money was used "in accordance with the contractual intent" of the LPA. Specifically, Penn "admits diverting money from the Fund in order to make investments, pay expenses, and advance management fees in accordance with the contractual intent and latitude as established by the Partnership agreement of the fund." (1st Aff. Def.).

<u>The LPA Did Not Authorize "Advances" on Management Fees</u>

Penn "admits that approximately all of the $9.3 million was sent from the Fund to CASO Management or CGI through Ssecurion in order to advance management fees in accordance with

Section 6.2 of the Limited Partnership Agreement which states the General Partner has the right to 'modify any obligations of the Partnership' based on the understanding that management fees are an obligation of the Partnership."[4] (3d Aff. Def.). This argument fails because the LPA spelled out precisely the amount and timing of management fees, it did not authorize "advances" on such fees, and it did not authorize anyone to modify these provisions unilaterally.

Section 6.8(c)(ii) defined the amount of management fees to be paid: for the first year, it was to be "two percent (2%) of the aggregate Capital Commitments of the Limited Partners"; in future years, it would be adjusted slightly to take into account fluctuations in the amount of capital under management, but would remain approximately 2% of the assets under management for the year. (SMF ¶ 48).

In addition, Section 6.8(c)(i) of the LPA prescribed the timing of such management fee payments:

> The Management Fee shall be: (x) payable quarterly, on the first day of each fiscal quarter of the Partnership, in advance; (y) pro-rated on a daily basis for short fiscal periods; and (z) additionally pro-rated on a daily basis (payable immediately) at any time that there is an increase in the aggregate Capital Commitments of the Partners.

(SMF ¶ 49). Nothing in the LPA suggests that the Investment Manager, or any of CASO GP's other affiliates, was entitled to receive advances on these carefully defined management fees. (SMF ¶ 50).

Penn takes the authorization to "extend or modify" the obligations of the Partnership out of context when he claims that it authorized CASO GP to increase the amount of management

---

[4]      References in this subsection to "Section" are to sections of the LPA, which is attached to the Willenken Declaration as Exhibit L.

Under the LPA, although the GP had ultimate authority to make investment decisions for the Fund, it was authorized to "delegate" most of its "management or administrative responsibilities" (SMF ¶ 39) to an Investment Manager (defined as "any entity that is controlled by one or more members of, or Affiliated with, the General Partner and is designated by the General Partner as the Investment Manager for purposes of this Agreement," see page 6). The Investment Manager, rather than the GP, was to receive management fees from the Fund. (SMF ¶ 40).

fees unilaterally. Section 6.2 defined the general partner's management role, "subject to the provisions of this Agreement," and subsection (c) of that section stated that the general partner had the power and authority to: "Borrow money or property on behalf of the Partnership, encumber Partnership property for the purpose of obtaining financing for the Partnership's business, and extend or modify any obligations of the Partnership." (SMF ¶ 45). Read in full, and in conjunction with Section 10.5(c), which stated that "there shall be no amendment to this Agreement that would materially reduce the rights, or increase the obligations, of a Limited Partner" without that partner's consent (SMF ¶ 52), Section 6.2 clearly did not authorize unilateral revisions to the amount or timing of the management fee.

Because the LPA stated that it represented the entire agreement of the parties (SMF ¶ 51) and could be modified only in writing (SMF ¶ 52), there are no facts Penn could prove at trial that would establish that the LPA permitted advances on fees.

<u>The LPA Prohibited the Use of Fund Assets to Line Management's Pockets</u>

Penn claims that investors "had an expectation that the balance of the committed and invested capital of the Fund (approximately $18 to $20 million) would go to management fees however characterized." (6th Aff. Def.). However, a review of the entire LPA makes clear that investors did not authorize, and in fact specifically tried to prevent, the payment of fees, beyond the carefully defined management fees, to the Fund's managers and related entities.

Although CASO GP had broad powers to manage the Fund under the LPA, Sections 6.4 and 6.7 of the LPA restricted that authority. Of note, CASO GP was explicitly forbidden to enter into transactions:

1.  With "any GP Related Person," which was defined as the GP, the "Investment Manager" (CASO Management) and any of their affiliates (LPA § 6.4(a)(i)); or

2.  That would cause the Fund to pay "the normal operating expenses of the General Partner and its equityholders (including salaries and benefits provided to

14

employees of the General Partner or its Affiliates, rent, facilities and supplies expenses, and similar expenses)." (LPA § 6.7(a)).

(SMF ¶ 46).

In addition, Section 6.7(b) of the LPA excluded from the definition of expenses payable by the Fund, "consulting fees relating to services rendered to the Partnership *that could reasonably have been rendered by the General Partner or its members*" or "*normal operating expenses of the General Partner*." (Emphasis added) (SMF ¶ 47). Penn's conduct violated these provisions in several respects: (1) Normal operating expenses paid by CASO Management and CGI from monies diverted from the Fund to Ssecurion and to them are outside defined expenses; (2) Because the diverted monies were not actually exchanged for a service, any due diligence services actually performed were performed by Penn, CASO GP and/or CASO Management, and can be considered "consulting fees" for services that could have been rendered by CASO Management; and (3) Because Ssecurion was just a pass-through entity, the payments were transactions with a "GP Related Person."

### E.    Penn's Admissions Establish That He Violated Sections 206(1) and 206(2) of the Investment Advisers Act

Section 206 of the Advisers Act prohibits fraud by investment advisers.[5] Section 206(1) of the Advisers Act makes it unlawful for an investment adviser, directly or indirectly, to employ any device, scheme, or artifice to defraud any client or prospective client. Section 206(2) makes it unlawful for any investment adviser, directly or indirectly, to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon a client or prospective client. Misappropriation of an advisory client's funds constitutes a violation of these provisions. *See, e.g., Gibson v. SEC*, 561 F.3d 548, 555 (6th Cir. 2009) (upholding lifetime bar without

---

[5]     Penn was an "investment adviser" because he was in the business, for compensation, of making investment decisions for the Fund. *See, e.g., In re John J. Kenny*, Advisers Act Rel. No. 2128, 2003 WL 21078085, at n.54 (May 14, 2003).

hearing against adviser who admitted misappropriating $450,000); *SEC v. Chiase*, 2011 WL 6176209, at *5 (D. N.J. Dec. 12, 2011) (granting summary judgment against individuals who misappropriated $2.5 million).

An investment adviser has a fiduciary duty to act in good faith in all dealings with its clients. *See Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 17 (1979). Additionally, as fiduciaries, investment advisers should execute client transactions favorably for the client and avoid improper self-dealing. *See, e.g., SEC v. Moran*, 922 F. Supp. 867, 898 (S.D.N.Y. 1996) (defendants' negligence by placing "their own interests ahead of their clients" breached the fiduciary duty owed to such clients under Advisers Act Section 206(2)); *SEC v. Mannion*, 789 F. Supp.2d 1321, 1341 (N.D. Ga. June 2, 2011) ("[T]he Advisers Act obligates Defendants to act for the benefit of the Fund rather than diverting Fund assets for personal use.").

Penn admits that he owned and controlled CASO Management, CGI and CASO GP (SMF ¶ 13-14), and that he had primary responsibility for all business and investment decisions for the Fund. (SMF ¶ 13). He also admits that "CASO Management [was a] registered investment adviser[] under Penn's control," and that CGI was "an affiliate." (SMF ¶ 16).

Penn admits that "approximately all of the $9.3 million was sent from the Fund to CASO Management or CGI through Ssecurion…." (3d Aff. Def.). Although he suggests that Ewers and/or his affiliated entities did provide "value" by "making introductions and recommendations on behalf of the General Partner," claiming that these actions "likely contributed significant value to the largest asset in the Fund" (Ans. ¶ 80, 10th Aff. Def.), he admits that the bulk of the $9.3 million – all but a few hundred thousand dollars – was kicked back to CASO Management and CGI. (SMF ¶ 17-18). And he does not allege that actual due diligence services were rendered

16

in exchange for these payments; rather, he claims that these payments were "advances on management fees." (1ˢᵗ Aff. Def.).

<u>Penn's Admissions Establish That He Made Misrepresentations to the Fund He Advised</u>

The Complaint alleges that Penn and CASO Management directed the Fund to pay purported "due diligence" expenses from March 2010 through October 2013 to Ssecurion. (Compl. ¶ 2). In his Answer, Penn does not deny this allegation, but he admits a watered-down version: "transferring money to CGI in a manner that did not characterize the use of the fund money appropriately from late 2010 to October 2013." (Ans. ¶ 2). The Complaint also alleges that Penn and Ewers "actively sought to mislead the fund's auditors and administrators concerning the due diligence payments." (Compl. ¶ 5). Again, Penn re-characterizes rather than denies the allegation; he "admits that the accounting should have accurately described the use of capital for auditors and administrators." (Ans. ¶ 5).

Even assuming that only what Penn explicitly admitted – and not the stronger allegations that he has failed to deny – is the truth, Penn misled the Fund about the nature of the $9.3 million payments. Nowhere in his Answer does Penn dispute: 1) that the Fund's money was paid initially to Ssecurion; 2) that most of this money ended up at CGI, a Penn affiliate; 3) that the money was not actually used to purchase due diligence services; and 4) that the accounting provided to the Fund's auditors did not accurately characterize the use of the money. He therefore misrepresented to the Fund the use of $9.3 million out of its $120 million assets.[6]

Penn also represented to the Fund that the Fund was paying only the management fees authorized by the LPA and/or investor side letters, which ranged from 1.5-2% of assets under management annually, when, in fact, it was paying a substantially higher percentage of its assets

---

[6]     It is of little moment that he did so indirectly, through agents such as the fund administrator and auditors, rather than directly. *See, e.g., SEC v. Seghers*, 298 Fed. Appx. 319, 330 (5th Cir. 2008); *U.S. v. Berger*, 188 F. Supp. 2d 307, 312 (S.D.N.Y. 2002).

to its advisers and their affiliates. *Szulik v. Tagliaferri*, 966 F. Supp. 2d 339, 363 (S.D.N.Y. 2013) (defendants' communications about management fees were misleading where defendants "collected over $1.4 million in management fees" without ever explaining they were also "skimming $1.6 million in illegal and undisclosed kickbacks").

Additionally, as discussed in Section I.D above, the payments constituted repeated violations of Sections 6.4(a) and/or 6.7(b) of the LPA. Penn failed to disclose those repeated violations, while still collecting management fees that the Fund likely would have refused to pay if it had known of his violations.

<u>The Misrepresentations Were Material</u>

Although materiality is a mixed question of fact and law, *see TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976), a court may find statements or conduct material as a matter of law where "reasonable minds cannot differ" about their materiality.  *See, e.g., SEC v. Research Automation Corp.*, 585 F.2d 31, 35 (2d Cir. 1978); *SEC v. Constantin*, 939 F. Supp. 2d 288, 306 (S.D.N.Y. 2013) (citations omitted). This is such a case because any reasonable investor would find it material that an investment adviser was lining its own pockets at the expense of the fund he advised, and because the actions of the Fund's investors, of which the Court may take judicial notice, confirm that it was material to them.

In the Investment Adviser context, materiality is defined by the same standard used for the antifraud provisions of the Exchange Act. *Steadman v. SEC*, 603 F.2d 1126, 1130 (5th Cir. 1979), *aff'd on other grounds*, 450 U.S. 91 (1981). Thus, misrepresentations or omissions are material under Section 206 if a reasonable client or prospective client would consider them important. *Basic, Inc. v. Levinson*, 485 U.S. 224 at 231-232 (1988) (discussing the Exchange Act).  Any reasonable investor would find it important that his investment adviser had misappropriated fund assets. *See, e.g.*, *SEC v. Morriss*, 2012 WL 6822346, at *11 (E.D. Mo.

Sept. 21, 2012) ("any investor, without regard for the degree of sophistication, would find it material that invested funds were not used for their stated purpose").

Misrepresentations and omissions concerning an adviser's self-dealing are material because "[a]ny rational mutual fund investor would be highly leery of dealing with a fiduciary such as [defendant adviser] and its affiliates who, in violation of the law, lined their pockets at the expense of investors whose interests they were obligated to protect." *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 93 (2d Cir. 2010). *See also Arthur Lipper Corp. v. SEC*, 547 F.2d 171, 178 (2d Cir. 1977) (finding it "almost too clear for argument" that it is a "fraud [under Section 10(b)] on the fund for a manager simply to pocket" rebates that he has diverted to himself).

Interpreting Penn's *pro se* Answer liberally, he has three arguments that his scheme was immaterial:

1. Investors understood that since a substantial portion of their funds would be used to pay expenses of one sort or another, and that only approximately 80-85% would be invested in portfolio companies, Penn's actions were in accordance with the contractual intent of the LPA;

2. The payments were authorized as advances on management fees, or as other types of payment authorized by the LPA; and

3. The investors' decision to stay in the Fund after Penn's fraud came to light establishes that they did not care what happened to their money.

None of these arguments has merit.

As to the first argument, even if investors understood that only 80-85% of their assets would be invested in portfolio companies, the fact that the money was going to Penn and his affiliates – who were violating their fiduciary duties and various provisions of the LPA (see Section I.D above) by lining their pockets rather than paying legitimate expenses that would

benefit the Fund – was material under the reasoning in *Operating Local* and *Arthur Lipper Corp.* discussed above.

The second argument – that the LPA authorized the payments to CGI as "advances" on management fees – is both factually inaccurate and irrelevant. For the reasons set forth in Section I.D above, the payments were not, in fact, authorized by the LPA as advances on management fees. Even if Penn were to prove that the LPA authorized "advances" on management fees, however, his proof would be irrelevant to materiality because he admits that he did not accurately report those "advances." At the time he took the money, there was no guarantee that any such advances ultimately would be earned, so a reasonable investor surely would want to monitor the amount of advances and compare them with available information about the Fund's performance. Penn did not give them this opportunity – instead, based on Penn's own admissions, he and his affiliates took approximately $9 million of "advances" while representing to the Fund that they were taking only scheduled management fees.

The third argument, that the investors' decision to continue the Fund after his arrest, is implausible on its face. That decision says nothing about the fraud's materiality. By contrast, the investors' decision to oust Penn and replace him with a new general partner and adviser strongly demonstrates that Penn's corruption was material to them. (SMF ¶ 53). The recent civil suit against Penn and others in New York Supreme Court by the renamed Fund further underscores the absurdity of Penn's argument. (SMF ¶ 56).

### F.   Penn's Admissions Establish That He Violated Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

Penn's admissions also establish that he violated Exchange Act Section 10(b) and Rule 10b-5 thereunder. Exchange Act Section 10(b) makes it "unlawful for any person ... [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive

device or contrivance in contravention of such rules and regulations as the Commission may

prescribe." Rules 10b-5(a) and (c) prohibit the use of any "device, scheme, or artifice to defraud"

or any other "act, practice or course of business which operates … as a fraud or deceit" in

connection with the purchase or sale of securities, with scienter. *SEC v. Monarch Funding Corp.*,

192 F.3d 295, 308 (2d Cir. 1999).  In short, these antifraud provisions impose primary liability

on any individual who "substantially participates in a manipulative or deceptive scheme by

directly or indirectly employing a manipulative or deceptive device . . . intended to mislead

investors." *SEC v. Lee*, 720 F. Supp. 2d 305, 334 (S.D.N.Y. 2010) (emphasis omitted). In the

Second Circuit, scheme liability can attach to a defendant based on his performance of

"inherently deceptive" conduct distinct from a misleading statement. *See SEC v. Garber*,  2013

WL 1732571, *4 (S.D.N.Y. Apr. 22, 2013).

Penn's conduct – knowingly manufacturing sham purchases of purported due diligence

"services" in order to divert fund investors' capital contributions to CGI and CASO Management

– falls squarely within the heartland of scheme liability because the transactions themselves were

deceptive.[7]  They were not legitimate transactions that were subsequently inaccurately reported

to investors, but instead were transactions that had no legitimate business purpose, and were

designed to steal money from the Fund. Accordingly, each of the relevant transactions can be

considered a deceptive act. *See e.g., SEC v. Credit Bancorp, Ltd.*, 738 F. Supp. 2d 376, 384

(S.D.N.Y. 2010) (fraudulent scheme in which high-ranking employees of a brokerage firm

concealed their placement of investor funds in different accounts than they represented to

---

[7]     For the same reasons set forth in Section I.E, discussing materiality in the context of the Advisers Act, the deceptive scheme was material. *See Steadman*, 603 F.2d at 1130 (materiality standard is the same under the Advisers Act and the Exchange Act). As to the "in connection with" requirement that Penn's Answer claims is lacking, the fraud qualifies because it "coincided with" and "touched upon" securities transactions; the purported need to conduct due diligence for each securities purchase provided the pretext under which Ssecurion billed the Fund for its purported services. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 85 (2006) ("Under our precedents, it is enough that the fraud alleged 'coincide' with a securities transaction—whether by the plaintiff or by someone else.")

investors they would place the funds); *SEC v. Constantin*, 939 F. Supp. 2d 288 (S.D.N.Y. 2013) (scheme liability attached to defendant broker-dealers for fraudulent conduct including using investors' funds differently than advised, exaggerating international presence, and exaggerating educational and professional achievements).

### G.   Penn's Admissions Establish That He Violated Section 204 of the Advisers Act and Rule 204-2

Section 204(a) of the Advisers Act and Rule 204-2 promulgated thereunder require that investment advisers registered with the Commission maintain and preserve certain books and records. Rule 204-2(a) requires registered investment advisers to "make and keep true, accurate and current" certain records of its investment advisory business. These include a "journal or journals, including cash receipts and disbursements, records, and any other records of original entry forming the basis of entries in any ledger" (Rule 204-2(a)(1)), "[g]eneral and auxiliary ledgers (or other comparable records) reflecting asset, liability, reserve, capital, income and expense accounts" (Rule 204(a)(2)), and "[o]riginals of all written communications received and copies of all written communications sent by such investment adviser relating to…any recommendation made or proposed to be made and any advice given or proposed to be given…." (Rule 204(a)(7)).

In addition, Rule 204-2(g)(2)(i) requires that "any books and records maintained electronically be arranged and indexed in a way that permits easy location, access, and retrieval of any particular record."

As set forth in Section III of the Statement of Facts, Penn effectively admits that CASO Management failed to produce relevant books and records. Through his control of CASO Management, Penn caused these violations. Penn's only defense – that of the SEC's purportedly unclean hands (5th Aff. Def.) – is unavailing "against a governmental agency which is attempting

to enforce a congressional mandate in the public interest." *SEC v. Follick*, 2002 WL 31833868, at *8 (S.D.N.Y. Dec. 18, 2002).

### H.   Penn's Admissions Prove That He Had the Requisite Mental State to Violate the Advisers Act, the Exchange Act and Rule 10b-5

Penn argues in his Answer – in some cases by supplying his own custom definition of the violations – that he lacked the requisite scienter to violate Advisers Act Section 206(1) and (2), Exchange Act Section 10(b) and/or Rule 10b-5 thereunder. These arguments misstate the law – the Complaint alleges, and Penn admits, sufficient facts to prove Penn had the scienter legally required for his violations of the securities laws.

To Prove Scienter, the SEC Must Demonstrate Only an
"Intent to Deceive, Manipulate or Defraud" – Not "Intent to Injure"

Civil liability for securities fraud – whether under Section 10(b) and Rule 10b–5 or under Advisers Act Section 206(1) – requires proof of scienter, defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 & n. 12 (1976); *Aaron v. SEC*, 446 U.S. 680, 695-697 (1980); *SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996); *SEC v. Moran*, 922 F. Supp. 867, 896-97 (S.D.N.Y. 1996). In the Second Circuit, scienter also may be demonstrated by showing reckless disregard for the truth of statements made. *SEC v. Wyly*, 117 F. Supp.3d 381, 388 (S.D.N.Y. 2015) (*citing South Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009); *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)). Such conduct sometimes is referred to as an "extreme departure from standards of ordinary care, which presents a danger of misleading buyers or sellers." *See Moran*, 922 F. Supp. at 897 (*citing SEC v. Steadman*, 967 F.2d 636, 641-42 (D.C. Cir.1992)).

To establish scienter, it is not necessary to show that the defendant knew he was violating the law; it is sufficient to show that he knew what he was doing. *Arthur Lipper Corp. v. SEC*,

23

547 F.2d 171, 181 (2d Cir. 1976) ("there must be proof of intention 'to deceive, manipulate, or defraud' not an intention to do this in knowing violation of the law").

In his Answer, Penn repeatedly attempts to defend his conduct by pointing to a lack of "intent to injure." For example, he denies engaging in "misappropriating moneys as defined as 'intentional use of the property or funds in order to injure investors'" (2d Aff. Def.) and says that his "actions were not meant to cause harm or injury." (7th Aff. Def.). However, "intent to injure" or "intent to harm" is not required to prove a violation of the Advisers Act, *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 192 (1963); *United States v. Tagliaferri*, 820 F.3d 568, 573 (2d Cir. May 4, 2016), or to find a criminal violation of Exchange Act Section 10(b). *United States v. Litvak*, 808 F.3d 160, 165, 178 (2d Cir. 2015).[8]

<u>Penn Does Not Allege Ignorance of Any Material Aspect of the Scheme</u>

Penn admits that he caused the Fund to purchase purported "due diligence" services and that the funds ultimately were distributed to CASO Management and CGI. He admits that he owned and controlled these entities. Although he denies knowledge and information sufficient to form a belief as to the truth of "some of" the record-keeping related to the purported due diligence transactions (Ans. ¶¶ 29), he admits "transferring money to CGI in a manner that did not characterize the use of the fund money appropriately. . . ." (SMF ¶ 20). Nowhere in his lengthy Answer does Penn allege that he lacked knowledge about any of the details of the scheme.

---

[8]     Penn also repeatedly attempts to defend his conduct by claiming a lack of "actual injury" or economic harm to the Fund's investors (3d, 4th, 6th, 9th and 10th Aff. Defs.), claiming "intent to defraud" "suggests actual injury." (6th Aff. Def.). Penn offers no facts to support the bold assertion that no one was harmed by his misappropriation of over $9 million, other than the fact that the investors chose to remain in the Fund even after they learned of his misappropriation. Even if the Court were to credit this claim, however, it would not affect Penn's liability because the SEC is not required to show "actual injury."

Penn's Behavior With the Auditors and the SEC's Examination Staff Confirms His Scienter

Penn's behavior when questioned by the Auditors and when the SEC examination staff attempted to meet with him evidences consciousness of guilt, which "has independent probative value of scienter." *SEC v. Musella*, 748 F. Supp. 1028, 1040 (S.D.N.Y. 1989) (citations omitted). If Penn honestly had believed, as his Answer asserts, that the LPA authorized him to take "advances on management fees" as long as he sent them to his confederate first, he would have met willingly with the Auditors and with the SEC examination staff to explain his view. Instead, Penn repeatedly failed to appear for scheduled meetings and when he did finally speak to the Auditors, he lied to them about his relationship with Ewers. (SMF ¶¶ 26-36). Similarly, he failed to appear for scheduled meetings with the SEC's examination staff. (SMF ¶ 37-39). His actual behavior, which he avoids admitting only by feigning ignorance of events in which he was the key player, demonstrates that he knew he was defrauding the Fund and feared the consequences if and when the investors found out.

The Guilty Pleas of Penn and Ewers Establish Penn's Scienter

Both Penn and his co-conspirator, Ewers, have pled guilty in the parallel criminal action. (SMF ¶ 5-6). Although Penn now seeks to attack the conviction, he does not claim that he lacked knowledge of the money transfers or the mischaracterization of those transfers on the books of the Fund – he argues only that what he did does not constitute grand larceny under New York law. (SMF ¶ 10-12). This Court should take judicial notice of Penn's plea and find that he knowingly engaged in the conduct described in the Complaint and his admissions.

II.     **The Court Should Grant Summary Judgment In Favor of the SEC on the Fraud Claims Pursuant to the Doctrine of Collateral Estoppel**

A.      **Standard for Summary Judgment Under Fed. R. Civ. P. 56(a)**

Summary judgment is appropriate if the SEC demonstrates "that there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden then shifts to the defendants who "must do more than simply show that there is some metaphysical doubt as to the material facts," but instead "must come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (original emphasis). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* In deciding the SEC's motion, the court must draw all "justifiable inferences" in Defendants' favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

B.      **Penn's Guilty Plea to Grand Larceny in New York State Court Collaterally Estops Him from Contesting the Facts That Establish His Violations of Advisers Act 206(1) and (2), Exchange Act Section 10(b) and Rule 10b-5**

Collateral estoppel is appropriate when (1) the issues in both proceedings are identical; (2) the issue in the prior proceeding was actually litigated and actually decided; (3) there was a full and fair opportunity for litigation in the prior proceeding; and (4) the issue previously litigated was necessary to the judgment. *Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 44 (2d Cir. 1986). "It is well-settled that a criminal conviction, whether by a jury verdict or guilty plea, constitutes estoppel in favor of the United States in a subsequent civil proceeding as to those matters determined by the judgment in the criminal case." *United States v. Podell*, 572 F.2d 31, 35 (2d Cir. 1978). Where, as here, a motion for partial summary judgment is based on a defendant's prior criminal conviction, the facts underlying the conviction may be given preclusive effect. *SEC v. Freeman*, 290 F. Supp. 2d 401, 404-405 (S.D.N.Y. 2003).

26

For collateral estoppel to apply in a parallel civil action, the civil claim does not need to arise under the same statutory provisions under which the defendant was criminally convicted. *SEC v. Amerindo Inv. Advisors, Inc.*, 2013 WL 1385013, at *3 (S.D.N.Y. Mar. 11, 2013). Rather, it is enough if "the factual allegations underlying the ... convictions are sufficient to establish that [the defendant] also violated the provisions [of law] at issue." *Id*. If the facts underlying the prior criminal conviction are the same as the essential facts underlying the subsequent civil case, the doctrine of collateral estoppel will apply even if the factual allegations are not identical. *See, e.g., SEC v. Dimensional Entertainment Corp.*, 493 F. Supp. 1270, 1277 (S.D.N.Y. 1980); *SEC v. Namer*, 2004 WL 2199471, at *6 (S.D.N.Y. Sept. 30, 2004).

Penn was convicted based on facts that establish the requisite elements necessary to find him liable for the securities law violations alleged against him in the Complaint. As set forth in the Statement of Facts filed with the Indictment and the transcript of Penn's indictment hearing, Penn was charged with larceny based on the same scheme the SEC alleges: Causing the private equity Fund he controlled to pay approximately $9.3 million to a purported due diligence provider from 2010 through 2013, then pocketing most of the money. In order to accept his plea, the state criminal court necessarily had to find that Penn:

- Wrongfully took, obtained or withheld property, with a value of at least $1 million, from an owner;

- With intent to deprive another of property or to appropriate the same to himself.

*See In re Blutrich*, 686 N.Y.S.2d 435, 436 (App. Div. 3d Dept. 1999) (first degree larceny); *People v. Brown*, 967 N.Y.S.2d 206, 208 (App. Div. 3d Dept. 2013) (third degree larceny). If Penn could show that he had taken the property "under a claim of right made in good faith," that would have been a defense. *Id.* at 208. The fact that this conduct occurred in connection with Penn's management of a private equity fund, as stated at the indictment hearing and set forth in

the Statement of Facts filed with the indictment, establishes that his conduct occurred in connection with the purchase or sale of a security, and in the context of Penn's role as an investment adviser to the Fund.

Penn's admitted "intent to deprive the owner of the property permanently" suffices to establish his intent to misappropriate the assets in violation of Advisers Act Sections 206(1) and (2), Exchange Act Section 10(b) and Rule 10b-5 thereunder. His taking of the property establishes that he engaged in a scheme to misappropriate assets. And as discussed in Section I.E above, the materiality of the conduct is self-evident and requires no further factual development.

Accordingly, the Court should grant summary judgment in favor of the SEC.

## III. Penn's Counterclaims Should Be Dismissed Because Section 21(g) of the Exchange Act Precludes This Court from Consolidating His Counterclaims With the SEC's Civil Action Seeking Injunctive Relief

Penn's Amended Answer asserts six counterclaims against the SEC and six of its current and former employees, as well as two employees of the New York District Attorney's Office ("NYDA"): 42 U.S.C.A. § 1983 (Due Process); 42 U.S.C.A. § 1983 (Equal Protection of Laws); Tortious Interference with a Contract and Partnership; Tortious Interference with Business Relation; Abuse of Process and Malicious Prosecution; and Defamation. All of these claims appear to derive from the same basic set of facts: The criminal prosecution, and the punishment that followed Penn's decision to plead guilty, negatively impacted his life. Penn asserts that, despite being advised for over a year by apparently highly competent counsel, he pled guilty to an offense that he could not have committed.[9] He further asserts that his guilty plea was coerced,

---

[9] While the validity of Penn's conviction for grand larceny is immaterial to the issues currently before this Court, the SEC notes that his challenge to his conviction likely will be unsuccessful. Penn's challenge to his conviction for grand larceny cites *People v. Zinke*, 76 N.Y.2d 8 (1990), which held that a partner's conviction for grand larceny was invalid because, under New York law, each partner in a partnership has equal claim to all of the partnership's property. That case involved an individual who, while acting as the general partner of a partnership, took some of its assets. Because under New York state law, larceny involves the taking of property *in which one*

and that the process by which he was charged and convicted involved a number of other procedural abuses.

Penn's counterclaims should be dismissed because Section 21(g) of the Exchange Act precludes this Court from considering them without the consent of the SEC.[10] The SEC does not consent. Section 21(g) provides:

> Notwithstanding the provisions of section 1407(a) of Title 28, or any other provision of law, no action for equitable relief instituted by the Commission pursuant to the securities laws shall be consolidated or coordinated with other actions not brought by the Commission, even though such other actions may involve common questions of fact, unless such consolidation is consented to by the Commission.

The purpose of Section 21(g) is to ensure speedy resolution of SEC enforcement actions, see *SEC v. Thrasher*, 1995 WL 456402, at *2-*5 (S.D.N.Y. Aug. 2, 1995), and it routinely has been employed to dismiss counterclaims. *See, e.g., SEC v. McCaskey*, 56 F. Supp. 2d 323, 325 (S.D.N.Y. 1999); *SEC v. Better Life Club of America, Inc.*, 995 F. Supp. 167, 179-80 (D.D.C.1998), because such additional claims protract litigation.

While the SEC cannot advocate on behalf of former NYDA employees Polly Greenberg and Artie McConnell, it notes that this statutory provision would appear to preclude this Court

---

*does not have a property interest* from one who does, and because the partner had a property interest in all of the partnership's property, the court overturned the conviction for grand larceny against the general partner.

However, in this case, the general partner of the partnership (the Fund) was CASO GP. Penn was the Managing Member of that entity, but he was not *himself* the general partner of the Fund. Moreover, it was not CASO GP who received the partnership's assets, but other entities under Penn's control. Accordingly, Penn's characterization of his scheme as a simple taking of partnership property by a general partner, analogous to the one in *Zinke*, is inaccurate. Furthermore, nothing in this opinion suggests that a general partner does not commit a different crime or other legal violation when he misappropriates funds.

[10] Even if Penn were permitted to assert counterclaims against the SEC and its employees in this action, those claims could not survive a motion to dismiss on the merits. Penn's only concrete examples of purported SEC misconduct involve allegedly false allegations in the Complaint. But the investigation and signing of a complaint, "without more, does not provide the necessary nexus between act and injury because an independent entity chose to arrest and prosecute plaintiff." *Arnold v. Hoelscher*, 2011 WL 1226901, *2 (E.D. Missouri, March 30, 2011) (*citing Ames v. U.S.*, 600 F.2d 183, 185 (8th Cir.1979)). Accordingly, any defects in the grand jury process, the subsequent criminal prosecution, Penn's guilty plea or his incarceration were not, as a matter of law, proximately caused by any misconduct of the SEC or its employees.

from considering Penn's claims against those individuals, who are non-parties to this action, as well as its claims against the SEC and its current and former employees.

## CONCLUSION

For the foregoing reasons, the SEC respectfully requests that the Court grant its application for judgment on the pleadings or, in the alternative, for summary judgment, against Defendant Lawrence E. Penn III. If the Court grants the SEC's motion, the SEC proposes that the appropriate remedies, including disgorgement, a civil penalty and permanent injunctions, be determined based on additional briefing.

Dated: July 1, 2016
New York, New York

SECURITIES AND EXCHANGE COMMISSION

By: _____
Howard A. Fischer
Karen E. Willenken
Katherine A. Bromberg

ATTORNEYS FOR PLAINTIFF
Securities and Exchange Commission
New York Regional Office
Brookfield Place, 200 Vesey St., Rm. 400
New York, New York 10281-1022
(212) 336-0140 (Willenken)
E-mail:  WillenkenK@SEC.gov

**CERTIFICATE OF SERVICE**

I hereby certify that, on July 1, 2016, I caused true copies of the foregoing document to

be served by the Court's Electronic Filing System upon the following persons and entities:

a)   Defendant Lawrence E. Penn III, *pro se*

b)   Edward Rodríguez, Esq., counsel to Defendants Camelot Acquisitions Secondary
     Opportunities Management LLC and Camelot Group International

Karen E. Willenken

Dated: July 1, 2016