**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

LAWRENCE E. PENN, III,
et al.,

*Defendants*,

- AND -

A BIG HOUSE FILM AND
PHOTOGRAPHY STUDIO, LLC

*Relief Defendant*,

14-CV-0581 (VEC)

ECF Case

---

PLAINTIFF'S MEMORANDUM OF LAW CONCERNING THE DATE
AS OF WHICH THE VALUE OF THE FORFEITED CARRIED INTEREST
<u>SHOULD BE DETERMINED</u>

Securities and Exchange Commission
New York Regional Office
Brookfield Place, 200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0589 (Fischer)

August 8, 2018

Plaintiff U.S. Securities and Exchange Commission ("SEC"), pursuant to the Court's order of June 27, 2018 (Docket Entry 280), respectfully submits this Memorandum of Law Concerning the Date as of Which the Value of the Forfeited Carried Interest Should Be Determined.

## I.     Summary

This action involves the misappropriation, by Defendant Lawrence E. Penn III and entities he controlled, of approximately $9.3 million from the Camelot Acquisitions Secondary Opportunities LLP (the "Fund"), a private equity fund.[1] As the owner of the Fund's general partner, Camelot Acquisitions: Secondary Opportunities G.P., L.L.C. ("CASO GP"), Penn was incentivized by a so-called "carried interest" provision in the Fund's Limited Partnership Agreement ("LPA").

Penn argues that the value of this carried interest, which he forfeited as part of his guilty plea in a parallel criminal case, should be offset against the disgorgement that otherwise would be payable in this action. As a general matter, the Commission agrees with the Court that "Penn is not required to disgorge amounts that he has already repaid." (Docket Entry 198, at 6.) The Commission's position, however, is that Penn can only be considered to have "already repaid" any amounts that he definitely would have been entitled to, but for his forfeiture, by the time the offset occurs – not the theoretical, speculative amount that he might have been entitled to receive in the future. What Penn may have thought he was giving up at the time of the forfeiture is irrelevant; what is relevant is the value that investors actually have received as a result of the forfeiture. To hold otherwise would improperly shift onto the

---

[1] On July 3, 2014, the name of the Fund was changed to CM Growth Capital Partners, L.P. *See* Ex. P-35.

defrauded investors the risk that the Fund's assets will not perform as well as the defendant hopes, rendering the carried interest, and the corresponding "repayment," worthless.

## II. Facts

### A. The Nature of the Carried Interest

Unlike a hedge fund, which actively trades securities, a private equity fund acquires stakes in a relatively small number of private companies (each of which is referred to as a "portfolio company" of the fund) and then holds them for a significant period of time. *See* Secs. and Exch. Comm'n, *Private Equity Funds*, Investor.gov (last visited Aug. 6, 2018), https://www.investor.gov/introduction-investing/basics/investment-products/private-equity-funds. When a portfolio company goes public, or when it is purchased by another entity, the private equity fund often will receive cash in exchange for its investment in the portfolio company. Cash may also be generated when a private equity fund sells its stake in a portfolio company to another private equity fund. These cash receipts, or "disposition proceeds," occur over the course of years.

As is typical for a private equity fund, the Fund's "carried interest" provision is in a paragraph summarizing the "waterfall," or the manner in which disposition proceeds will be distributed. The waterfall, contained in Section 5.1(a) of the LPA, provides, in relevant part, that "Disposition Proceeds shall be distributed . . . . First, 100% to each Partner until such Partner has received distributions of Current Income and Disposition Proceeds from all investments" equal to the partner's capital contributions plus the partner's share of expenses and fees. Once this threshold has been reached, the Fund's general partner is entitled to 15-20% of the profits, with the remainder allocated among the Fund's limited partners.

Under this provision, the general partner is entitled to nothing *unless and until* the Fund reaches profitability after paying back all capital contributions, fees and expenses. As

each portfolio company investment is disposed of for cash, the Fund's manager calculates whether profitability has been reached, and then allocates the proceeds in accordance with the formula. Until cash proceeds are received, this provision triggers no rights. In this case, it is uncontroverted that the Fund's investors made capital contributions of approximately $123 million, and the Fund invested in six portfolio companies. And as of December 2017, the Fund has taken on liabilities of over $12 million to cover a follow-on investment and operating expenses. *See* P-105 at 3. Accordingly, even if Penn still had a right to carried interest, he would get nothing until the Fund had received over $135 million in disposition proceeds.

To date, that has not happened. The portfolio company in which the Fund invested the largest amount, Fisker Automotive, declared bankruptcy and returned nothing to its shareholders. P-79-N at 3. Three other portfolio companies have been disposed of at losses, returning proceeds of less than $11 million on an initial investment of over $23 million. P-104, P-106. Testimony at the hearing will show that although the Fund's fifth portfolio company, Bloom Energy Corporation, recently has had an IPO, the Fund would realize proceeds of less than $13 million if it could sell them at today's trading prices. The Fund now holds common stock that is subject to a six-month holding period.

Accordingly, if Penn still had a right to carried interest, he, like the Fund's investors, would now be waiting anxiously to see how the Fund's final portfolio company, MetricStream, would perform. It is conceivable, though highly unlikely given its recent performance, that MetricStream will one day have a huge IPO or high-value acquisition. In that case, the Fund's interest in MetricStream, which was purchased for $26.7 million, could be disposed of for such a large amount that the Fund would make a profit in spite of its

losses on the other five portfolio companies. In that unlikely event, the general partner normally would receive a percentage of the profits as carried interest – but only once the disposition occurred and the profit could be calculated.

### B. The Elimination of Penn's Right to Carried Interest

In early 2014, the Commission filed this action against Penn and related entities. At approximately the same time, Penn was indicted for the same conduct in New York State criminal court in the matter of *The People of the State of New York v. Lawrence Penn III*, Indictment No. 0073/2014 (March 16, 2015, Sup. NY) (the "Criminal Case").

In 2014, the Fund removed CASO GP from its position as general partner, for cause, pursuant to Section 7.6(b) of the Limited Partnership Agreement. Under Section 7.6(c) of the LPA, CASO GP's right to carried interest was "reduced by fifty percent (50%)" upon its termination. Ex. P-21; Ex. P-29 at 12. A new general partner, which is not entitled to carried interest but is entitled to be paid other incentive compensation, has been appointed to manage the Fund. *See* Ex. P-41 at 18-19.

Benjamin Brafman, representing Penn in the Criminal Case, negotiated a favorable resolution in which Penn pled guilty, on March 16, 2015, to grand larceny and falsification of business records, but he served only two years in prison for his crimes. In April 2015, Penn signed a document in which he agreed to "forfeit my interest (including, but not limited to, income, fees, management fees, interest, carried interest…) as a partner, general partner, former general partner, limited partner, or otherwise, in the Fund and the Offshore Fund for $0.00 value." Ex. P-20 at 1. He also was subject to a restitution order, which did not provide a credit for the value of the forfeited carried interest. Ex. P-19.

### C. The Woody Victor Valuations

Having gotten no credit toward his restitution for the value of his forfeited carried interest, Penn seeks to revisit the issue in this action. Through a purported expert, Woody Victor, he claims that the Fund's assets were worth over $250 million as of November 30, 2014.[2] *See* Ex. P-79-B at 4. In particular, Victor's report estimated an enterprise value of over $1 billion for MetricStream, and it valued the Fund's interest in the company at over $200 million. *Id.* The Commission anticipates that, if Victor is permitted to testify, cross examination will demonstrate that Victor's conclusions are unreliable because, among other things, Victor ignored a recent market-based arms-length transaction in which MetricStream was valued at $285.6 million, suggesting that the Fund's interest should be valued at approximately $55 million – not $200 million. *See* P-78.

### D. The CM Growth GP Valuations

After assuming management of the Fund in 2014, CM Growth Capital Partners GP, LLC ("CM Growth GP") prepared valuations of the Fund's portfolio company investments. These valuations were audited and included in financial statements dated December 31, 2014. *See* Ex. P-29. The Fund's financial statements acknowledge that "the fair value of the Partnership's investments may differ significantly from…the values that the Partnership may ultimately realize." *Id.* at 10. As of December 31, 2014, CM Growth GP estimated that the Fund's interest in MetricStream had a value of $54.3 million, and that all of the Fund's assets had a value of $69 million. *Id.* at 7. Since then, MetricStream's prospects have not improved.

---

[2] No logical explanation has been provided for the use of November 30, 2014, rather than the later date on which Penn's forfeiture was finalized in the criminal case, to value the Fund's assets. Victor claimed in a deposition that it was the last date for which he had "updated information," but neither he nor Penn appears to have made any effort to obtain similar information for the first half of 2015.

5

As of December 31, 2017, CM Growth GP valued MetricStream at less than $54 million. P-107 at 4.

If CM Growth GP's current estimates for MetricStream prove even close to correct, the Fund's investors will never make a profit – and it is not even a close call. Yet Penn argues that because his purported expert claims MetricStream was worth over a billion dollars in late 2014, he should not have to pay the investors back for the $9 million of cash that he misappropriated.

### III.  Argument

The primary issue for decision at the upcoming evidentiary hearing, currently scheduled for August 20, 2018, is whether the disgorgement otherwise payable by Penn should be offset by the estimated value of the "carried interest" in the Fund that he would have had, but for his forfeiture of the right in the Criminal Case. The Court has asked the parties to brief the legal question of whether, assuming Penn is entitled to any offset, it should be valued (i) as of the date of the forfeiture (April 2015), (ii) as of the date the Court orders disgorgement, or (iii) based on only the value of the assets that have been monetized by the Fund. The Commission believes that it would be unfair to investors, and would establish a perverse set of incentives for potential wrongdoers, if a fund manager were allowed to use a speculative *estimate* of entitlement to *future* carried interest to offset disgorgement. Accordingly, the Commission believes that, under the circumstances of this case, the amount of offset should be based only on the value of assets that have been monetized by the Fund.[3]

---

[3] Although this memorandum answers the specific question posed by the Court, the Commission does not mean to abandon its argument that no offset is appropriate, regardless of the value of the carried interest at any time, because Penn's forfeiture in the criminal case was intended as a penalty. Courts have held that a forfeiture intended to penalize the criminal defendant should not be credited against disgorgement, because: "A criminal fine is punitive. Disgorgement is restitutionary. Allowing the fine to count toward the disgorgement order

6

A. **Offsets Are Granted for Actual, Not Theoretical, Repayments**

Because the remedy of disgorgement is intended to deprive the wrongdoer of the benefit of his misconduct, courts typically will offset against disgorgement the amount of the wrongdoer's gain that has been repaid pursuant to, for example, a restitution agreement in a parallel criminal prosecution. The offset prevents the defendant from reimbursing the defrauded investors multiple times for the same conduct – a result that would convert the remedial remedy of disgorgement into a penalty.

Such offsets consistently have been based on *actual* payments toward a restitution order – not on the mere existence of the order. *See SEC v. Palmisano*, 135 F.3d 860, 864-66 (2d Cir. 1998) ("we modify the judgment to provide that *to the extent* that Palmisano *pays or has paid* restitution as ordered in the criminal judgment, *such payments* will offset his disgorgement obligation under the present judgment") (emphasis added); *SEC v. Opulentica, LLC*, 479 F. Supp. 2d 319 (S.D.N.Y. 2007) ("To the extent that [defendant] *pays or has paid* restitution as ordered in the criminal judgment, *such payments* will offset his disgorgement obligation under the present judgment.") (emphasis added); *Disraeli v. SEC*, 334 F. App'x 334, 335 (D.C. Cir. 2009) ("To the extent petitioner can establish that he *has repaid* the funds he [stole], *such payments* will offset his disgorgement obligation.") (emphasis added).

---

removes the punitive nature of the fine." *SEC v. Blackwell*, 477 F. Supp. 2d 891, 914-16 (N.D. Ohio 2012); *see also SEC v. Svoboda*, 409 F. Supp. 2d 331, 344 n. 4, 348 (S.D.N.Y. 2006) (imposing disgorgement and a civil penalty where defendants already had received criminal fines). It is only where the forfeiture appears to be restitutionary in nature, rather than punitive, that courts have held it should be offset against disgorgement. *See SEC v. Bergin*, 2015 WL 4275509, at *4 (N.D. Tex. July 15, 2015) (finding that criminal court had based amount of forfeiture on defendants' illegal gains, and offsetting disgorgement by the amount of defendant's forfeited cash plus the value of a forfeited Porsche automobile).

In Penn's Criminal Case, forfeiture was ordered *in addition* to full restitution of the amounts Penn misappropriated from the Fund, and no credit was given for the value of the forfeiture – the order states that the interest is forfeited "for 0.00 value," and the forfeiture is not mentioned in the restitution order. The logical conclusion from these facts is that the sentencing court intended the forfeiture as a penalty.

Similarly, where a forfeiture was deemed restitutionary in nature, a district court granted an offset – but in that case, the defendant had forfeited cash and a Porsche automobile. *SEC v. Bergin*, 2015 WL 4275509, at *4 (N.D. Tex. July 15, 2015). The Commission is aware of no precedent for granting an offset based on a speculative future interest.

### B.   A Speculative Future Interest Is No Substitute for Misappropriated Cash

Determining the amount of an offset to disgorgement based on anything other than what can be definitively calculated at the time of the offset – amounts that have in some sense been "already repaid" – would convert a speculative form of compensation into one that is risk-free, at the expense of the victims.

In this case, the Commission has established by uncontested evidence that Penn misappropriated approximately $9.3 million of the cash investors deposited into the Fund. Penn definitely received that money. He argues that because, but for his forfeiture he might, in theory, *someday* have been entitled to receive a similar or greater amount in carried interest, he should be treated as if he has *already paid back* that cash to the Fund's investors. In reality, of course, he has not paid back anything.

In the extremely unlikely event that the Fund someday makes a profit, it will benefit from Penn's forfeiture by keeping most of the profits that it otherwise would have shared with Penn. Although the Fund will have to pay incentive compensation to CM Growth GP, that amount will be significantly smaller than the carried interest would have been. If the investments perform poorly, however, the carried interest will have no value, and the Fund will receive no benefit from Penn's relinquishment of his right. Even if Penn's proffered valuations were supported by credible expert analysis, they still would be mere projections.

Crediting Penn with the theoretical future value of his carried interest, when no profit has yet been earned, shifts to the investors the risks that: a) the valuation, even if based on reasonable assumptions and methodology, nevertheless does not accurately reflect the market as it exists at the time of the valuation; and b) the market will change between the date of the valuation and the date on which the Fund ultimately disposes of its final investment, so that the Fund receives less than was projected.

Were the Court to accept Penn's proposed offset, the disgorgement remedy would not function as intended, because it would not restore him to his pre-misappropriation state. He would have been permitted to trade the definite cash he misappropriated for a speculative future entitlement that might well never be obtained.

Although the Commission is aware of no directly analogous precedents, case law in this Circuit has held that the hypothetical future value of a carried interest was not an asset of any value. In *SEC v. Ahmed*, the court held that a defendant's theoretical entitlement to carried interest, which had an estimated value of $23 million, could not be considered an asset for purposes of determining the scope of an asset freeze because it "represented only an expectancy of an entitlement to future income," and there was "great uncertainty as to whether this carried interest account will materialize into an asset available for victim recovery." 123 F. Supp. 3d 301, 312 (D. Conn. Aug. 12, 2015).

Just as the court in *Ahmed* did not consider a speculative asset sufficient to ensure victim recovery, this Court should not treat a forfeited asset whose value is speculative as equivalent to an amount actually repaid to the investors. Even if Penn's expert was convincing in his estimates of the carried interest's theoretical value in late 2014, offset would only be appropriate to the extent that Penn could show that he had in some sense *already repaid* the

9

Fund that amount. Unless and until the predicate for Penn to earn carried interest – dispositions of Fund investments that yield an overall profit for the Fund – occurs, Penn cannot be said to have repaid the Fund.[4]

## CONCLUSION

For the foregoing reasons, the SEC respectfully requests that the Court consider only the value of the assets actually monetized by the Fund in determining the value of Penn's forfeited Carried Interest.

Dated: August 8, 2018
       New York, New York

SECURITIES AND EXCHANGE COMMISSION

By: _____
Howard A. Fischer
Karen E. Willenken
Katherine S. Bromberg

ATTORNEYS FOR PLAINTIFF
Securities and Exchange Commission
New York Regional Office
Brookfield Place, 200 Vesey St., Suite 400
New York, New York 10281-1022
(212) 336-0589 (Fischer)
E-mail: FischerH@SEC.gov

---

[4] Under different circumstances, where a defendant could demonstrate that profits were likely to be realized in the near future, the Court might consider fashioning a remedy that would permit him to seek an offset of the *actual* value of the carried interest, once the final dispositions occurred, against any disgorgement obligation remaining unpaid as of that date. Such a result would ensure that the defendant received credit only for a definite, realized amount, so it would not shift onto the investors the risk that the fund would perform poorly. The carried interest would be considered repaid to the investors only once the original conditions for its payment had occurred. Structuring such a remedy, however, would involve delaying the payment of disgorgement and would impose administrative burdens on the Commission and the Court. Because the Fund's audited financials demonstrate that any profit is extremely unlikely in this case, no such accommodations to the defendant are appropriate.