UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

               *Plaintiff*,

v.

LAWRENCE E. PENN, III, MICHAEL ST. ALTURA EWERS, CAMELOT ACQUISITIONS SECONDARY OPPORTUNITIES MANAGEMENT LLC, THE CAMELOT GROUP INTERNATIONAL, LLC, and SSECURION LLC,

               *Defendants*,

- and -

A BIGHOUSE PHOTOGRAPHY AND FILM STUDIO LLC,

               *Relief Defendant*.

14-CV-581 (VEC)

ORDER

---

VALERIE CAPRONI, United States District Judge:

       This represents the end of an SEC enforcement action begun in early 2014. The Defendant, Lawrence Penn, III, was arrested by New York state authorities and charged with stealing approximately $9 million from a private-equity fund that he managed. Penn pleaded guilty to one count of first-degree grand larceny and one count of falsifying records and was sentenced to prison. Parallel to the state prosecution, the SEC filed this action, alleging that Penn violated Section 10(b) of the Exchange Act, Rule 10b-5 promulgated thereunder, and Sections 204, 206, and 207 of the Investment Advisers Act, and Rule 204-2 promulgated thereunder. On December 21, 2016, the Court granted the SEC partial summary judgment, and on August 22, 2017, the Court permanently enjoined Penn from further violations of the

securities laws. Before the Court is the SEC's motion to require Penn to disgorge his ill-gotten gains and to impose civil monetary penalties.

## BACKGROUND

The Court assumes familiarity with the Court's prior opinions in this case, dated December 21, 2016, Dkt. 168, and August 22, 2017, Dkt. 198. From 2007 to approximately February 2014, Penn managed a registered private equity fund called Camelot Acquisitions Secondary Opportunities LP or the "Fund." In early 2014, the Fund's auditors discovered that Penn had misappropriated approximately $9.3 million from the Fund. Penn and an accomplice had used Ssecurion, LLC, a sham corporation, to send the Fund phony invoices for "due diligence" services. Ssecurion forwarded most of the proceeds to other entities controlled by Penn. Much of the money appears to be unaccounted for.

On March 16, 2015, Penn pleaded guilty in New York Supreme Court to one count of first-degree grand larceny and one count of falsifying business records in the first degree. Penn was ordered to make restitution in the amount of $8,362,973.89 and to forfeit his interest in the Fund, which consisted principally of his right to a percentage of the Fund's profits—what is known as "carried interest" or "carry." To date, Penn has paid no restitution. Moreover, Penn has expressed no remorse for his conduct and, despite his guilty plea, continues to profess his innocence. Despite the overwhelming evidence of his guilt, Penn asserts that he is the victim of a conspiracy among the New York District Attorney's Office, the SEC, and the current managers of the Fund to seize unlawfully control of his interest in the Fund. And, even though he pleaded guilty, Penn filed an unsuccessful appeal of his conviction. *See People v. Penn*, 153 A.D. 3d 1171 (1st Dep't 2017), *leave to appeal denied*, 30 N.Y.3d 1107 (N.Y. Jan. 31. 2018).

On December 21, 2016, the Court granted the SEC's motion for summary judgment in respect of its claims under Section 10(b), Rule 10b-5, and Sections 204 and 206 of the Investment Advisers Act. On August 22, 2017, the Court granted the SEC's motion to permanently enjoin Penn from further violations of the securities laws and denied without prejudice the SEC's motion to impose disgorgement and civil monetary penalties. As the Court explained in the August 22, 2017 order, the SEC has carried its burden to establish liability and to demonstrate the "approximate" value of Penn's unlawful gains. According to a declaration from James R. D'Avino, entities controlled by Penn received $9,067,004.00 in proceeds from the Ssecurion scheme. But the Court denied the SEC's motion with respect to disgorgement and penalties without prejudice because there was a dispute of fact whether Penn is entitled to offset the value of his forfeited interest in the Fund against the amount of his ill-gotten gains.

After approximately a year of discovery and delays,[1] the Court set a hearing for the morning of August 20, 2018, so that Penn, by then appearing pro se, could present evidence regarding the value of his forfeited interest in the Fund. Dkt. 278. The parties filed a joint pre-trial order on May 16, 2018, in which Penn identified three witnesses he intended to call at the hearing: himself; Mr. Woody Victor, a proposed expert on valuation; and Mr. Thomas Morgan, an investor in the Fund. Dkt. 273 at 4. On August 14, 2018, Penn requested an adjournment of the August 20, 2018 evidentiary hearing on the grounds that the SEC had produced additional documents that required his review. *See* Dkt. 283. As the SEC explained in response, the additional documents were few in number and had largely been produced previously. *See* Dkt. 284. The Court denied the adjournment request. Dkt. 286. On August 16, 2018, the Court held

---

[1] Penn disregarded several court-imposed deadlines in discovery. *See, e.g.*, Dkt. 222.

a final pre-trial conference at which Penn represented to the Court that he would call the same three witnesses. August 16, 2018 Tr. (Dkt. 291) at 33-34. Penn reiterated his request for an adjournment of the evidentiary hearing, and the Court again denied his request. August 16, 2018 Tr. at 33.

Penn did not appear on August 20, 2018. Minutes before the hearing was to begin, he called Chambers and informed the Court that he was ill.[2] Although asked to remain on the line so that staff could consult with the Undersigned, Penn failed to do so. Subsequent attempts to reach him by telephone were unsuccessful. Later that day, the Court entered an order, requiring Penn to show cause why the Court "should not declare him in default in light of his failure to appear for the August 20, 2018 evidentiary hearing." Dkt. 287 at 2. On August 24, 2018, Penn responded as follows:

> I write this letter to respond to the order to show cause. I respectfully informed the Court through Judge's Chambers before the Evidentiary [sic] hearing that I was ill.

Dkt. 288. Although Penn's terse letter provided no credible explanation for his absence, the Court nonetheless provided him an opportunity to explain his conduct. The Court ordered as follows:

> Mr. Penn and the SEC must appear for a status conference with the Court at 11:00 a.m. on August 30, 2018. Mr. Penn must bring with him any information to corroborate the nature of his illness, when he became ill, and what medical treatment he received and from whom. Mr. Penn is forewarned that failure to appear on August 30, 2018, will be grounds for the Court to enter judgment against him.

Dkt. 290.

Penn did not appear for the August 30, 2018 conference. In lieu of appearing as ordered, Penn filed a response, 25 minutes before the hearing, in which he explained that there was no

---

[2] Messrs. Victor and Morgan also did not appear for the August 20, 2018 hearing, which suggests either Penn provided them with advance notice he did not intend to appear or Penn never intended to call them as witnesses.

evidence of his illness because he treated it with "over the counter medicine" and requested an adjournment of the August 30, 2018, conference because of his "inability to arrange travel on short notice." Dkt. 293. Penn, who lists his address as a condominium in midtown Manhattan, did not explain why he was unable to travel to the courthouse downtown or why he waited six days from the date of the Court's order, until moments before the hearing, to request an adjournment. The Court denied Penn's request for an adjournment orally at a status conference attended only by the SEC on August 30, 2018. *See* Dkt. 295; *see also* Dkt. 294.

In light of Penn's failure to appear and his disregard of Court orders, the Court finds that he has knowingly and intentionally waived the opportunity to present evidence. *See Allied Int'l Union v. Tristar Patrol Servs., Inc.*, No. 06 -CV15515 (LAP), 2007 WL 2845227, at *4 (S.D.N.Y. Sept. 26, 2007) (concluding that respondent's failure to appear at hearing amounted to waiver of its defenses and collecting cases). Penn failed to appear at the August 20, 2018 hearing after the Court denied his request for an adjournment on multiple occasions, and after he represented repeatedly to the Court (and the SEC) that he would call three witnesses.[3] Penn failed to appear for the August 30, 2018 conference, which itself was scheduled to address his non-appearance, after being advised clearly by the Court of the potential consequences should he fail to appear as directed.[4]

---

[3]  Penn's representation that he intended to call Mr. Victor caused the SEC to waste significant resources deposing Mr. Victor and preparing for the evidentiary hearing and delayed these proceedings by approximately a year.

[4]  The same conduct would also be grounds for the Court to impose sanctions pursuant to Rule 16(f). In determining whether sanctions are appropriate, courts ordinarily consider: (1) the willfulness of the conduct, (2) the efficacy of lesser sanctions, (3) the duration of the non-compliance, and (4) whether the litigant was warned of the consequences of non-compliance. *See Agiwal v. Mid Island Mort. Corp.*, 555 F.3d 298, 302-03 (2d Cir. 2009) (per curiam). Penn's excuses for his failure to appear are not credible and appear intended to delay these proceedings. It defies belief that Penn could have become so ill on the eve of the August 20, 2018, hearing that he could not appear in Court but that he could treat his acute, sudden-onset illness with over-the-counter medication. The fact that Penn's witnesses were not in Court on August 20, 2018, also suggests that they had advance notice Penn would not appear, despite Penn's claim that he became sick the night before the hearing and despite the fact that he did not

Having given Penn ample opportunity to provide evidence and Penn having failed to take advantage of those opportunities, the Court will determine the value of his forfeited interest in the Fund on the record before it.[5]

## DISCUSSION

"Once the district court has found federal securities law violations, it has broad equitable power to fashion appropriate remedies, including ordering that culpable defendants disgorge their profits." *SEC v. First Jersey Sec. Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996). A burden-shifting framework applies: first, the SEC is required to present a reasonable approximation of the profits related to the fraud. If it does so, the burden shifts to the defendant to show the SEC's estimate is incorrect. *SEC v. Tourre*, 4 F. Supp. 3d 579, 589 (S.D.N.Y. 2014). As the Court concluded in the August 22, 2017 order, the SEC has satisfied its burden of establishing the approximate value of Penn's ill-gotten gains: they are $9,286,916.65.

Penn has not satisfied his burden of presenting evidence to show that the SEC's estimate is incorrect.[6] Penn has argued that the SEC's estimate of his gains is incorrect because it does

---

notify his adversary or the Court until moments before the hearing. Additionally, Penn was warned of the possible consequences of failing to appear at the August 30, 2018 conference, and nonetheless provided no credible explanation for failing to attend or for waiting until moments before the conference to request an adjournment. Penn's late-in-the-game requests for an adjournment appear calculated to delay these proceedings as long as possible. Given the advanced stage of these proceedings, finding that Penn has waived his opportunity to present witnesses appears to the Court to be the least severe sanction available. As explained below, the Court will nonetheless consider the documentary evidence submitted by Penn, including the report from his proposed expert.

[5] The Court has considered and rejected the possibility of setting yet another date for the evidentiary hearing. While pro se litigants are entitled to substantial latitude, pro se litigants, no more than counselled litigants, are not permitted to disregard flagrantly Court orders and rules. *See McDonald v. Head Criminal Court Supervisor*, 850 F.2d 121, 124 (2d Cir. 1988) ("[A]ll litigants, including pro ses, have an obligation to comply with court orders. When they flout that obligation they, like all litigants, must suffer the consequences of their actions."). Under this Court's Individual Practices, requests for an adjournment must be filed not less than 48-hours in advance. More important, the Court has no confidence that setting a new schedule would do anything other than waste more Court time and the time of the SEC attorneys, who have prepared for a hearing on two occasions already.

[6] The Court assumes a preponderance of the evidence standard would apply. Because Penn has not provided any competent evidence, as the Court explains below, the Court would reach the same conclusion regardless of the evidentiary standard applied.

6

not account for the value of the interest in the Fund that he forfeited, but he has failed to establish the value of that interest.[7] Penn waived his opportunity to present witnesses by twice failing to appear. The documentary evidence he provided consists of an expert report prepared by Woody Victor and an affidavit from Thomas Morgan, an investor in the Fund.[8] For the reasons the Court explains below, the Victor report is unreliable and cannot be credited by the Court.

Until his removal in February 2014, Penn controlled the Fund through Camelot Acquisitions Secondary Opportunities GP, LLC ("CASO GP"). CASO GP was the general partner of the Fund and was entitled to carried interest under the Fund's Limited Partnership Agreement or "LPA." Pursuant to Section 5 of the LPA, CASO GP was entitled to 15% of the Fund's return on investments, after management fees and expenses and net of unrealized losses. Declaration of Howard Fischer (Dkt. 203) Ex. 3 (the "LPA") at §5.1(a)(ii). CASO GP was entitled to 20% of the Fund's returns once the cumulative distributions to the limited partners exceeded 150% of the Fund's initial capital investment (plus fees, expenses, and unrealized losses). LPA §5.1(a)(iii). Because CASO GP was removed from the general partnership for "cause," pursuant to Section 7.6(c) of the LPA, its carried interest in the fund's distributions was reduced by 50%. LPA §7.6. Thus, in essence, Penn forfeited a contractual right to 7.5% of the

---

[7] Penn also maintained, as he has throughout these proceedings, that the $9.2 million he admitted to stealing does not represent ill-gotten gains because he was entitled to the funds under New York law. Dkt. 293. The First Department, Appellate Division, has rejected Penn's argument, and the Court of Appeals denied Penn's petition for leave to appeal. Moreover, whether Penn was entitled to the funds under New York law is irrelevant to whether his conduct violated the federal securities laws, as this Court concluded in December 2016.

[8] On August 30, 2018, Penn submitted an affidavit from Mr. Morgan. *See* Dkt. 293-1 (Morgan Aff.). According to Mr. Morgan, "the Partnership was valued at approximately $232 to $250 million in a profitable state" shortly after Penn's removal from the general partnership. Morgan Aff. ¶ 14. Mr. Morgan appears to be relying on Victor's previous valuation, which was prepared in connection with Penn's state criminal prosecution. For the reasons discussed below, Victor's valuation is unreliable. Mr. Morgan has otherwise provided no basis for his opinion (nor has Penn moved to qualify him as an expert on valuation) and the remainder of his affidavit is irrelevant to the issues before the Court.

Fund's future returns in excess of the Fund's initial capital investment ($123,703,703.00) plus expenses, fees, and debt, and 10% of the Fund's future returns in excess of 150% of the Fund's initial capital investment plus expenses, fees, and debt (approximately $180,000,000.00). Whether this contractual right had any value depends on the value of the Fund's underlying investments at the time it was forfeited.

The primary evidence provided by Penn that is relevant to the value of the Fund's investments is a valuation prepared by Victor, as of November 30, 2014, that appears to be a copy-and-paste of a previous valuation prepared in connection with the state criminal case. It appears Victor did nothing to update the report before submission to this Court to account for any changes in value between November 30, 2014, and April 2015, when Penn forfeited his interest in the Fund. The report purports to show that the Fund was worth approximately $200 million in November 2014. As the SEC has argued persuasively, Victor is not qualified and his valuation is riddled with methodological errors and inexplicable inferences that render it unreliable.[9] Victor has limited relevant experience: as far as the Court has been made aware, he has never been qualified as an expert on valuation. See Pl.'s Mem. (Dkt. 264) at 9. Victor also has not published any articles on any relevant topic. His relevant experience appears to be limited to a part-time position as a director with an investment fund called Carthage Capital that has less than $2 million under management. See Declaration of Howard Fischer (Dkt. 263) Ex. 4

---

[9] The SEC previously moved to exclude Victor from testifying. See Dkt. 262. The Court gave Penn the benefit of the doubt and denied the motion without prejudice on the assumption that the Court would be better able to assess Victor's qualifications and the reliability vel non of his methodology and data in person at the August 20, 2018 hearing. As is evident from the Court's discussion above, this was a generous assumption. It was Penn's burden to establish the admissibility of Victor's report and testimony. Because Penn has waived his right to present Victor's live testimony at a hearing, the Court considers the admissibility and probative value of Victor's evidence on the papers. As the Court's discussion above makes clear, Victor has no experience as an expert on valuation and limited relevant practical experience, and his report lacks any discernable methodology. The court assumes Penn's interest should be valued as of the date of forfeiture. The SEC disputes this assumption, but that is the date most favorable to Penn.

(Victor Tr.) at 156-160. Victor has never been responsible for valuing non-public companies such as the Fund's portfolio companies. *See* Victor Tr. at 94.

Assuming Victor could be qualified as an expert, which the Court doubts, he made numerous methodological errors and drew mistaken assumptions, which collectively render his opinion unreliable. As became clear at Victor's deposition, his valuation of each of the Fund's portfolio companies was based primarily on the Fund's unaudited 2013 financial statements. *See* Expert Report of Woody Victor (Dkt. 263-6) ("Victor Report") Tab B at 3; Victor Tr. at 242-43. From there, it appears Victor applied no discernable methodology. Of the Fund's six investments, Victor assumed that three were worth the same amount as when the Fund valued them in 2013. With respect to one company, Branders, this assumption was incorrect. Branders was sold in early 2014, before Victor produced his valuation, and the Fund's interest was expected to be worth approximately $300,000—nearly $6 million less than Victor estimated. *See* Victor Tr. at 199-201. The Court has otherwise been provided with no explanation of why it was appropriate to assume that the value of these companies did not change between September 30, 2013, and Penn's forfeiture of his interest in the Fund in April 2015.

Victor assigned inflated values to two of the Fund's remaining investments.[10] Victor concluded that the Fund's most valuable holding, MetricStream, was worth approximately $1 billion, *see* Victor MetricStream Valuation (Dkt. 263-7) at 9, a three-fold increase over the Fund's September 30, 2013, valuation. *See* Pl.'s Mem. at 20. To reach this conclusion, Victor modified the weight assigned to each component of the Fund's valuations and the component valuations themselves. Victor MetricStream Valuation at 9. He increased to 80% the weight of the "comparable companies" component of the MetricStream valuation. Victor MetricStream

---

[10] The Fund's sixth portfolio company, Fisker Automotive, declared bankruptcy and was worth nothing.

Valuation at 9. Victor then selected as "comparable companies" multi-billion dollar established public companies such as Salesforce, Fireeye, Oracle, and SAP to calculate a price to revenue multiple to apply to MetricStream. Victor MetricStream Valuation at 14-16. Applying that multiple to projected revenues from 2014, Victor arrived at a valuation of MetricStream of $1.2 billion. Victor has not explained why it was reasonable to assume the market would apply a similar multiple to a non-public, early stage venture like MetricStream or why the same multiple would apply to the revenue *projections* of an early stage company with a limited track record. The revenue projections used by Victor assume without justification that MetricStream's revenues would grow by 51% in 2014 and by another 70% in 2015.[11] Moreover, Victor's valuation does not account for the fact that MetricStream raised capital in August 2014 at an implied enterprise value of $258 million, which is approximately 25% of what Victor assumed MetricStream to be worth. *See* Fischer Declr. Ex. 16 at 8. Because the Fund did not participate in this financing, its stake in MetricStream was diluted down from 19.1% to 16.1%. Victor disregarded this transaction even though it was included in the materials provided to him and even though it provides real data for how the market valued MetricStream less than a year before Penn forfeited his interest in the Fund.

Victor's flawed valuations of MetricStream, which accounts for approximately 80% of the Fund's purported value, along with his seemingly arbitrary assumption that three of the Fund's four other investments were worth the same in April 2015 as they were in September

---

[11] Victor used similarly aggressive revenue projections to value the Fund's stake in Bloom Energy, assuming, without explanation, that revenue would double in 2013 and increase by nearly 50% in 2014 and 2015. It appears likely that Victor used estimates for 2013 and 2014 revenue, rather than actual revenue, which should have been available, because he relied on his prior November 2014 valuation and did not update the information.

10

2013, renders his report unreliable.[12] Penn provided no other evidence to substantiate the value of his forfeited interest in the Fund. Because Penn has not satisfied his burden of proof relative to the value of his forfeited interest, Penn will be required to disgorge the full amount of his ill-gotten gains. The Court has previously held that the SEC is entitled to prejudgment interest at the IRS underpayment rate.

In addition to authorizing disgorgement, the Exchange Act and Investment Advisers Act authorize the Court to impose a civil monetary penalty. The Court may impose a penalty of up to the "gross amount of pecuniary gain to [the] defendant" or a "tiered" penalty per violation of $150,000 or $160,000, depending on the date of the violation. 15 U.S.C. § 78u(d)(3); *see also SEC v. Credit Bancorp, Ltd.*, No. 99-CV-11395 (RWS), 2002 WL 31422602, at * 3 (S.D.N.Y. Oct. 29, 2002). To determine the appropriate penalty, the Court considers: "(1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition." *SEC v. Haligiannis*, 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007). The defendant bears the burden of establishing that his financial circumstances warrant a reduction in penalties. *See SEC v. Amerindo Inv. Advisors Inc.*, No. 05–CV-523 (RJS) 2014 WL 2112032, at * 13 (S.D.N.Y. May 6, 2014).

---

[12] Even were the Court to value MetricStream at the implied enterprise value of the August 2014 financing, the overall value of the Fund would still be well below the minimum valuation necessary for Penn's forfeited interest to have had any value. Assuming the MetricStream investment was worth approximately $41.2 million, the total value of the Fund was far below the approximately $123 million in invested capital, not including fees, expenses, and debt assumed by the Fund. All of those funds would have to be repaid before Penn could hope to see a return from his carried interest.

The Court has found previously that Penn's conduct was egregious, involved a high degree of scienter, and was recurrent. Penn's scheme caused approximately $9 million in losses to his investors—individuals and institutions who trusted Penn with their money and to whom he owed a fiduciary duty. Penn has presented no evidence from which the Court could find that his financial circumstances warrant a reduction in penalties. From 2010 to 2013, Penn was paid approximately $6 million by the Fund. He received another $9 million in ill-gotten gains, approximately $8 million of which is unaccounted for. This money was transferred to entities controlled by Penn and never recovered. Although Penn reported to the Internal Revenue Service that he had no income in 2016, the Court has been presented with no evidence that he made any effort to secure employment since his release from prison.[13] Penn Dep. Tr. (Pl.'s Ex P-14) at 61-62. Assuming those returns were accurate, Penn has not provided any information regarding assets he may possess that would not show up on his 2016 tax return, such as equity investments from which he derives no income. He has essentially refused to provide any additional evidence regarding his financial circumstances. *See SEC v. Rabinovich & Associates, LP*, No. 07–CV-10547 (GEL) 2008 WL 4937360, at *6 (S.D.N.Y Nov. 18 2008) (noting defendant's failure to provide an accounting as ordered by the Court in concluding that defendant's civil penalty should not be mitigated by his financial hardship). Under the circumstances, the Court finds Penn's claim to be indigent not to be credible.

Although the Court has discretion to impose a fine of up to $150,000 or $160,000 per violation, the Court finds that it is appropriate to impose a penalty of the amount of Penn's ill-

---

[13] He has apparently spent his time embroiled in litigation and arbitration (including this case) against the victims of his fraud and taking a correspondence course in becoming a paralegal from the Blackstone Career Institute. Penn Tr. at 61. Penn's deposition transcript was designated to be admitted at the August 20, 2018 hearing by the SEC. The hearing never took place. Nonetheless, because this information is beneficial to Penn, the court has considered it.

gotten gains or $9,286,916.65. Were the Court to treat each improper transfer from the Fund to Ssecurion as a separate violation, the amount of the fine could be higher. But doing so would disaggregate a continuous course of fraudulent conduct and would bear little connection to the factors the Court must consider in determining the amount of the fine under *Haligiannis*. Put another way, it was one scheme to defraud, not many.

The Court finds that it is more appropriate to impose a fine based on the amount Penn stole from his investors. That method more accurately reflects the egregiousness of Penn's conduct and the losses he caused. Penn not only diverted money from the Fund and thus ultimately from his investors, but he did so through a series of sham transactions. As egregious, when the Fund's auditor detected the unlawful transactions, Penn forged documents in an attempt to conceal his fraud. Most of the money Penn stole has never been recovered. Penn's complete lack of remorse – he insists this proceeding is a part of a conspiracy among the District Attorney, the SEC, and the Fund's current managers to steal the Fund from him – and the high degree of scienter involved in his scheme also support imposing a significant fine. *See SEC v. Alternative Green Technologies, Inc.*, No. 11–CV-9056 (SAS) 2014 WL 7146032, at *4 (S.D.N.Y. Dec. 15, 2014).

## CONCLUSION

The SEC's motion for disgorgement and civil monetary penalties is GRANTED. Penn is ordered to disgorge his ill-gotten gains in the amount of $9,286,916.65 plus interest. The Court imposes a civil monetary penalty in the same amount. The SEC is directed to provide a proposed form of judgment, including a revised damages and penalties calculation consistent with the Court's findings by **September 21, 2018**.

**SO ORDERED.**

**Dated: September 10, 2018**
 **New York, NY**                                           **VALERIE CAPRONI**
                                                            **United States District Judge**