USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 03/17/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
SECURITIES AND EXCHANGE
COMMISSION,

                      Plaintiff,

           -against-

           14-CV-0581 (VEC)

LAWRENCE E. PENN, III, ET AL.,

           MEMORANDUM
           Defendants,           OPINION & ORDER

           -and-

A BIG HOUSE FILM AND PHOTOGRAPHY
STUDIO, LLC,

           Relief Defendant.
-------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

      This Court previously entered final judgment against Defendant Lawrence Penn, III ("Penn") for violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. § 78j(b)), and Rule 10b–5 thereunder (17 C.F.R. § 240.10b–5) and Sections 204, 206(1), and 206(2) of the Investment Advisers Act of 1940 (the "Advisers Act") (15 U.S.C. §§ 80b–4, 80b–6(1), 80b–6(2)), and Rule 204–2 thereunder (17 C.F.R. §§ 275.204–2). *SEC v. Penn*, 225 F. Supp. 3d 225, 229–30 (S.D.N.Y. 2016). The U.S. Court of Appeals for the Second Circuit summarily dismissed Penn's appeal of the judgment, Dkt. 334, and the SEC has moved, unopposed, for summary judgment against the two entities that Penn controlled and used to commit the aforementioned violations, Camelot Acquisitions Secondary Opportunities Management LLC ("CASO Management"), and Camelot Group International, LLC ("CGI") (collectively, the "Camelot Entities"), Dkt. 313. Because the Court agrees with the SEC that

Penn's conduct should be imputed to the Camelot Entities and that there is no genuine dispute as to liability, the SEC's motion is granted; the Court further concludes that a permanent injunction, disgorgement, and civil monetary penalties are appropriate remedies.

## I. BACKGROUND

Most of the pertinent facts are set forth in the Court's decisions granting summary judgment against Penn and permanently enjoining him from violating the securities laws. *See Penn*, 225 F. Supp. 3d at 230–32; *SEC v. Penn*, No. 14-CV-581, 2017 WL 5515855, at *1 (S.D.N.Y. Aug. 22, 2017). For purposes of this motion, the Court focuses on the facts needed to contextualize and establish Penn's relationship with the Camelot Entities.[1]

---

[1] The Court's account of the record is based on prior rulings, as well as uncontroverted facts in the SEC's Rule 56.1 Statement ("Pl. 56.1 Stmt.") (Dkt. 317) and the supporting declarations filed by James D'Avino ("D'Avino Decl.") (Dkt. 315) and Karen E. Willenken ("Willenken Decl.") (Dkt. 316). The Camelot Entities were represented by counsel, Ian Orr, when the SEC filed the instant motion. Dkt. 327. The Camelot Entities were originally required to file any opposition by June 4, 2019, but, despite two extensions granted *sua sponte* by the Court, no opposition has been filed. Dkts. 311, 319, 323.

On June 6, 2019, Penn, acting without counsel and purporting to file documents on behalf of the Camelot Entities, moved to disqualify the undersigned from the matter. Dkt. 319. On June 14, 2019, the Court denied Penn's motion because he may not represent anyone other than himself in federal court. *Id.*; *see* 28 U.S.C. § 1654. The Court reminded Penn of the need to retain counsel to represent the Camelot Entities and *sua sponte* extended the deadline to oppose the SEC's motion to July 3, 2019, in addition to ordering Orr to explain whether he was continuing to represent the Camelot Entities. Dkt. 319.

Rather than retain counsel, Penn again purported to represent the Camelot Entities and filed an opposition to the SEC's motion. *See* Dkts. 320–22. No response to the Court's order was received from Orr as to the status of his representation.

The Court struck Penn's opposition to the SEC's motion for violating 28 U.S.C. § 1654 and Rule 11(a) of the Federal Rules of Civil Procedure. Dkt. 323. The Court then gave Penn yet another chance to retain counsel and *sua sponte* granted him a second extension to July 22, 2019, warning him that further non-compliance would result in the SEC's motion being treated as unopposed. *Id.* The Court also ordered Orr to show cause why he should not be sanctioned for failing to respond to the Court's previous order. *Id.* Orr responded that Penn had terminated his representation of the Camelot Entities, although he failed to notify the Court until two orders had been issued seeking information regarding his status; the Court imposed a monetary sanction on Orr, which he has since moved to reconsider and will be addressed in a separate order. *See* Dkts. 328–29, 333.

Thereafter, Penn has not retained counsel, and no opposition has been filed. The Court therefore views the SEC's motion as unopposed; the Court nevertheless has an independent obligation to determine whether the grant of summary judgment is warranted in light of the uncontroverted record and the applicable law. *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 242, 244 (2d Cir. 2004).

Penn managed a private equity fund, Camelot Acquisitions Secondary Opportunities LP (the "Fund"), from the Fund's inception in 2007 to February 2014, when Penn was criminally charged with grand larceny, money laundering, and falsifying business records. Pl. 56.1 Stmt. (Dkt. 317) ¶ 1; *Penn*, 225 F. Supp. 3d at 230. The criminal prosecution stemmed from the same course of conduct that is at issue in this case—Penn's scheme to divert over $9 million from the Fund to entities under his control through the use of false invoices and inaccurate books and records. Pl. 56.1 Stmt. (Dkt. 317) ¶ 5; *Penn*, 225 F. Supp. 3d at 230. This action was stayed pending Penn's prosecution in state court; he ultimately pleaded guilty in March 2015 to grand larceny and falsifying business records, both in the first degree. Pl. 56.1 Stmt. (Dkt. 317) ¶ 2; *Penn*, 225 F. Supp. 3d at 230–31.

As part of his guilty plea and during the course of this litigation, Penn made numerous inculpatory admissions, which are now being used by the SEC to advance this motion. In state court, Penn admitted to making a false entry in the Fund's schedule of invoices and stealing over $1 million from the Fund. *Penn*, 225 F. Supp. 3d at 231. In his amended answer to the SEC's Complaint, Penn admitted to transferring $9.3 million from the Fund to Defendants CASO Management and CGI, the entities against whom the SEC is now seeking summary judgment. Penn Am. Ans. (Dkt. 134) ¶ 3; Pl. 56.1 Stmt. (Dkt. 317) ¶ 12; *Penn*, 225 F. Supp. 3d at 230–31. He also conceded that he violated "Sections 204 of the Investment Advisers Act" and "Rule 204-2 of 17 CFR 275.204-2." Penn Am. Ans. (Dkt. 134) ¶ 6; Pl. 56.1 Stmt. (Dkt. 317) ¶ 16.

There is no genuine dispute that Penn founded, owned, and controlled the Camelot Entities, which "collectively" managed the Fund. Penn Am. Counterclaims (Dkt. 134) ¶ 4; Pl. 56.1 Stmt. (Dkt. 317) ¶ 8. CASO Management was a registered investment adviser that acted as the investment manager for the Fund. Pl. 56.1 Stmt. (Dkt. 317) ¶¶ 10, 18, 22. CGI functioned as

an affiliate or parent organization of CASO Management. *Id.* ¶ 19. Penn admitted that "he had primary responsibility for all business decisions as Managing Member and Managing Director of" CASO Management. *Id.* ¶ 9. Penn also owned at least 99% of both of the Camelot Entities.[2] *Id.* ¶ 8.

Penn, as an investment adviser for the Fund, used the Camelot Entities and an entity controlled by a co-conspirator, Ssecurion LLC ("Ssecurion"), to misappropriate the Fund's assets under the guise of paying due diligence expenses. Pl. 56.1 Stmt. (Dkt. 317) ¶¶ 21, 27, 30; *Penn*, 225 F. Supp. 3d at 230–31. Specifically, Penn, using a "Camelot Group" signature and email address, sent an agreement and purported invoices generated by Ssecurion to the Fund's administrator to procure payment; CASO Management also maintained a ledger containing due diligence payments, which the Fund's administrator relied on to prepare financial statements. Pl. 56.1 Stmt. (Dkt. 317) ¶¶ 27, 30. Ssecurion, in turn, caused the purported due diligence fees to be transferred to bank accounts owned by CASO Management and CGI. *Id.* ¶¶ 31-32, 34-35. CGI received $8,627,004, while CASO Management received $440,000, of the purported due diligence fees paid to Ssecurion. *Id.*

Based on those and other facts, the Court granted the SEC's motion for summary judgment against Penn, as to his violations of Section 10(b) of the Exchange Act and Rule 10b–5 thereunder; and Sections 204, 206(1), and 206(2) of the Advisers Act and Rule 204–2 thereunder. The Court further determined that Penn must disgorge his pecuniary gain of $9,286916.65, plus prejudgment interest at the IRS underpayment rate, and pay a civil penalty in the same principal amount; final judgment was entered on October 1, 2018. Dkt. 300. Penn

---

[2] Penn purports to own 100% of CASO Management and 99% of CGI. Dkt. 320 ¶ 8. Penn's father appears to own the remaining 1%. *See* Compl. (Dkt. 1) ¶ 20; Penn Am. Ans. (Dkt. 134) ¶ 20. In any event, there is no material difference in this case between 99% ownership and 100% ownership.

appealed, unsuccessfully, Dkt. 334, and the SEC now seeks summary judgment against the Camelot Entities, arguing that Penn's conduct is imputable to them.

By imputing Penn's conduct and knowledge to the entities he controlled, the SEC contends that CASO Management directly violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Sections 204, 206(1), and 206(2) of the Advisers Act and Rule 204-2 thereunder. SEC Br. (Dkt. 314) at 11 (citing Compl. (Dkt. 1) ¶ 7). CGI is accused of aiding and abetting the violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Sections 206(1) and (2) of the Advisers Act. Compl. (Dkt. 1) ¶ 11.

## II. DISCUSSION

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute exists when the evidence is such that, if the party against whom summary judgment is sought is given the benefit of all permissible inferences and all credibility assessments, a rational factfinder could resolve all material factual issues in favor of that party." *SEC v. Sourlis*, 851 F.3d 139, 144 (2d Cir. 2016). The SEC argues that there is no genuine dispute of fact, given the prior criminal and civil judgments against Penn and Penn's admissions regarding the relationship between him and the Camelot Entities. The Court agrees.

### A. Penn's Conduct

The Camelot Entities failed to oppose the SEC's motion for summary judgment, but even if they had responded, they would be barred from re-litigating the facts of Penn's conduct and his violations of the securities laws. The doctrine of the law of the case consists of two general principles. First, it "forecloses relitigation of issues expressly or impliedly decided by the appellate court." *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het*

*Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 407 F.3d 34, 44 (2d Cir. 2005) (citation omitted). The doctrine also limits "a district court's discretion to reconsider its own decisions . . . to circumstances in which new evidence is available, an error must be corrected, or manifest injustice would otherwise ensue," unless there is an intervening change in law. *Id.* Here, because the Court of Appeals for the Second Circuit has affirmed this Court's final judgment as to Penn, and no change in law or circumstance or error has been shown, both principles foreclose further dispute as to all issues expressly and impliedly decided as part of the judgment against Penn. *Cty. of Suffolk v. Stone & Webster Eng'g Corp.*, 106 F.3d 1112, 1117 (2d Cir. 1997).

      The court has discretion to apply the law of the case doctrine, notwithstanding a "difference in parties," provided that doing so would be consistent with the court's "good sense." *See Zdanok v. Glidden Co., Durkee Famous Foods Div.*, 327 F.2d 944, 953 (2d Cir. 1964). The doctrine is "[d]riven by considerations of fairness to the parties, judicial economy, and the societal interest in finality." *Suffolk*, 106 F.3d at 1117. Here, judicial economy would undoubtedly be aided by relying on the judgment against Penn, rather than requiring the SEC to re-litigate the legality of Penn's actions upon the same record. Such re-litigation would be inconsistent with finality, as this Court would be acting contrary to the Second Circuit's mandate if it were to find that Penn did not in fact violate the securities laws. Although the Camelot Entities were not parties to the Penn judgment, holding them to any judgment entered against Penn has been expressly contemplated by the Court and the parties since at least January 19, 2018. SEC Letter (Dkt. 237). The proceeding was stayed as to the Camelot Entities because "it would conserve judicial and prosecutorial resources to first determine the liability of Penn as the liability of the Camelot Entities is entirely derivative of his." Stay Order (Dkt. 243) ("This case shall remain STAYED as to the Camelot Entities, pending the conclusion of the proceedings

relative to Mr. Penn."). The Camelot Entities, which were represented by counsel, had notice that any determination of Penn's liability would dispose of the claims against them and failed to note any objection. The litigation of the SEC's summary judgment motion against Penn was, therefore, effectively a "test case," and streamlining the rest of this litigation presents no unfairness to the Camelot Entities, who would have benefitted had Penn prevailed. *See Zdanok*, 327 F.2d at 953. In sum, the facts and the law have not changed, and application of the law of the case cannot come as a surprise to the Camelot Entities.

For those reasons, the Court concludes that Penn's conduct and liability for violating the securities laws, as set forth in the Court's prior orders and judgments, are not subject to further challenge in this case, by Penn or the Camelot Entities.[3]

### B. Imputation of Penn's Conduct

What remains to be decided is whether Penn's conduct and violations should be imputed to the Camelot Entities. Courts have long imputed an individual's misconduct to his or her "corporate embodiments."[4] *See SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1089 n.3 (2d Cir. 1972) (affirming district court's conclusions that individual had "blanket authority" over entities and that imputation of their knowledge was appropriate). That is, where an entity is completely dominated and controlled by an individual, such that the entity has "no autonomous

---

[3] The Camelot Entities would also be barred, as the SEC has argued, under issue preclusion or collateral estoppel, because of exceptions to the rule against non-party preclusion. *See Taylor v. Sturgell*, 553 U.S. 880, 893–95 (2008).

[4] *See also SEC v. Haligiannis*, 470 F. Supp. 2d 373, 381–82 (S.D.N.Y. 2007) ("The scienter of Haligiannis, the president and chief operating officer of Sterling Capital and Sterling Advisors, which in turn have exclusive control over the management and operations of Sterling Watters, can be imputed to those entities. These undisputed facts support a finding of the liability for all defendants.") (citations omitted); *SEC v. v. Tee to Green Golf Parks, Inc.*, No. 00-CV-478S, 2011 WL 147862, at *8 (W.D.N.Y. Jan. 18, 2011) ("The undisputed facts show that Blumhagen made these statements knowingly and voluntarily, with intent to deceive and defraud the purchasers. His misconduct is imputed to Tee to Green because Blumhagen was president and ran the entity's day-to-day operations.").

7

and separate existence," the entity becomes "independently liable for violations of the relevant statutes and rules" committed by the controlling individual. *SEC v. Franco*, 253 F. Supp. 2d 720, 730 (S.D.N.Y. 2003). "This [control] principle is consistent with the self-evident proposition that a corporation can act only through the actions of natural persons and that the actions of its agents, acting within the scope of their agency, are attributed to the corporation." *Id.* at 729 (citing *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 154 (1972)); *see also SEC. v. Kinnucan*, 9 F. Supp. 3d 370, 375 (S.D.N.Y. 2014) (imputing president's liability for Exchange Act violations to his entity).

There is no genuine dispute that Penn completely dominated the Camelot Entities and that, at least for purposes of the transactions at issue, there is no distinction between them. Penn owned at least 99% of both of the Camelot Entities and was responsible for all business decisions made by CASO Management—facts that Penn admitted in his answer and counterclaims. Pl. 56.1 Stmt. (Dkt. 317) ¶¶ 8-9. The Camelot Entities also benefitted from the scheme, with CGI and CASO Management receiving, respectively, $8,627,004 and $440,000 of the fraudulent due diligence payments. *Id.* ¶¶ 11, 34-35. And by virtue of Penn's domination of the Camelot Entities, any funds going to the Camelot Entities effectively went to Penn. Under those circumstances, Penn and the Camelot Entities were acting of one mind, and imputation of Penn's conduct and knowledge is appropriate. *See Franco*, 253 F. Supp. 2d at 728–30 & n.3.

CASO Management is accused of directly violating Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Sections 204, 206(1), and 206(2) of the Advisers Act, as well as Rule 204-2 thereunder. Because Penn's conduct and knowledge are imputed to CASO Management, and the Court has already determined that Penn's conduct violated the foregoing provisions, CASO Management is necessarily liable for the same.

The SEC charges CGI with aiding and abetting Penn's (and therefore CASO Management's) violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, as well as Sections 206(1) and (2) of the Advisers Act. To establish aiding and abetting liability, "the government must prove: (1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge of this violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the primary violation." *SEC v. DiBella*, 587 F.3d 553, 566 (2d Cir. 2009) (internal quotation marks and citation omitted). First, Penn's securities law violations have already been conclusively adjudicated. Dkt. 334. Second, Penn's knowledge of the wrongfulness of his conduct, established through his guilty plea in state court, *see Penn*, 225 F. Supp. 3d at 236, is imputed to CGI, as discussed above. And finally, CGI helped Penn implement the fraud by allowing Penn to use CGI newsletters and emails to procure the fraudulent due diligence payments from the Fund. Pl. 56.1 Stmt. (Dkt. 317) ¶¶ 24–26, 30. Because CGI knowingly enabled Penn's fraud on the Fund, it is liable for aiding and abetting Penn's violations of the Exchange Act and the Advisers Act.

In sum, the undisputed facts as to Penn's conduct, knowledge, and relationship with the Camelot Entities establish their liability.[5]

---

[5] As noted previously, Penn purported to represent the Camelot Entities and filed an opposition the SEC's motion, which the Court ordered stricken because, as a non-lawyer, Penn may not represent anyone other than himself. *See Lattanzio v. COMTA*, 481 F.3d 137, 139 (2d Cir. 2007). Penn's opposition, even if the Court could consider it, would be unavailing. Penn's response to the SEC's statement of undisputed facts, to the extent it raises any disputes, merely seeks to relitigate his conviction in state court, contending that his guilty plea was "void" and that his criminal conviction was "wrongful and unlawful" because he disagreed with the state court's application of state law—issues that he has exhausted on appeal and cannot be considered in this action. Penn Resp. (Dkt. 320) ¶¶ 1, 2. Penn's memorandum of law again seeks to overturn the Court's summary judgment decision, contending that reliance on his criminal conviction was improper—an argument that this Court and the Second Circuit rejected. *See generally* Penn. Br. (Dkt. 322).

### C. Remedies

"The court has broad discretion to tailor the sanction to the wrongful conduct involved." *SEC v. Posner*, 16 F.3d 520, 522 (2d Cir. 1994). The SEC seeks a permanent injunction against further violations of the securities laws, disgorgement with prejudgment interest, and a civil penalty. SEC Br. (Dkt. 314) at 12.

#### 1. Permanent Injunction

The Court may grant an injunction against a future violation of the securities laws. *See* 15 U.S.C. §§ 78u(d)(1), 80b–9(d). "The critical question for a district court in deciding whether to issue a permanent injunction in view of past violations is whether there is a reasonable likelihood that the wrong will be repeated." *Manor Nursing Centers, Inc.*, 458 F.2d at 1100. To ascertain the risk of future violation, "a district court may consider: (1) the egregiousness of the violation; (2) the degree of scienter; (3) the isolated or repeated nature of the violations; and (4) the sincerity of defendant's assurances against future violations." *Haligiannis*, 470 F. Supp. 2d at 384; *see also SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 100 (2d Cir. 1978).

As when the Court granted the SEC's motion for a permanent injunction against Penn, "[e]ach factor weighs in favor of an injunction in this case." *Penn*, 2017 WL 5515855, at *2. Penn and his entities all acted egregiously and with a high degree of scienter—the scheme took substantial planning and involved the coordination of multiple entities, including Ssecurion, which was controlled by a co-conspirator. *Id.* Nor was the fraud an isolated incident— Defendants' scheme used 32 false invoices to generate 80 improper transfers over a period of three years. *Id.* In other words, the fraud was "systematic." *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1477 (2d Cir. 1996) ("[A]n injunction is particularly within the court's discretion where a violation was founded on systematic wrongdoing, rather than an isolated occurrence."

(citation omitted)). And finally, none of the Defendants has accepted responsibility in this action or expressed any intention of refraining from future violations. Although Penn pleaded guilty in state court, he has since repeatedly filed frivolous papers contesting the validity of his guilty plea and seeking damages from essentially every government official known to have been involved in the criminal and civil enforcement actions against him. *See, e.g.*, Penn Decl. (Dkt. 302) ¶ 5 ("Defendant asserts that the [SEC] colluded with members of the Manhattan District Attorney and the State of New York."); Penn Counterclaims (Dkt. 134) ¶ 1 ("This is an action against staff members in the New York Office of the Plaintiff, the SEC for federal and state constitutional violations and tortious conduct committed under the color of state law and in violation of state law."); Complaint, *Penn v. City of New York et al.*, No. 19-CV-2106, Dkt. 1 (S.D.N.Y. Mar. 7, 2019). In essence, Penn and his entities appear to believe that they are the victims in this story, and that the enforcement authorities responsible for stopping their fraud are in the wrong. *See also SEC v. Penn*, No. 14-CV-581, 2018 WL 4378444, at *1 (S.D.N.Y. Sept. 14, 2018) ("Despite the overwhelming evidence of his guilt, Penn asserts that he is the victim of a conspiracy among the New York District Attorney's Office, the SEC, and the current managers of the Fund to seize unlawfully control of his interest in the Fund.").

For those reasons, the Court concludes that the Camelot Entities, like Penn, have not demonstrated any respect for the law, and that the entry of a permanent injunction is warranted due to the likelihood of future violations.

### 2. Disgorgement

"Disgorgement serves to remedy securities law violations by depriving violators of the fruits of their illegal conduct." *SEC v. Contorinis*, 743 F.3d 296, 301 (2d Cir. 2014). For that reason, "the disgorgement amount may not exceed the amount obtained through the

wrongdoing," *id.*, although it could be greater than the actual damages to the victim. *SEC v. Cavanagh*, 445 F.3d 105, 117 (2d Cir. 2006). Once the SEC satisfies its "burden of establishing a reasonable approximation of the profits causally related to the fraud, the burden shifts to the defendant to show that his gains 'were unaffected by his offenses.'" *SEC v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013) (quoting *SEC v. Lorin*, 76 F.3d 458, 462 (2d Cir. 1996)). The Court "has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged." *First Jersey Sec., Inc.*, 101 F.3d at 1474–75.

Using bank records, the SEC has established with reasonable certainty that Ssecurion, after receiving fraudulent due diligence payments from the Fund, transferred over $9 million of those payments, either directly or through an intermediate account,[6] to CGI and CASO Management. D'Avino Decl. ¶ 7. Specifically, CASO Management received $440,000 of the fraudulent fees, while CGI received $8,627,004. *Id.* Despite being given multiple opportunities to file an opposition to the SEC's request for disgorgement, the Camelot Entities have failed to provide any basis to rebut the SEC's calculations or rationale. Accordingly, the Court concludes that CASO Management and CGI must each disgorge their ill-gotten payments, which are, respectively, $440,000 and $8,627,004.

The Court further finds that an award of prejudgment interest is appropriate to fully deprive the Camelot Entities of the fruits of their crimes. The SEC requests that prejudgment interest, at the IRS underpayment rate, be assessed from July 12, 2013, the date of the final due diligence payment from the Fund, to the date that the disgorgement payment becomes due. *See* D'Avino Decl. ¶ 23. The Court agrees, with one caveat. The Second Circuit has held that

---

[6] The intermediate account belonged to Big House Film and Photography Studio, LLC ("Big House"), an entity owned by the same co-conspirator as owned Ssecurion. D'Avino Decl. ¶ 7. The Court has previously entered a final judgment against Penn's co-conspirator, Ssecurion, and Big House. Dkts. 105, 106, 107.

prejudgment interest should not be assessed against frozen assets, for the period during which they were frozen, if such assets will be used to satisfy a defendant's disgorgement obligation. *See Razmilovic*, 738 F.3d at 38. Here, the Camelot Entities have frozen assets totaling $155,704.63. D'Avino Decl. ¶ 22. To the extent that the SEC intends to use the frozen assets to satisfy the Camelot Entities' disgorgement obligation, the SEC must submit a revised prejudgment interest calculation that accounts for the duration of the asset-freeze order. The prejudgment interest calculation must also be updated to reflect the present date, as the SEC's estimate is currently based on a due date of July 30, 2019. *Id.* ¶ 23.

Disgorgement, however, should not be duplicative, else it would exceed the amount gained and acquire a punitive character. *See Cavanagh*, 445 F.3d at 116 n.25 (noting that disgorgement is "remedial rather than punitive"). The Court previously ordered Penn to disgorge the entirety of the ill-gotten gains from the fraud ($9,286,916.65 plus prejudgment interest). CASO Management's and CGI's ill-gotten gains ($9,067,004 plus prejudgment interest) are a subset of that amount. To avoid duplicative recovery, the Court finds CASO Management and CGI jointly and severally liable with Penn for disgorgement up to their respective share of the ill-gotten gains. That is, CASO Management shall be jointly and severally liable with Penn for disgorgement of $440,000, plus prejudgment interest; CGI shall be jointly and severally liable with Penn for disgorgement of $8,627,004, plus prejudgment interest.

In sum, the Court finds that disgorgement plus prejudgment interest is an appropriate remedy in this case. CGI must disgorge $8,627,004, and CASO Management must disgorge $440,000; prejudgment interest shall be determined based on the SEC's supplemental submission, using the IRS underpayment rate.

### 3. Civil Penalty

The Exchange Act and Investment Advisers Act authorize the Court to impose a civil monetary penalty, in addition to disgorgement, to punish and deter fraudulent activities. *See* 15 U.S.C. §§ 78u(d)(3), 80b–9(e). "In determining whether civil penalties should be imposed, and the amount of the fine, courts look to a number of factors, including (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition." *Haligiannis*, 470 F. Supp. 2d at 386. The maximum penalty is the greater of the defendant's pecuniary gain and one of three possible statutory maximums determined by the severity of the defendant's conduct. *See* 15 U.S.C. §§ 78u(d)(3), 80b–9(e).

As the Court previously found, imposing a penalty equal to each defendant's pecuniary gain in this case is appropriate. *Penn*, 2018 WL 4378444, at *6 ("Were the Court to treat each improper transfer from the Fund to Ssecurion as a separate violation, the amount of the fine could be higher. But doing so would disaggregate a continuous course of fraudulent conduct and would bear little connection to the factors the Court must consider."). For the reasons already discussed, the conduct underlying the scheme, which has been imputed to the Camelot Entities, "was egregious, involved a high degree of scienter, and was recurrent." *Id.* The fraudulent scheme also led to losses of over $9 million, most of which has never been (and might never be) recovered. *Id.* As to their financial circumstances, the Camelot Entities passed on multiple opportunities to explain why a reduction in penalties is warranted. And finally, by all indications, the Camelot Entities, like Penn, are recalcitrant; most recently, despite the entry of

final judgment against Penn, which clearly controls the outcome of the claims against them, the Camelot Entities refused to accept responsibility, forcing the SEC to file a second motion for summary judgment, causing unnecessary expenditure of judicial resources, and delaying the imposition of judgment. *See* SEC Letter (Dkt. 327).

For those reasons, the Court concludes that a civil monetary penalty, in the amount of the Camelot Entities' respective pecuniary gain, is appropriate. Thus, CGI must pay a penalty of $8,627,004, and CASO Management must pay $440,000.

### III. CONCLUSION

The SEC's motion for summary judgment, a permanent injunction, disgorgement, and civil penalties against CASO Management and CGI is GRANTED as set forth above. CGI must disgorge $8,627,004 and pay a civil penalty of the same amount; CASO Management must disgorge $440,000 and pay a civil penalty of the same amount. Prejudgment interest on the disgorgement is GRANTED, with the amount to be fixed upon receipt of a revised calculation from the SEC that is consistent with this Order.

No later than **April 15, 2020**, the SEC must submit a proposed final judgment as to the Camelot Entities, along with a declaration containing revised prejudgment interest amounts. The SEC must also indicate whether it intends to turn over the Camelot Entities' frozen assets to satisfy their disgorgement obligations.

The existing order freezing Defendants' assets, Dkt. 300, shall remain in effect pending a decision on the SEC's anticipated turnover motion. No later than **April 15, 2020**, the SEC must either file the anticipated turnover motion or propose a briefing schedule for the motion.

The Clerk of Court is respectfully directed to terminate docket entries 313 and 326 and remove Mr. Ian Orr as counsel for the Camelot Entities.

**SO ORDERED.**

**Date:  March 17, 2020**  **VALERIE CAPRONI**
**New York, New York**  **United States District Judge**