USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/31/2021

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| *Plaintiff*, | |
| - against - | 14-CV-581 (VEC) |
| LAWRENCE E. PENN, III, MICHAEL ST. ALTURA EWERS, CAMELOT ACQUISITIONS SECONDARY OPPORTUNITIES MANAGEMENT LLC, THE CAMELOT GROUP INTERNATIONAL, LLC, and SSECURION LLC, | OPINION AND ORDER |
| *Defendants*, | |
| - and - | |
| A BIGHOUSE PHOTOGRAPHY AND FILM STUDIO LLC, | |
| *Relief Defendant.* | |

VALERIE CAPRONI, United States District Judge:

This Court previously entered final judgments against Defendant Lawrence Penn, III

("Penn") and against Defendants Camelot Acquisitions Secondary Opportunities Management

LLC ("CASO Management") and Camelot Group International, LLC ("CGI") (collectively, the

"Entity Defendants") for violations of federal securities laws.  Dkts. 300, 339, 340.  Each

Defendant was permanently enjoined from further violations of the securities laws and ordered to

pay disgorgement, pre-judgment interest, and civil penalties.  *Id.*  Defendants, with Penn

proceeding *pro se*, have moved pursuant to Rule 60(b) of the Federal Rules of Civil Procedure

for relief from the portions of the judgments that order disgorgement, arguing that the

disgorgement orders conflict with *Liu v. Securities & Exchange Commission*, 140 S. Ct. 1936

(2020), a Supreme Court case decided after the judgments were entered.  Dkts. 381, 384.  The Securities and Exchange Commission ("SEC") has separately moved for orders that (i) direct certain financial institutions to turn over funds held in frozen accounts in partial satisfaction of the three judgments; (ii) lift freeze orders on a safe deposit box and  on accounts that do not contain any funds; and (iii) amend the Complaint to dismiss Count VI, which the SEC no longer wishes to pursue.  Dkt. 350.  Defendants, as well as non-parties Camelot Acquisitions Secondary Opportunities GP, LLC ("CASO GP") and CASO Co-Invest A, LLC ("CASO Co-Invest") have opposed the SEC's motion.  Dkts. 375, 378.  For the reasons discussed below, Defendants' Rule 60(b) motions are DENIED, and the SEC's motion is GRANTED.

## BACKGROUND

The Court assumes familiarity with the Court's numerous prior opinions issued over the course of this seven-year litigation and will summarize only the most pertinent facts.[1]  From 2007 to February 2014, Penn managed a registered private equity fund called Camelot Acquisitions Secondary Opportunities LP or the "Fund."  *Penn Remedies I*, 14-CV-581, 2017 WL 5515855, at *1 (S.D.N.Y. Aug. 22, 2017).  In early 2014, the Fund's auditors discovered that Penn had misappropriated approximately $9.3 million from the Fund.  Penn and an accomplice had used Ssecurion, LLC, a shell corporation, to send the Fund invoices for "due diligence" services that it had not performed; the Fund paid the invoices.  Ssecurion forwarded most of the proceeds it received to CASO Management and CGI, other entities controlled by

---

[1]    *See Sec. & Exch. Comm'n v. Penn*, 225 F. Supp. 3d 225 (S.D.N.Y. 2016) ("*Penn Liability*"); *Sec. & Exch. Comm'n v. Penn*, No. 14-CV-581, 2017 WL 5515855 (S.D.N.Y. Aug. 22, 2017) ("*Penn Remedies I*"); *Sec. & Exch. Comm'n v. Penn*, No. 14-CV-581, 2018 WL 4378444 (S.D.N.Y. Sept. 14, 2018) ("*Penn Remedies II*"); *Sec. & Exch. Comm'n v. Penn*, No. 14-CV-581, Dkt. 309 (S.D.N.Y. Jan. 3, 2019) ("*Penn First Rule 60(b) Motion*"); *Sec. & Exch. Comm'n v. Penn*, No. 14-CV-581, Dkt. 319 (S.D.N.Y. June 14, 2019) ("*Order on Motion to Disqualify*"); *Sec. & Exch. Comm'n v. Penn*, No. 14-CV-581, 2020 WL 1272285 (S.D.N.Y. Mar. 17, 2020) ("*Entity Defs. Liability & Remedies*").

Penn.[2]  *Id.*  On March 16, 2015, Penn pled guilty in New York state court to one count of grand

larceny and one count of falsifying business records.[3]  *Id.*

In 2014, the SEC commenced this parallel civil enforcement action against Penn, CASO

Management, CGI, and others.  Compl., Dkt. 1.  The Court granted a temporary restraining order

to freeze assets held in bank accounts associated with Penn, CASO Management, CGI, CASO

GP, CASO Co-Invest, and another non-party entity, CM Growth Capital Partners, L.P., which

was formerly known as Camelot Acquisitions Secondary Opportunities Offshore, LP ("CASO

Offshore").  Dkt. 2.  The Court issued preliminary injunctions to extend the asset freeze pending

resolution of this matter.  Dkts. 56, 58.

On December 21, 2016, the Court granted the SEC's motion for summary judgment on

its claims that Penn violated Section 10(b) and Rule 10b-5 of the Exchange Act and Sections 204

and 206 and Rule 204-2 of the Investment Advisers Act.  *Penn Liability*, 225 F. Supp. 3d 225,

230 (S.D.N.Y. 2016).  As discussed at length in the Court's opinion, Penn admitted, as part of his

allocution in his criminal case and in his answer in this case, to stealing millions of dollars from

the Fund, including by mischaracterizing expenses and diverting funds to entities that he

---

[2]     Most of the money fraudulently obtained from the Fund appears to be unaccounted for.

[3]     Despite his guilty plea, Penn moved to vacate the New York state judgment, asserting that he received
ineffective assistance of counsel, among other claims.  He argued that his guilty plea contravened a New York Court
of Appeals' decision, *People v. Zinke*, which held that a general partner of a limited partnership cannot commit
larceny when he takes property owned by the partnership.  556 N.Y.S.2d 11 (1990).  The New York Supreme Court
found that not only did Penn fail to provide necessary documentation to support his claims, but that *Zinke* was
inapplicable to his conviction.  *See* N.Y. Sup. Ct. Order, Dkt. 391-5 ("The People have provided sufficient
information to establish that the defendant did not serve as a partner, either general or limited, of the fund at the time
of the theft.  Therefore, the defendant's reliance on [*Zinke*] is misplaced.").  Penn appealed, and the Appellate
Division, First Department, affirmed.  *See People v. Penn*, 60 N.Y.S.3d 664, 665 (1st Dep't 2017) (finding that
Penn's guilty plea precluded appellate review, but that "[i]n any event, the record before us establishes that, unlike
the situation in *People v. Zinke*, defendant adopted a form of business organization whereby he held no ownership
interest in the stolen money at the time of the theft.") (cleaned up).  The New York Court of Appeals declined to
review that decision, *People v. Penn*, 77 N.Y.S.3d 6 (2018), and then denied reconsideration, *People v. Penn*, 79
N.Y.S.3d 107 (2018).  *See also Penn First Rule 60(b) Motion*, Dkt. 309 at 7–8, 8 n.4.

controlled.  *Id.* at 231.  Penn also directly conceded violations of Section 204 of the 40 Act and Rule 204–2 thereunder.  *Id.*

Moving to remedies, on August 22, 2017, the Court granted the SEC's motion to permanently enjoin Penn from further violations of the securities laws, *Penn Remedies I*, 2017 WL 5515855, at *1, and on September 14, 2018, the Court ordered disgorgement in the amount of $9,286,916.65, plus interest, and a monetary civil penalty in the same amount, *Penn Remedies II*, No. 14-CV-581, 2018 WL 4378444, at *3, 7 (S.D.N.Y. Sept. 14, 2018).  On October 1, 2018, the Court entered a final judgment against Penn.  Judgment, Dkt. 300.  The U.S. Court of Appeals for the Second Circuit summarily dismissed Penn's appeal.  *See* Mandate, Dkt. 334 ("Upon due consideration, it is hereby ordered that the appeal is dismissed because it lacks an arguable basis either in law or in fact.") (cleaned up).

On March 17, 2020, the Court granted the SEC's motion for summary judgment on its claims against CASO Management and CGI, two of the entities that Penn controlled and used to commit the securities law violations.[4]  *Entity Defs. Liability & Remedies*, No. 14-CV-581, 2020 WL 1272285, at *1 (S.D.N.Y. Mar. 17, 2020).  The Court found there was no dispute that Penn founded, owned, and controlled the two entities: CASO Management was a registered investment adviser that acted as the investment manager for the Fund, and CGI functioned as an affiliate or parent organization of CASO Management.  *Id.* at *2.  Penn admitted that he had primary responsibility for CASO Management's business decisions and that he owned at least 99% of both entities.  *Id.*  Given Penn's dominance over the entities, the Court imputed Penn's conduct to them and found CASO Management and CGI liable for violating the securities laws. *Id.* at *1.

---

[4]       Despite two *sua sponte* extensions by the Court of their time to respond, *see* Dkts. 319, 323, CASO Management and CGI did not respond to the SEC's motion for summary judgment.

With respect to remedies, the SEC used bank records to establish with reasonable certainty that, after receiving fraudulent due diligence payments from the Fund, Ssecurion transferred over $9 million of those payments, either directly or through an intermediate account, to CASO Management and CGI.  Specifically, CASO Management received $440,000 of the fraudulent fees, and CGI received $8,627,004.  *Id.* at *6.  The Court enjoined CASO Management and CGI from further violations of the securities laws and ordered CASO Management to disgorge the $440,000 and CGI to disgorge the $8,627,004.  Both entities were ordered to pay pre-judgment interest, and, for each, a civil penalty was set equal to the amount of that entity's disgorgement.  *Id.* at *7.  On April 30, 2020, the Court entered judgments against CASO Management and CGI.  Judgments, Dkts. 339, 340.

Throughout this litigation's seven-year history, Penn has expressed no remorse for his conduct, and, despite his guilty plea, he continues to profess his innocence.  *See, e.g.*, Dkts. 161, 275, 282, 303, 378, 385.  Despite the overwhelming evidence of his guilt, Penn asserts that he is the victim of a giant conspiracy among the New York District Attorney's Office, the SEC, this Court, and others to seize unlawfully his control in the Fund.  *See* First Motion to Disqualify, Dkt. 318; Second Motion to Disqualify, Dkt. 372.  Moreover, Penn has taken numerous actions to prolong unnecessarily these proceedings, including waiting until moments before deadlines or conferences to make meritless requests for adjournments.[5]  *See Penn Remedies II*, 2018 WL 4378444, at *2–3 (describing such efforts); *Order on Motion to Disqualify*, No. 14-CV-581, Dkt. 319 at 4–5 (S.D.N.Y. June 14, 2019) (same).  The Court sincerely hopes that today's order will finally bring this drama to a close.

---

[5]  The Court views Defendants' opposition to the SEC's turnover motion and Defendants' Rule 60(b) motions as yet another example of such foot dragging.

**DISCUSSION**

I.      **Defendants' Rule 60(b) Motions**

    A.  **Legal Standard**

Pursuant to Federal Rule of Civil Procedure 60(b), the Court may grant relief from a final judgment in six circumstances, only three of which have been raised here: "(1) mistake, inadvertence, surprise, or excusable neglect; . . . (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or (6) any other reason that justifies relief."  Fed. R. Civ. P. 60(b).  Any such motion must be made within a reasonable time.  Fed. R. Civ. P. 60(c)(1).[6]

Regardless of which provision a party invokes, Rule 60(b) requires courts to "strike[] a balance between serving the ends of justice and preserving the finality of judgments."  *Nemaizer v. Baker*, 793 F.2d 58, 61 (2d Cir. 1986) (collecting cases).  To strike this balance, Rule 60(b) motions "should be broadly construed to do substantial justice, yet final judgments should not be lightly reopened."  *Id.* (cleaned up).  Accordingly, Rule 60(b) is "a mechanism for extraordinary judicial relief invoked only if the moving party demonstrates exceptional circumstances." *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) (cleaned up); *see also Miles v. N.Y.C. Transit Auth.*, 802 F. App'x 658, 659 (2d Cir. 2020).  The decision whether to grant such relief is "committed to the sound discretion of the district court."  *Shanfa Li v. Chinatown Take-Out Inc.*, 812 F. App'x 49, 53 (2d Cir. 2020) (internal citation omitted); *Nemaizer*, 793 F.2d at 61.

---

[6]      With respect to motions made pursuant to Rule 60(b)(1), the Rule caps what can be considered a "reasonable time" at one year.  *See* Fed. R. Civ. P. 60(c)(1).

Although Penn and the Entity Defendants filed separate Rule 60(b) motions, Dkts. 381,

384, both motions rely on Rule 60(b)(6).[7]  Penn Rule 60(b) Mem. of Law, Dkt. 385 at 11; Entity

Defs. Rule 60(b) Mem. of Law, Dkt. 382 at 5–6.  Rule 60(b)(6) is a catchall provision that

applies when there is "any other reason that justifies relief."  Fed. R. Civ. P. 60(b)(6).  Motions

pursuant to Rule 60(b)(6) may only be brought if no other subsection is applicable.  *See PRC*

*Harris, Inc. v. Boeing Co.*, 700 F.2d 894, 898 (2d Cir. 1983) ("Rule 60(b)(6) is a broadly drafted

'umbrella provision,' which must be read in conjunction with the other sections of that Rule, and

is applicable only where the more specific provisions do not apply.") (collecting cases); *accord*

*Nemaizer*, 793 F.2d at 63 (same); *Jackson v. Stanford*, No. 16-CV-9702, 2020 WL 6822984 at

*4 (S.D.N.Y. Nov. 20, 2020) (same); *cf. Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd.*

*P'ship*, 507 U.S. 380, 393 (1993) (holding that Rule 60(b)(1) and Rule 60(b)(6) are mutually

exclusive provisions).

Because both motions rely on Rule 60(b)(6), the Court must first determine whether this

is the only provision of Rule 60(b) that could apply.  Defendants argue that the Court should

reconsider its final judgments because they allegedly conflict with a recent Supreme Court

decision, *Liu v. Securities & Exchange Commission*, 140 S. Ct. 1936 (2020).  As discussed

below, courts apply Rule 60(b)(1) when parties contend that a judgment is no longer valid

because of an intervening change of law.  Because Rule 60(b)(6) is a provision of last resort,

---

[7]     Penn briefly reviews the purported Rule 60(b)(5) standard in his opening brief.  *See* Penn Rule 60(b) Mem.
of Law, Dkt. 385 at 10–11.  To the extent that Penn intends to rely on Rule 60(b)(5), the motion is denied.  Rule
60(b)(5) allows a court to grant relief in three scenarios: the judgment has been satisfied, released, or discharged; it
is based on an earlier judgment that has been reversed or vacated; or applying the judgment prospectively is no
longer equitable. Fed. R. Civ. P. 60(b)(5).  Penn owes over $20 million dollars pursuant to a valid judgment against
him, *see* Dkt. 300, and no one has asserted that the judgment has been paid.  Accordingly, the judgment has not been
satisfied, released, or discharged.  The judgment against Penn is not based on an earlier judgment that has been
reversed or vacated, and Penn's appeal of the judgment was unsuccessful, *see* Dkt. 334, so the second scenario does
not apply.  The final possibility, that applying the judgment prospectively is no longer equitable, is inapplicable to
money judgments such as this one.  *See DeWeerth v. Baldinger*, 38 F.3d 1266, 1275 (2d Cir. 1994) (holding that
judgments involving injunctions may have prospective applications while money judgments do not).

were Rule 60(b)(1) to apply, the motions would have to be evaluated pursuant to that provision and not under Rule 60(b)(6).  Accordingly, the Court must first make a threshold determination whether Rule 60(b)(1) applies, and, if it does not, then the Court can consider the motions under Rule 60(b)(6).

### B.   Rule 60(b)(1) Is Not Available to Penn; The Entity Defendants' Rule 60(b)(1) Motion Is Denied

Rule 60(b)(1) permits a court to grant relief from a final judgment in the case of "mistake, inadvertence, surprise, or excusable neglect."  Fed. R. Civ. P. 60(b)(1).  The Second Circuit has construed this provision to apply to judicial mistakes, including when courts incorrectly apply the law.  *See Chiulli v. Internal Revenue Serv.*, No. 03-CV-6670, 2006 WL 3008084, at *2 (S.D.N.Y. Oct. 20, 2006) (collecting Second Circuit cases).  The Second Circuit has also interpreted this subsection in a manner that facilitates the correction of judgments that, although correct at the time of decision, subsequently became incorrect due to a change in law.  *Schildhaus v. Moe*, 335 F.2d 529, 530–31 (2d Cir. 1964); *Tarkington v. United States Lines Co.*, 222 F.2d 358, 359–60 (2d Cir. 1955).  In *Schildhaus*, Judge Friendly explained that interpreting "mistakes" in this manner promotes judicial efficiency by allowing district courts to correct errors without requiring the aggrieved party to appeal.  *Schildaus*, 335 F.2d at 351; *see also In re 310 Assocs.*, 346 F.3d 31, 35 (2d Cir. 2003) (reiterating the judicial efficiency rationale).

Rule 60(b)(1) motions must be made within a reasonable time and no more than one year after the date of judgment.  Fed. R. Civ. P. 60(c)(1).  One year is the outer limit; what is reasonable depends on the facts and circumstances of the particular case.  *Chiulli*, 2006 WL 3008084, at *3 (internal citation omitted).  When parties move pursuant to Rule 60(b)(1) to address an alleged intervening change of law, motions are only made within a reasonable time when they are filed before the time to appeal has expired.  *In re 310 Assocs.*, 346 F.3d at 35; *In*

*re Texlon Corp.*, 596 F.2d 1092, 1100 (2d Cir. 1979); *Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 670 (2d Cir. 1977).  Accordingly, for a Rule 60(b)(1) motion based on an intervening change of law to be timely, two things must happen before the time to appeal has expired: the pertinent change of law must occur, and the corresponding Rule 60(b)(1) motion must be filed.  Given Judge Friendly's reasoning — that it is more efficient for district courts to alter their judgments and save the parties from an appeal on the same grounds — it makes sense that a Rule 60(b)(1) motion based on a post-judgment change in law would be temporally limited in this manner.

With respect to Penn, the outer limit on a Rule 60(b)(1) motion is one year from entry of judgment.  *See* Fed. R. Civ. P. 60(c)(1).  The Court entered judgment against Penn on October 1, 2018.  Judgment, Dkt. 300.  The alleged intervening change of law occurred in June 2020, well over a year after the judgment was entered.  Accordingly, Rule 60(b)(1) is unavailable to Penn, leaving Rule 60(b)(6) as his only mechanism for seeking relief.

The Entity Defendants are in a different situation because the alleged intervening change of law occurred within the time to appeal the judgments against them.  Specifically, the Court entered judgments against the Entity Defendants on April 30, 2020, Judgments, Dkts. 339, 340, meaning that the entities had until June 29, 2020 to appeal.[8]  Fed. R. App. R. 4(a)(1)(B)(ii).  The *Liu* decision was announced on June 22, 2020, a week before their appeal deadline.[9]

---

[8]        Neither entity filed an appeal.

[9]        Although a week may seem like a relatively short period, the Entity Defendants were, or at least they should have been, on notice that the Supreme Court was likely to issue its decision around that time; the Supreme Court granted the writ of *certiorari* on November 1, 2019, and heard oral argument on March 3, 2020.  *See Liu v. Sec. & Exch. Comm'n*, 140 S. Ct. 451 (2019); *Liu*, 140 S. Ct. at 1936.  Moreover, if the Entity Defendants were worried about time, they could have requested an extension of time to file a notice of appeal, which would have given them an additional 30 days to file their motion.  *See* Fed. R. App. P. 4(a)(5)(A).

Accordingly, Rule 60(b)(1) was available to the Entity Defendants, precluding them from pursuing relief pursuant to Rule 60(b)(6).

Because the Entity Defendants' Rule 60(b) motion could have been filed pursuant to Rule 60(b)(1), the Court must apply that provision to their motion.  Upon careful consideration, the Court denies the Entity Defendants' 60(b)(1) motion as untimely.  The entities informed the Court of their intention to file their Rule 60(b) motion on August 18, 2020, *see* Letter, Dkt. 363, several weeks after the deadline to appeal had passed.  The Entity Defendants attempt to excuse their failure to file earlier,[10] Entity Defs. Rule 60(b) Reply, Dkt. 392 at 10, but excusing such delay would undermine the fundamental purpose of allowing a Rule 60(b)(1) motion following a change in law — to avoid an unnecessary appeal.  With no other arguments why Rule 60(b)(1) should not apply,[11] the Entity Defendants' Rule 60(b) motion must be denied.

Although this finding warrants denial of the Entity Defendants' Rule 60(b) motion in its entirety, the Court further considers their motion pursuant to Rule 60(b)(6), which only confirms that the motion should be denied.

### C.  Penn and the Entity Defendants' Motions Must Be Denied Pursuant to Rule 60(b)(6)

When considered pursuant to Rule 60(b)(6), the Court finds that Penn and the Entity Defendants' motions are procedurally improper and substantively baseless.  The Court considers each deficiency in turn.

---

[10]     As will be discussed below, the Entity Defendants' excuse, that they were unrepresented, is manifestly inadequate.  *See* Section I(C)(1)(b) of this Opinion, *infra*.

[11]     Oddly, the Entity Defendants do not discuss Rule 60(b)(1) at all.  This is all the more surprising inasmuch as they acknowledge that Rule 60(b)(6) relief is only available when "the asserted grounds for relief are not recognized in clauses (1)-(5) of the Rule."  Entity Defs. Rule 60(b) Mem. of Law at 5–6 (citing *Nemaizer v. Baker*, 793 F.2d 58, 63 (2d Cir. 1986)).

### 1.  The Motions Are Procedurally Improper

To be procedurally proper, a Rule 60(b)(6) motion must be filed within a reasonable time, and it is not a substitute for a properly filed appeal.  With respect to timing, the Supreme Court has found that to "justify relief under subsection (6) [of Rule 60(b)], a party must show extraordinary circumstances suggesting that the *party is faultless in the delay*."  *Pioneer Inv. Servs. Co.*, 507 U.S. at 393 (collecting cases) (emphasis added); *see also PRC Harris, Inc.*, 700 F.2d at 897 (requiring courts to "scrutinize the particular circumstances of the case, and balance the interest in finality with the reasons for delay.").  As discussed below, Penn's motion must be denied because he has done nothing within a reasonable time in this case.  The Entity Defendants' motion must be denied because their purported reason for their delay — that they were unrepresented — is meritless.

Additionally, Rule 60(b) motions "may not be used as a substitute for a timely appeal," *Nemaizer*, 793 F.2d at 61, and, in the event that a party has failed to appeal, the party must "allege[] circumstances showing that [the] failure to appeal was justifiable," *Ackermann v. United States*, 340 U.S. 193, 197 (1950).  While Penn timely appealed the judgment against him, he did not appeal the amount of disgorgement; the Entity Defendants did not appeal at all.  Here too the Entity Defendants attempt to excuse their failure by asserting their lack of representation.  For the reasons discussed below, the fact that the Entity Defendants were not represented is not an adequate excuse for their failure to appeal.

#### a.  *Penn Is at Fault for the Delay, Making his Rule 60(b)(6) Motion Untimely*

Penn filed this Rule 60(b) motion — his second one — more than two years after the Court entered judgment against him in 2018 and more than two months after the Supreme Court's decision in *Liu*, the purported basis of his motion.  Penn offers no explanation or

justification for his delay in filing this motion, and the Court finds that this is just one more attempt by Penn to prolong the inevitable, the turning over of assets to partially satisfy the judgment that was entered against him.  Accordingly, the Court finds that Penn's motion for relief from the judgment was not made within a reasonable time and must be denied.

Penn has engaged in a series of strategic moves to delay the Court's issuance of judgments against him and against the entities he controls.  While there are many examples of such behavior, Penn's actions surrounding an evidentiary hearing on remedies is an excellent illustration of his larger pattern of dilatory conduct that wastes judicial time and that has delayed this case for no legitimate reason.

After finding Penn liable for violations of the securities laws, the Court directed the parties to brief the issue of remedies.  *Penn Liability*, 225 F. Supp. 3d at 238.  The Court then granted the SEC's motion to enjoin Penn from further violations of the securities laws, but denied its motion with respect to disgorgement and penalties because a dispute of fact required an evidentiary hearing.  *Penn Remedies I*, 2017 WL 5515855, at *1.  The Court gave the parties two weeks to propose a schedule for the hearing.  *Id.* at *5.  After over a year of discovery delays, including many precipitated by Penn's disregard for court deadlines, the Court finally set the hearing for August 20, 2018.  *Penn Remedies II*, 2018 WL 4378444, at *2, *2 n.1.  Penn represented to the Court that he would call three witnesses; he also repeatedly requested adjournments of the hearing without a valid basis, which the Court denied.  *Id.* at *2.  Penn called Chambers minutes before the hearing was scheduled to begin to inform the Court that he was ill and would not be attending.  He then hung up despite requests by Court staff that he remain on the line so that the undersigned could be consulted.  *Id.*  Follow-up calls from the Court to Penn went unanswered.  *Id.*  Penn's three witnesses also did not appear at the hearing

suggesting either that the witnesses never planned to appear or that they had advance notice from Penn that he would not proceed with the hearing on that date.  *Id.* at *2 n.4.

In response to a subsequent order to show cause why default should not be entered against him in light of his failure to appear at the hearing, Penn filed a two-sentence letter stating that he had been ill.  *Id.* at 2 (citing Letter, Dkt. 288).  The Court scheduled a conference for a few days later to give Penn an opportunity to provide medical documentation of his sudden illness and warned him that failure to appear would be grounds for the Court to enter judgment against him.  *Id.* (citing Endorsement, Dkt. 290).  Penn did not appear at the conference scheduled to address his non-appearance; instead, he filed a letter twenty-five minutes before the start time stating that he had treated his illness with over-the-counter medication and that he could not travel to the Court on such short notice.  *Id.*  He offered no explanation why the trip from his apartment in midtown Manhattan to the courthouse in lower Manhattan would require more than three days to plan.  *Id.*

In light of these shenanigans, the Court concluded that "Penn's late-in-the-game requests for an adjournment appear calculated to delay these proceedings as long as possible."  *Id.* at *2 n.4.  While the events surrounding the evidentiary hearing represent an egregious form of his dilatory actions, such tactics have been ever-present in this litigation.  Had Penn adhered to court-ordered deadlines, this matter would have been resolved years earlier.  When "balance[ing] the interest in finality with the reasons for delay," *PRC Harris, Inc.*, 700 F.2d at 897, the Court resoundingly concludes that the interest in finality is paramount.  Not only was the judgment entered almost two years before the alleged intervening change in law, but had Penn respected court procedure and decorum,[12] the time between the judgment and the intervening change in

---

[12]     The fact that Penn is *pro se* is of no moment.  *See Penn Remedies II*, 2018 WL 4378444, at *3 n.5 ("While pro se litigants are entitled to substantial latitude, pro se litigants, no more than counselled litigants, are not

law would have been much longer. "Although courts have permitted untimely motions for reconsideration when there was a compelling reason to ignore the time limit, nothing in this motion presents such a compelling reason, or any circumstance that may excuse the delay." *Millennium Partners, L.P. v. U.S. Bank Nat. Ass'n*, No. 12-CV-7581, 2015 WL 6454844 at *2 (S.D.N.Y. Oct. 26, 2015) (cleaned up). Accordingly, the Court denies Penn's Rule 60(b)(6) motion as untimely.

> b. *The Entity Defendants Have No Excuse for Their Delay and Their Rule 60(b)(6) Motion Is an Improper Substitute for an Appeal*

The Entity Defendants' Rule 60(b)(6) motion is also procedurally improper. With respect to timing, the judgments against the entities were entered on April 30, 2020. Dkts. 339, 340. *Liu* was announced almost two months later, one week before their time to appeal would expire. Approximately six weeks later, on August 18, 2020, the Entity Defendants informed this Court of their intention to file a Rule 60(b) motion. *See* Letter, Dkt. 363. The Entity Defendants did not appeal the judgments against them, nor did their apparently recently-retained attorneys seek an extension of time for them to file a notice of appeal. While the majority of the Entity Defendants' memorandum of law in support of their Rule 60(b) motion focuses on the effect of the *Liu* decision on the Court's disgorgement orders, the Entity Defendants also contest the Court's decisions finding Penn and the entities liable for the underlying conduct. *See* Entity Defs. Rule 60(b) Mem. of Law at 2 n.1, 8–9 (arguing that Penn never admitted his guilt and that the Court was wrong to impute its findings about Penn to the Entity Defendants); Entity Defs.

---

permitted to disregard flagrantly Court orders and rules.") (citing *McDonald v. Head Crim. Ct. Supervisor*, 850 F.2d 121, 124 (2d Cir. 1988) ("[A]ll litigants, including pro ses, have an obligation to comply with court orders. When they flout that obligation they, like all litigants, must suffer the consequences of their actions.")).

Rule 60(b) Reply at 3–4 (same).[13]  Opposing the SEC's motion for summary judgment or

appealing the final judgments would have been the proper avenues for raising such arguments.

But the Entity Defendants chose neither option, and a Rule 60(b) motion is not a proper

substitute.

The Entity Defendants offer the same excuse for both the delay and the failure to appeal:

they were unrepresented.  *See, e.g.*, Entity Defs. Rule 60(b) Reply ("Crucially, the Camelot

Entities were unrepresented when the U.S. Supreme Court granted certiorari in *Liu* (November 1,

2019), they were unrepresented when the Court entered summary judgment against them (March

17, 2020), they were unrepresented when the final judgments were entered (April 30, 2020), and

they were unrepresented when the U.S. Supreme Court decided *Liu* (June 22, 2020)"); *see also*

*id.* at 7–9 (repeating that any deficiency should be excused by the entities' lack of

representation); Entity Defs. Rule 60(b) Mem. of Law at 5, 13–14 (same).

In citing their lack of representation, the Entity Defendants are the corporate equivalent

of the child who, having killed his parents, is begging for mercy because he is an orphan.  As

discussed in further detail below, the Entity Defendants were not always unrepresented; Penn

fired their counsel on the day after their opposition to the SEC's motion for summary judgment

was due.[14]

For more than three of the seven years of this protracted litigation, the Entity Defendants

were represented.  On June 28, 2016, Edward Rodriguez filed a notice of appearance as counsel

---

[13]     These arguments ignore the Court's reasoned determinations about Penn's admissions, *see Penn Liability*,
225 F. Supp. 3d at 230–38, and the Court's detailed analysis supporting the imputation of Penn's liability to the
Entity Defendants, *see Entity Defs. Liability & Remedies*, 2020 WL 1272285, at *4–5.

[14]     Given the heavy reliance the Entity Defendants place on the fact that they were unrepresented when they
should have filed a notice of appeal or made a Rule 60(b)(1) motion, the Court was anticipating some explanation
for why, all of a sudden, they decided to retain counsel.  No such explanation appears in the Defendants' papers,
leading to the inevitable conclusion that this is just one more delaying tactic by Penn.

for the Entity Defendants.  Dkt. 143.  Four months later, Rodriguez filed a stipulation of

substitution of counsel on behalf of the Entity Defendants (calling themselves the "Penn

Entities"), under which Ian Orr replaced Rodriguez as counsel, "pursuant to the wishes of the

Penn Entities and on consent."  Stip., Dkt. 166 at 1.  Although Orr never filed a motion to

withdraw as counsel, the Court later learned that Penn, acting on behalf of his entities, had fired

Orr the day after the Entity Defendants' response to the SEC's motion for summary judgment

was due.  *See* Orr Letter, Dkt. 324 at 1 ("[M]y firm's representation of the Camelot Entities in

this matter was terminated by Mr. Lawrence Penn, the sole member of said entities, on June 5,

2019."); *see also* Penn Letter to Orr, Dkt. 326-1 ("As the matter currently evokes strategic,

material and irreconcilable differences, your representation of [the Entity Defendants] is hereby

terminated on June 5, 2019.").

Penn proceeded to represent his entities on his own, an action which the Court twice

warned Penn was unlawful.  In lieu of responding to the pending motion for summary judgment,

on June 6, 2019, Penn filed a motion to disqualify the undersigned on his own behalf and on

behalf of the Entity Defendants.  First Motion to Disqualify, Dkt. 318.  The Court initially gave

Penn the benefit of the doubt as a *pro se* party who may not understand that unlicensed

laypersons are prohibited from representing anyone but themselves.[15]  *See Order on Motion to*

*Disqualify* at 4 (citing 28 U.S.C. § 1654 and relevant case law).  Accordingly, the Court *sua*

*sponte* extended the deadline for the Entity Defendants to oppose SEC's motion for summary

judgment to give Penn more time to arrange for counsel to represent his entities.[16]  *Id.* at 5.  Even

---

[15]     To the extent that Penn filed the motion to disqualify on his own behalf, the Court denied the motion as
moot or in the alternative, as untimely.  *See Order on Motion to Disqualify* at 3–4.

[16]     The Court also ordered Orr, who had not filed a motion to withdraw as counsel for the Entity Defendants,
to explain (i) whether he was continuing to represent the entities or whether he was seeking to withdraw; (ii) why he
failed to respond to the SEC's motion for summary judgment; and (iii) why he allowed Penn, a layperson, to file
papers on behalf of his clients.  *See Order on Motion to Disqualify* at 5.

though Penn had been warned that he could not represent anyone but himself, Penn filed a response to the SEC's motion on the entities' behalf, which the Court struck for violating 28 U.S.C. § 1654 and Federal Rule of Civil Procedure 11(a).  Order, Dkt. 323 at 2–3.  The Court again *sua sponte* extended the deadline for the Entity Defendants to respond to the motion for summary judgment, this time to July 22, 2019.  *Id.*  Penn continued not to retain counsel for the entities, and no valid opposition brief was ever filed.  *See Entity Defs. Liability & Remedies*, 2020 WL 1272285, at *1 n.1.  In fact, it appears that Penn only retained counsel for his entities in August 2020, a year after the opposition brief was due and more than three months after the Court had entered final judgments against the entities.  *See* Notices of Appearance, Dkts. 353, 354.  In short, the Entity Defendants' lack of representation is far from an innocent excuse; instead, it was a calculated decision by Penn, their sole owner.

Just as the Court did relative to liability, the Court imputes Penn's lack of diligence vis-à-vis this motion to the Entity Defendants.  "Where an entity is completely dominated and controlled by an individual, such that the entity has no autonomous and separate existence, the entity becomes independently liable for violations . . . committed by the controlling individual." *Entity Defs. Liability & Remedies*, 2020 WL 1272285, at *4 (cleaned up) (collecting cases); *accord id.* *4 n.4.  As the Court has previously found, Penn completely dominates the Entity Defendants, a fact which he has conceded on numerous occasions.  *Id.* at *4.  Accordingly, because Penn has proffered no excuse for leaving his entities unrepresented (and the Court is aware of none), the Court will not credit the Entity Defendants' contention that their lack of representation is good cause for them to be relieved of the timing requirements for a Rule 60(b) motion.  In short, the Entity Defendants' Rule 60(b)(6) motion is denied as untimely and as an improper attempt to use a Rule 60(b) motion as a substitute for an appeal.

## 2.   The Motions Fail on the Merits

Even if Defendants' Rule 60(b)(6) motions were procedurally proper, they would fail on the merits.  As the Supreme Court noted, "[i]ntervening developments in the law by themselves rarely constitute the extraordinary circumstances required for relief under Rule 60(b)(6)." *Agostini v. Felton*, 521 U.S. 203, 239 (1997).  The Second Circuit has not directly considered what standard applies when a Rule 60(b)(6) motion is filed as a result of an intervening change of law.  But the Second Circuit has said that its power to recall a mandate when faced with an intervening change of law is analogous to the power conferred on district courts by Rule 60(b).  *See Sargent v. Columbia Forest Prod., Inc.*, 75 F.3d 86, 89 (2d Cir. 1996).  Accordingly, the Court looks for guidance to the Second Circuit's reasoning in such cases when considering an analogous Rule 60(b)(6) motion.  *See also Devino v. Duncan*, 215 F. Supp. 2d 414, 417–18 (S.D.N.Y. 2002) (applying the Second Circuit's reasoning in *Sargent* to a Rule 60(b)(6) motion made following an intervening change of law).  Alongside other factors,[17] the Second Circuit evaluates whether the new law "is beyond any question inconsistent with [its] earlier decision." *Sargent*, 75 F.3d at 90.  Because the Court finds that its disgorgement orders are not "beyond any question" inconsistent with the Supreme Court's decision in *Liu*, Defendants' Rule 60(b)(6) motions would be denied on the merits, if they were timely and otherwise appropriate.

Defendants argue that the Court's disgorgement orders conflict with *Liu* in three ways: (i) *Liu* requires the Court to deduct legitimate expenses from disgorgement awards; (ii) *Liu* forbids

---

[17]      The other factors are: "whether the moving party notified the court of a pending case or motion that may alter the decisional law; whether substantial time had elapsed between the earlier decision and the pending motion; and whether the equities strongly favor the moving party."  *See Devino v. Duncan*, 215 F. Supp. 2d 414, 417–18 (S.D.N.Y. 2002) (listing the factors identified by the Second Circuit in *Sargent*).  These factors clearly weigh in favor of denying Defendants' motions.  Neither Penn nor the Entity Defendants informed the Court that *Liu* was pending and that it may implicate the Court's disgorgement orders; Defendants only informed the Court about *Liu* after the decision was issued.  And for the reasons discussed in Section I(C)(1) of this Opinion, the Court finds that the time elapsed and the equities weigh against Defendants.

joint and several liability; and (iii) *Liu* does not allow disgorged funds to be sent to the U.S.

Treasury.  Entity Defs. Rule 60(b) Mem. of Law at 5.[18]  The Court evaluates each contention in

turn.

### a.   The Court's Disgorgement Orders Do Not Conflict with the Requirement in Liu *to Deduct Legitimate Expenses*

In *Liu*, the Supreme Court grappled with the SEC's power to seek, and a federal court's

power to order, disgorgement pursuant to 15 U.S.C. § 78u(d)(5), a statute which limits the

court's power to equitable relief.  *Liu*, 140 S. Ct. at 1940.  The Supreme Court looked to what

has historically constituted equitable relief and held that "a disgorgement award that does not

exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under

§ 78u(d)(5)."  *Id.*  With respect to net profits, the Supreme Court further held that to avoid

becoming a punitive sanction, which is not permitted when granting equitable relief, "courts

must deduct legitimate expenses before ordering disgorgement."  *Id.* at 1950.

*Liu* involved an offering fraud.  The Lius, a married couple, solicited $27 million from

investors purportedly to establish a treatment center for cancer patients.  *Id.* at 1941.  The SEC

investigated and found that "only a fraction of the funds were put towards a lease, property

improvements, and a proton-therapy machine for cancer treatment" and that $20 million of the

investors' money was spent on marketing expenses and salaries, which was far more than what

was permitted by the offering memorandum.  *Id.*  The district court "ordered disgorgement equal

to the full amount petitioners had raised from investors, less the $234,899 that remained in the

corporate accounts for the project."  *Id.* at 1942.  But because the Lius had spent some of the

money on expenses that "arguably have value independent of fueling a fraudulent scheme," *id.* at

1950, the Supreme Court held that the district court erred by not considering whether the

---

[18]     Penn makes the first two arguments but not the third.  *See* Penn Rule 60(b) Mem. of Law at 2.

disgorgement award should be limited to net profits.  The Supreme Court remanded the case for

the district court to reevaluate its disgorgement award in line with the Court's decision.  *Id.*

From the Supreme Court's summary of the facts, it appears that the district court was obligated

to determine how much of the $7 million was spent on legitimate expenses, like the lease

payments and medical equipment, and how much of the $20 million was spent on permissible

marketing expenses and salaries.  The ultimate outcome will constitute profit less legitimate

expenses, which is the post-*Liu* formula for determining the amount to be disgorged.

This case does not involve an offering fraud.  In this matter, Penn misappropriated

approximately $9.3 million of a total "$123 million of committed capital" in the Fund.  *See* Penn

Turnover Resp., Dkt. 378 at 10; *accord* SEC Rule 60(b) Resp., Dkt. 390 at 2.  Between 2010 and

2013, Penn misappropriated "$9,286,916.65 from the Fund through a series of fictitious invoices

for 'due diligence.'"  *Penn Remedies I*, 2017 WL 5515855, at *1 (internal citation omitted).  The

Court found that the "invoices were from Ssecurion, LLC ("Ssecurion"), a [shell] company set

up by Penn and an accomplice" and that "Ssecurion transferred the lion's share of the funds to

other entities controlled by Penn," namely the Entity Defendants.  *Id.*  Because "[t]here is no

evidence that Ssecurion provided any legitimate services to the Fund," the full $9,286,916.65

constitutes ill-gotten gains, which the Court ordered Penn to disgorge, *see Penn Remedies II*,

2018 WL 4378444, at *7.  "To avoid duplicative recovery, the Court [found] CASO

Management and CGI jointly and severally liable with Penn for disgorgement up to their

respective share of the ill-gotten gains," which was $440,000 for CASO Management and

$8,627,004 for CGI, *Entity Defs. Liability & Remedies*, 2020 WL 1272285, at *7.  *See also*

Judgments, Dkts. 300, 339, 340.

Penn and the Entity Defendants make different arguments to support their contention that this Court's disgorgement awards contradict the Supreme Court's holding in *Liu.* Penn argues that his New York larceny conviction is "illegitimate on its face," that he "is not an individual defendant who actually profited," that "without profits there can be no wrongdoing," and, therefore, "[b]ased on the U.S. Supreme Court's holding in *Liu*, disgorgement is not permissible." Penn Rule 60(b) Mem. of Law at 15; Penn Rule 60(b) Reply at 1–2. To support his contention, Penn returns to the arguments he has made throughout this litigation: his larceny conviction in New York state court is invalid pursuant to *People v. Zinke*, 556 N.Y.S.2d 11 (1990); that he has been denied a hearing on the merits before New York courts in violation of his due process rights; that it was unlawful for this Court to rely on his invalid criminal conviction; that a 2018 affidavit from a member of the Fund's advisory board shows that it was impossible for him to have committed larceny; and that the $9.3 million was not misappropriated because it was part of committed capital designated for investments and expenses in line with the Fund's agreements and associated documents. *See generally* Penn Rule 60(b) Mem. of Law; Penn Rule 60(b) Reply.

None of these arguments has anything to do with *Liu*; instead, Penn is attempting to re-litigate liability. The Court has already considered Penn's arguments and properly concluded that he violated federal securities laws. *Liu*'s requirement that legitimate expenses be deducted from disgorgement awards is not relevant to the underlying liability determination, and the Court refuses to reopen this case to determine yet again that Penn is liable for fraud. "The law of the case doctrine commands that when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case unless cogent and compelling reasons militate otherwise." *Hernandez v. Sessions*, 731 F. App'x 51, 55 (2d Cir. 2018) (quoting

*Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009)).  While an intervening change of law can be

one such compelling reason, *see Johnson*, 564 F.3d at 99–100, nothing in *Liu* concerns liability

for fraud, and Penn has provided no cogent or compelling reason to depart from the law of the

case.

The Entity Defendants make a different argument.  They claim that the SEC "made no

effort to deduct legitimate expenses from the gross proceeds that were allegedly ill-gotten, as *Liu*

requires" and that "the SEC has conceded from the very beginning that certain funds were used

for business and overhead expenses."  Entity Defs. Rule 60(b) Mem. of Law at 10–11.  The

Entity Defendants are correct that the SEC alleged in the Complaint that Penn and his entities

"engaged in a fraudulent scheme to misappropriate approximately $9.3 million" in order "to

provide additional assets to Penn to spend on his business and personal expenditures."  Compl. ¶

2.  The SEC also alleged that, after money was diverted from the Fund, "it was commingled with

management fees" that had been paid to CASO Management and forwarded to CGI, which, in

turn, "used the commingled funds to pay overhead expenses, such as rent and salary."  *Id.* ¶ 4.

But the Entity Defendants have not shown that the Court's disgorgement awards were

"beyond any question inconsistent" with *Liu*'s holding that disgorgement may not exceed a

wrongdoer's net profits.  *Sargent*, 75 F.3d at 90.  First, this Court limited its disgorgement

awards to the amount that was misappropriated; the Court found that the entire $9.3 million was

the result of fraud because there was "no evidence that Ssecurion provided any legitimate

services to the Fund."  *Penn Remedies I*, 2017 WL 5515855, at *3.  This contrasts with the

district court in *Liu*, whose disgorgement award included amounts that were apparently not

misappropriated but were instead spent on apparently legitimate expenses, such as a lease,

property improvements, and medical equipment.  *Liu*, 140 S. Ct. at 1941.  Second, *Liu*

recognizes an exception to the requirement that legitimate expenses be deducted, namely where the "entire profit of a business or undertaking" results from wrongful activity.  *Id.* at 1945 (internal citation omitted).  Although the Supreme Court does not define what constitutes an "undertaking" in this context, the due diligence scheme must fit into that category.  Money is fungible, so any portion of the misappropriated funds that were subsequently spent on allegedly legitimate expenses are "merely wrongful gains under another name."  *Id.* at 1950 (internal citation omitted).  And third, the SEC has far from conceded that such expenses were legitimate.[19]  As alleged in the Complaint and admitted by Penn in his Answer, "CGI used the commingled funds to pay overhead expenses, such as rent and salary, which were not permissible fund expenses under the [F]und's governing document."  Compl. ¶ 4; *accord* Am. Ans., Dkt. 134 ¶ 4; SEC Rule 60(b) Resp. at 24–25 n.8.[20]  At best for the Entity Defendants, such expenses are somewhat analogous to the payments in *Liu* for marketing expenses and salaries that went beyond what the offering memorandum permitted; an illegitimate expense that should not be deducted when calculating the amount of disgorgement.[21]  SEC Rule 60(b) Resp. at 24–25

---

[19]     The Entity Defendants also point to the Court's acknowledgement of a discrepancy between the amount misappropriated by Penn ($9,286,916.65) and the amount of the state court's restitution order ($8,362,973.89), which the Court noted is based on the "[state] court's finding that  $1 million of the diverted funds were used for the benefit of the Fund."  Entity Defs. Rule 60(b) Mem. of Law at 2–3 (citing *Penn Remedies I*, 2017 WL 5515855, at *1 n.1).  Not only is the state court's finding not binding on this Court, but the orders at issue are fundamentally different: the state court ordered restitution pursuant to New York criminal law while this Court ordered disgorgement pursuant to federal securities laws.

[20]     Paragraph 6.7(a) of the Amended and Restated Limited Partnership Agreement of Camelot Acquisition: Secondary Opportunities, L.P. states that "expenses of the Partnership shall not include the normal operating expenses of the General Partner and its equity holders (including salaries and benefits provided to employees of the General Partner or its Affiliates, rent, facilities and supplies expenses, and similar expenses)."  *See* Agreement, Dkt. 391-1, ¶ 6.7(a).

[21]     The analogy between this case and *Liu* does not fit neatly: in *Liu*, investors were providing funds pursuant to an offering memorandum that permitted the Lius to make use of the funds for the intended purpose.  The Lius were charged with fraud because they did not use the vast majority of the funds raised for the intended purpose.  In contrast, here, using false invoices, Penn told the Fund that its money was being used to pay a third party that had provided services to the Fund, even though Penn knew that no such services had ever been provided.  Because the entire relationship between Ssecurion and the Fund was fraudulent, there are no legitimate expenses at issue, even if the stolen funds were commingled with funds that were then used to pay legitimate expenses.

n.8 (citing *Liu*, 140 S. Ct. at 1941).  Given these findings, the Entity Defendants have not met

their burden to demonstrate that the disgorgement awards were beyond question inconsistent

with *Liu*.

The Entity Defendants further argue that the disgorgement orders violate *Liu* because the

state court's restitution order covers most of the same funds as the Court's disgorgement orders.

Entity Defs. Mem. of Law at 11.  But the Court explicitly accounted for this, finding that "Penn

is not required to disgorge amounts that he has already repaid" as part of restitution.  *Penn*

*Remedies I*, 2017 WL 5515855, at *3; *accord id.* at *3 n.2 ("It is unclear whether Penn has paid

any restitution to the Fund. To the extent he does so in the future, it is appropriate to offset these

payments against his disgorgement obligation.").  The Entity Defendants claim that this is

insufficient because "nothing in the judgments provides for such an offset."  Entity Defs. Rule

60(b) Reply at 5–6.  But the Entity Defendants provide no reason why a Court must explicitly

include such language in the judgment itself when it has already so directed in a binding court

order.[22]  Moreover, the judgments explicitly provide the Court with enforcement jurisdiction, *see*

Dkts. 300, 339, 340, providing Defendants with an avenue for recourse in the unlikely event this

were ever to become a real issue.

---

[22]     In *Securities & Exchange Commission v. Palmisano*, the Second Circuit modified a judgment to "provide
that to the extent that Palmisano pays or has paid restitution as ordered in the criminal judgment, such payments will
offset his disgorgement obligation under the present judgment."  135 F.3d 860, 864 (2d Cir. 1998).  But in that case,
there was no previous court decision stating that any restitution payments would offset the disgorgement award.  In
fact, in cases where courts acknowledge that restitution payments will offset disgorgement awards, this language is
often not included in the final judgment.  *Compare Sec. & Exch. Comm'n v. Credit Bancorp, Ltd.*, 738 F. Supp. 2d
376, 391 (S.D.N.Y. 2010) (noting in a summary judgment opinion that "[t]o the extent that Rittweger has paid or
pays the amount owed in restitution, the amount of his disgorgement obligation may be offset accordingly.") *with*
Judgment, *Sec. & Exch. Comm'n v. Credit Bancorp, Ltd.*, No. 99-CV-11395, Dkt. 1219 (lacking any reference to
such offsets in the final judgment).

In short, neither Penn nor the Entity Defendants have demonstrated that the disgorgement awards are inconsistent with *Liu*'s holding that a disgorgement award may not exceed a wrongdoer's net profits.

### b. Liu *Does Not Prohibit Joint and Several Liability*

The Court held CASO Management and CGI jointly and severally liable with Penn for disgorgement up to their respective share of the ill-gotten gains. *Entity Defs. Liability & Remedies*, 2020 WL 1272285, at *7; *see also* Judgments, Dkts. 339, 340.  Defendants argue that this aspect of the disgorgement awards contradicts *Liu*, which requires holding defendants liable for "profits only as have accrued to themselves" and that imposing disgorgement liability "on a wrongdoer for benefits that accrue to his affiliates" could transform the equitable remedy into a penalty.  Entity Defs. Rule 60(b) Mem. of Law at 7 (citing *Liu*, 140 S. Ct. at 1945).  Defendants further contend that *Liu* prohibits joint and several for that reason.  *See* Entity Defs. Rule 60(b) Mem. of Law at 1, 4–5, 7; Penn Rule 60(b) Mem. of Law at 1, 12.

Defendants' argument misinterprets *Liu*.  The Supreme Court found that disgorgement cannot be applied jointly and severally when such a remedy was not available at common law but that the "common law did . . . permit liability for partners engaged in concerted wrongdoing."  *Liu*, 140 S Ct. at 1949.  To this Court's knowledge, no court has agreed with Defendants' argument that *Liu* proscribes joint and several liability in all instances.  *See, e.g.*, *Sec. & Exch. Comm'n v. Curative Biosciences, Inc.*, No. 18-CV-925, 2020 WL 7345681, at *6 (C.D. Cal. Oct. 22, 2020) (holding that *Liu* permits joint and several liability when defendants were "partners engaged in concerted wrongdoing") (quoting *Liu* 140 S. Ct. at 1949); *Sec. & Exch. Comm'n v. Laura*, No. 18-CV-5075, 2020 WL 8772252, at *4 (E.D.N.Y. Dec. 30, 2020) (same); *Fed. Trade Comm'n v. Elec. Payment Sols. of Am. Inc.*, 482 F. Supp. 3d 921, 930 (D.

Ariz. 2020) (same). Accordingly, the mere fact that the Court imposed joint and several liability does not, standing alone, run afoul of the holding in *Liu*.

The Entity Defendants further argue that by holding the entities jointly and severally liable with Penn, the Court has made the "error of not ordering disgorgement only to the extent that profits accrued to the [Entity] Defendants." Entity Defs. Rule 60(b) Mem. of Law at 8. To support this contention, they contest the Court's underlying liability findings and recycle old arguments that Penn's guilty plea and the admissions in his answer have been misconstrued. *Id.*; Entity Defs. Rule 60(b) Reply at 3–4. But, as discussed above, the holding in *Liu* is confined to the proper scope of disgorgement; it does not concern underlying determinations of wrongdoing. Penn and the Entity Defendants' liability is the law of the case, and, like Penn, the Entity Defendants have provided the Court with no cogent or compelling reason to depart from the law of the case, particularly given their failure to respond to the motion for summary judgment or to appeal.

Additionally, the Entity Defendants claim that the Court never determined the entities' individual liability and instead simply imputed Penn's conduct and scienter to the entities. Entity Defs. Rule 60(b) Mem. of Law at 7. But this argument ignores that Penn and the Defendant Entities were partners engaged in concerted wrongdoing, the exact scenario in which *Liu* permits joint and several liability. *Liu*, 140 S Ct. at 1949. As this Court found, "Penn completely dominated the Camelot Entities and that, at least for purposes of the transactions at issue, there is no distinction between them." *Entity Defs. Liability & Remedies*, 2020 WL 1272285 at *4. Penn and his entities carried out the fraud together, making joint and several liability for disgorgement appropriate.

Moreover, the entities were not "mere passive recipient[s] of profits," as the Entity

Defendants contend.  Entity Defs. Rule 60(b) Mem. of Law at 8 (quoting *Liu*, 1940 S. Ct. 1949).

CASO Management "maintained a ledger containing due diligence payments, which the Fund's

administrator relied on to prepare financial statements."  *Entity Defs. Liability & Remedies*, 2020

WL 1272285, at *2.  Additionally, "CGI helped Penn implement the fraud by allowing Penn to

use CGI newsletters and emails to procure the fraudulent due diligence payments from the

Fund."  *Id.* at *5.  And, more generally, "Penn and his entities all acted egregiously and with a

high degree of scienter — the scheme took substantial planning and involved the coordination of

multiple entities . . . ."  *Id.* at *6.  In short, CASO Management and CGI played active roles in

the fraud under the direction and control of their owner Penn.

The Court previously found that the Entity Defendants "benefitted from the scheme, with

CGI and CASO Management receiving, respectively, $8,627,004 and $440,000 of the fraudulent

due diligence payments."  *Id.* at *4.  The Court held each entity jointly and severally liable with

Penn for disgorgement only up to its respective share of the ill-gotten gains.  Accordingly, the

Court's imposition of joint and several disgorgement is not in any way inconsistent with *Liu*.

> c.   *The SEC Distribution Plan Is Not Inconsistent with* Liu

Pursuant to *Liu*, for disgorgement to constitute permissible equitable relief, the SEC is

generally required "to return a defendant's gains to wronged investors for their benefit" and that

disgorgement awards "must do more than simply benefit the public at large by virtue of

depriving a wrongdoer of ill-gotten gains."  *Liu*, 140 S. Ct. at 1948.  But the Supreme Court also

noted that an open question remains as to whether the SEC is permitted to deposit disgorgement

funds with the Treasury when it is infeasible to distribute such funds to investors.  *Id.*  In this

case, the judgments all contain the same language with respect to distribution of disgorgement. The judgments state:

> The Commission shall hold the funds (collectively, the "Fund") and may propose a plan to distribute the Fund subject to the Court's approval. The Court shall retain jurisdiction over the administration of any distribution of the Fund.  If the Commission staff determines that the Fund will not be distributed, the Commission shall send the funds paid pursuant to this Final Judgment to the United States Treasury.

Judgments, Dkt. 300 at 5; Dkt. 339 at 4; Dkt. 440 at 5.  The Court agrees with the Entity Defendants that, read in isolation, this text permits "the SEC, in its discretion, to send any disgorged funds to the U.S. Treasury if the SEC does not distribute them to investors . . . ." Entity Defs. Rule 60(b) Mem. of Law at 12.  But the SEC has clarified that the money it collects — if the Court grants its turnover motion — will be distributed to investors.   SEC Rule 60(b) Resp. at 28; *see also* SEC Turnover Mem. of Law, Dkt. 351 at 11–12.  The SEC further committed to conducting a feasibility analysis were it to collect additional money; if it determines that distribution to investors is infeasible, it will update the Court so that the undersigned can decide whether directing such proceeds to the Treasury is permissible.  SEC Rule 60(b) Resp. at 28–29.  The Court agrees with the SEC's sensible approach and finds it consistent with *Liu*.

The Entity Defendants argue that this is insufficient, noting that nothing in the judgments requires the SEC to inform the Court if distribution to investors is ever infeasible.  Entity Defs. Rule 60(b) Reply at 6.  But the Entity Defendants cite no caselaw that would require such language to be in the judgments themselves.  The Court agrees with other district courts which, post-*Liu*, have relied on SEC commitments without requiring that such plans be detailed in the respective judgments.  *Compare Curative Biosciences, Inc.*, 2020 WL 7345681, at *6 (highlighting with approval the SEC's assertion in a supplemental brief that it plans to distribute

28

the funds to investors) *with* Judgment, *Sec. & Exch. Comm'n v. Curative Biosciences, Inc.*, No. 18-CV-925, Dkt. 178 at 5 (stating only that the "SEC may propose a plan to distribute the Fund subject to the Court's approval"); *compare Sec. & Exch. Comm'n v. Mizrahi*, No. 19-CV-2284, 2020 WL 6114913, at *2 (C.D. Cal. Oct. 5, 2020) (analyzing the SEC plan, as stated in its memorandum of law, to return disgorged funds to the defendant's investors) *with* Final Judgment, *Sec. & Exch. Comm'n v. Mizrahi*, No. 19-CV-2284, Dkt. 77 at 3–4 (stating that the SEC "may propose a plan to distribute the Fund subject to the Court's approval" and that "[i]f the Commission staff determines that the Fund will not be distributed, the Commission shall send the funds paid pursuant to this Final Judgment to the United States Treasury.").  The SEC has already committed to distributing collected funds to investors and to informing the Court if that becomes infeasible.  The SEC's plan does not conflict with anything in the judgments, and the Court retains enforcement jurisdiction for exactly these types of issues.  Accordingly, this portion of the judgment is also not inconsistent with *Liu*.[23]

To summarize, the Entity Defendants' motion was improperly filed pursuant to Rule 60(b)(6).  When properly considered as a Rule 60(b)(1) motion, it must be denied as untimely.  Considering the Entity Defendants and Penns' motions pursuant to Rule 60(b)(6), they are procedurally improper, because Penn's behavior in this litigation demonstrates that he and his entities are at fault for the many delays and for the Entity Defendants' failure to appeal.  In all events, even if considered on the merits, the motions are without merit.

---

[23]    The Entity Defendants also argue that "it would be inequitable to permit the SEC to collect disgorgement from the [Entity Defendants] when a civil penalty already has been imposed against both Penn and the [Entity Defendants], because the SEC may use any civil penalties collected to benefit investors through a Fair Fund." Entity Defs. Rule 60(b) Mem. of Law at 12.  *Liu* is limited to interpreting the scope of disgorgement permissible under 15 U.S.C. § 78u(d)(5); it does not have any impact on civil penalties ordered pursuant to other statutory provisions.  Because nothing in *Liu* disturbs the Court's power to order civil penalties, or the SEC's authority to set up a Fair Fund.  This is just another attempt by the Entity Defendants to use a Rule 60(b) motion to substitute for an appeal.  For that reason, the Court declines to consider this argument.

## II.     SEC's Turnover Motion

The SEC has separately moved for orders directing certain financial institutions to turn over funds held in accounts that were frozen to satisfy in part the three judgments.  Dkt. 350 at 1. Pursuant to the final judgments against them, Defendants owe the following amounts:

|  | Penn | CASO Management | CGI |
|---|---|---|---|
| **Disgorgement*** | $9,286,916.65 | $440,000.00 | $8,627,004.00 |
| **Pre-Judgment Interest on the Disgorgement**[24] | $1,878,064.28 | $132,095.10 | $2,556,971.61 |
| **Civil Penalties** | $9,286,916.65 | $440,000.00 | $8,627,004.00 |
| **TOTAL** | **$20,451,897.58** | **$1,012,095.10** | **$19,810,979.61** |

*CASO Management and CGI's disgorgement is owed jointly and severally with Penn

To satisfy partially these judgments, the SEC has moved the Court to order four financial institutions to turn over a combined total of $177,615.15, which is the sum that was frozen pursuant to preliminary injunctions and subsequent orders.  *See* Willenken Decl., Dkt. 352, ¶¶ 6, 7, 9, 16, 20, 25; Prelim. Injunctions, Dkts. 56, 58; Judgment, Dkt. 300 at 6 (extending the freeze); *Entity Defs. Liability & Remedies*, 2020 WL 1272285, at *8 (same).  These funds are held in bank accounts belonging to the three Defendants and to three non-parties: CASO GP, CASO Co-Invest, and CASO Offshore.  The breakdown of the frozen funds by account holder is as follows:

---

[24]     In its memorandum of law, the SEC clarified that the amount of pre-judgment interest in Penn's judgment (Dkt. 300) is approximately $1,000 too high because, when calculating interest, the SEC failed to account for the fact that pre-judgment interest does not accrue on funds from the time they are frozen.  SEC Turnover Mem. of Law, Dkt. 351 at 3 n.1.  The SEC must re-calculate the amount of pre-judgment interest and file a proposed corrected judgment with the Court.

| Name of Account Holder | Amount Held in Frozen Accounts |
|---|---|
| Penn | $5,083.25 |
| CASO Management | $4,380.97 |
| CGI | $158,368.66 |
| CASO GP | $3,255.00 |
| CASO Co-Invest | $3,200.00 |
| CASO Offshore[25] | $3,327.27 |
| **TOTAL** | **$177,615.15** |

Defendants and two of the non-party entities, CASO GP and CASO Co-Invest (collectively, the "Non-Party Entities"), object to the SEC's motion. *See* Penn Turnover Resp., Dkt. 375; Entities Turnover Resp., Dkt. 375.

### A.  Legal Standard

District courts have "broad equitable power to fashion ancillary relief" when their jurisdiction has been invoked pursuant to the "sweeping mandate manifest in the securities laws." *Sec. & Exch. Comm'n v. Smith*, 653 F.3d 121, 129 (2d Cir. 2011) (quoting *Sec. & Exch. Comm'n v. Unifund SAL*, 910 F.2d 1028, 1041 (2d Cir. 1990) and *Sec. & Exch. Comm'n v. Materia*, 745 F.2d 197, 200 (2d Cir. 1984)).  The Court has "the authority to grant the full panoply of equitable remedies so that the [SEC] can obtain complete relief." *Sec. & Exch. Comm'n v. Martino*, 255 F. Supp. 2d 268, 288 (S.D.N.Y. 2003) (internal citations omitted). Such equitable power includes the authority to order the turnover of assets to be used to satisfy judgments in such cases. *Id.* at 289.

---

[25]     The Willenken Declaration appears to have a typographical error.  Ms. Willenken reports that CASO Offshore has $3,375 remaining in the account.  Willenken Decl., Dkt. 352 ¶ 25.  But the email from a bank representative that she references to support that claim states that there is $3,327.27 in the account, as does the SEC's memorandum of law.  *See* First Republic Bank Email, Dkt. 352-3 (listing $3,327.27 in the account ending with 9380); SEC Turnover Mem. of Law at 4 (listing $3,327).

**B. The Court Grants the SEC's Turnover Motion with Respect to Defendants**

Penn objects to the SEC's motion to turn over the funds in his bank accounts.  *See* Penn

Turnover Resp., Dkt. 375.  But Penn's objections simply rehash his claims of innocence.  Penn

Turnover Resp. at 4, 6–8, 11–12.  He also argues that the Court's disgorgement award violates

the Supreme Court's *Liu* decision.  *Id.* at 2–4, 6–10.[26]  Because Penn's underlying liability is law

of the case and because the Court's disgorgement award does not contravene *Liu*, the Court

overrules Penn's objections.  *See* Section I(C)(2)(a) of this Opinion, *supra*.

The Entity Defendants do not object to the turnover orders; their only request was that the

Court decide the turnover motion after briefing on the Rule 60(b) motion was complete.  Entities

Turnover Resp., Dkt. 375. at 9–10.[27]  Briefing on the Rule 60(b) motion has long been complete

and, accordingly, this request is moot.

The time has come for Defendants to start paying the valid judgments that have been

entered against them.  Accordingly, the SEC's turnover motion with respect to the Defendants is

granted.

**C. The Court Grants the SEC's Turnover Motion with Respect to the Non-Party Entities**

"Federal courts may order equitable relief against a person who is not accused of

wrongdoing in a securities enforcement action where that person: (1) has received ill-gotten

funds; and (2) does not have a legitimate claim to those funds."  *Sec. & Exch. Comm'n v.*

*Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998); *see also Sec. & Exch. Comm'n v. Rosenthal*, 426 F.

---

[26]     Penn also argues that he is not the alter ego of the Entity Defendants or of the Non-Party Entities.  Penn
Turnover Resp., Dkt. 375 at 13–14.  With respect to the Entity Defendants, this argument is irrelevant as the Entity
Defendants' liability is the law of the case, and that finding will not be re-opened.  With respect to the Non-Party
Entities, the Court need not consider this argument because the Court does not rely on a finding of alter ego to
determine that those entities must turn over the funds at issue to the SEC.

[27]     The Entity Defendants and the Non-Party Entities filed a joint brief in opposition to the SEC's turnover
motion.  Dkt. 375.  The Court refers to this joint brief as the "Entities Turnover Response."

App'x 1, 3 (2d Cir. 2011) (applying the *Cavanagh* test); *Sec. & Exch. Comm'n v. Boock*, No. 09-CV-8261, 2013 WL 4828571, at *2 (S.D.N.Y. Sept. 9, 2013) (same).

### 1. CASO Offshore

Bank records show that the $3,327.27 in the CASO Offshore[28] account is ill-gotten funds because it is the remainder of a $10,000 wire transfer from Defendant CGI. SEC Turnover Mem. of Law at 7. CASO Offshore transferred $5,000 back to CGI and $1,250 to an unnamed individual. *Id.* Beyond bank fees, there were no other transactions in the account. *Id.* Because the money came directly from CGI while the Ssecurion fraud was on-going, and CGI was a recipient of ill-gotten funds from Ssecurion, the Court finds that the sums in the account are ill-gotten funds. Moreover, CASO Offshore is aware that it has the right to oppose the SEC's motion, and it decided that it would not oppose. Healy Decl., Dkt. 359 ¶¶ 5–6. CASO Offshore's lack of opposition can be construed as an admission that it does not have a legitimate claim to those funds. Accordingly, the Court grants the SEC's turnover motion with respect to CASO Offshore.

### 2. CASO GP

Bank records show that the $3,255 in the CASO GP account is ill-gotten funds because it is also the remainder of a $10,000 wire transfer from Defendant CGI. SEC Turnover Mem. of Law at 5–6. CASO GP argues that the SEC made no effort to trace the assets to funds that were allegedly misappropriated. Entities Turnover Resp. at 9. But "[t]he SEC is not required to trace specific funds to their ultimate recipients in such a situation." *Rosenthal*, 426 F. App'x at 3. The Second Circuit explained that "[i]mposing such a tracing requirement would allow [a] defendant

---

[28]     The SEC explains, without contradiction from the Defendants, that according to documents provided by Defendant CASO Management, CASO Offshore was used as a vehicle to pool capital so it could then be invested in the master Fund. SEC Turnover Mem. of Law at 6.

to escape disgorgement by spending down illicit gains while protecting legitimately obtained assets or, as was the case here, by commingling and transferring such profits." *Id.* Accordingly, the Court finds that the money remaining in CASO GP's account was ill-gotten because it was transferred from CGI while the Ssercurion scheme was on-going.

The Second Circuit has "not developed explicit guidelines for what qualifies as a 'legitimate claim.'" *Commodity Futures Trading Comm'n v. Walsh*, 618 F.3d 218, 226 (2d Cir. 2010).[29]  But even without such guidance, the Court finds, based on the evidence in the record, that CASO GP does not have a legitimate claim to those funds.  Penn admitted that CASO GP "made all the decisions and had the right to pay consultants, finders, and those who added value like Mr. Ewers."  Am. Ans. at 22.  (Mr. Ewers was the managing partner of Ssecurion, the shell corporation that generated fraudulent invoices for the phony due diligence services that are at the core of this case.  Compl. ¶ 31.)  CASO GP is part of the Camelot Group, which also includes the two Entity Defendants.  As Penn explained, he "was the [f]ounder and approximately 99% owner" of CGI, CASO Management, and CASO GP.  Am. Ans. at 24.  Penn used a Camelot group signature and email address to perpetrate the fraud.  *Entity Defs. Liability & Remedies*, 2020 WL 1272285, at *2.

There is no evidence that CGI received any consideration for the funds it transferred to CASO GP.  The Second Circuit has found that "the receipt of property as a gift, without the payment of consideration, does not create a 'legitimate claim' sufficient to immunize the property from disgorgement."  *Walsh*, 618 F.3d at 226 (2d Cir. 2010) (citing *Cavanagh*, 155 F.3d at 137).  The only activity in the CASO GP account was the initial wire transfer of $10,000 from

---

[29]    The Entity Defendants argue that the SEC failed to establish that CASO GP is the alter ego of CGI or Penn. Entities Turnover Resp. Dkt. 375, at 4–8.  But the Court does not rely on a finding of alter ego to determine that the entities must turn over the funds at issue to the SEC, and neither party argues that such a finding is required.

CGI, the transfer of $5,000 back to CGI, the transfer of $1,250 to an unnamed individual, and bank fees. SEC Turnover Mem. of Law at 5–6 (citing bank records). The lack of business activity suggests that CGI received no consideration for the amount remaining in the account. CASO GP argues that the lack of business activity should carry little weight, because the account has been frozen since January 2014. Entities Turnover Resp. at 6. But the bank records reveal that there was no activity in the account (other than bank fees) between November 2012 and the freeze in January 2014. SEC Turnover Reply, Dkt. 380 at 7. Accordingly, the Court finds that CGI received no consideration for the money transferred to CASO GP, demonstrating that CASO GP does not have a legitimate claim to the funds.

Because CASO GP has received ill-gotten funds to which it lacks a legitimate claim, the Court grants the SEC's turnover motion with respect to CASO GP.

### 3. CASO Co-Invest

The remaining $3,200 in the CASO Co-Invest account is also ill-gotten funds. As with the other entities, these funds constitute the remaining portion of an initial wire transfer of $10,000 from CGI made during the fraud scheme. SEC Turnover Mem. of Law at 6. As with the other accounts, $5,000 was transferred back to CGI, $1,250 was transferred to an unnamed individual, and the remaining deductions were for various bank fees. *Id.* In addition to these transfers, the account also received $1.79 million from investors, which was transferred out of the account to purchase shares of Fisker Automotive in what appears to be a legitimate transaction prior to the freeze order. *Id.*; SEC Turnover Reply at 4–5. Because the SEC is under no obligation to trace the money and given the apparent commingling of legitimate and illegitimate funds, the Court concludes that the remaining $3,200 constitutes ill-gotten gains.

The Court also finds that CASO Co-Invest has no legitimate claim to the funds. CASO Co-Invest is a private fund that "co-invested" with the Fund in one issuer, Fisker Automotive. SEC Turnover Mem. of Law at 6; Annex C, CASO Co-Invest Subscription Agreement, Dkt. 352-13 at 9 ("[CASO Co-Invest] will invest all of its available assets in one company, Fisker Holdings, Inc. . . ."); *see also* Am. Ans. at 4 (describing CASO Co-Invest's role amongst the various entities). CASO Co-Invest does not dispute that Fisker Automotive has filed for bankruptcy. *See* SEC Turnover Reply at 3 n.2. All of the evidence presented demonstrates, without refutation from Defendants, that the funds were a gift from CGI, given without consideration. As recipients of such gifts do not have legitimate claims to ill-gotten funds, *Walsh*, 618 F.3d at 226 (2d Cir. 2010), CASO Co-Invest is ordered to turn over the funds to the SEC.

In short, because CASO Co-Invest received ill-gotten funds from CGI and because it lacks any legitimate claim to those funds, the Court grants the SEC's turnover motion with respect to CASO Co-Invest.

### D. The Court Grants the SEC's Request to Lift the Freeze on Accounts with Zero or Negative Balances and to Lift the Freeze on a Safe Deposit Box

The SEC also moves the Court to lift the freeze with respect to bank accounts that were included in the Court's temporary restraining order and preliminary injunctions, Dkts. 2, 56, 58, but that turned out to have zero or negative balances. SEC Turnover Mem. of Law at 7, 12. Additionally, the SEC seeks to lift the freeze on the contents of a CGI safe deposit box that, after inspection, appear to have no monetary value. *Id.* at 7; Willenken Decl. ¶ 7. Entity Defendants do not oppose this request, *see* Entities Turnover Resp. at 3 n.3, and Penn does not provide his view on the matter. Without any reason to maintain a freeze on accounts or items with no value, the Court grants the SEC's motion.

### III.   Dismissal of Count VI of the Complaint

The SEC also moves to dismiss Count VI of the Complaint, which alleges that Penn and CASO Management violated Section 207 of the Advisers Act by "willfully [making] untrue statements of material facts in registration applications filed with the Commission, and willfully [omitting] to report material facts, which are required to be stated therein."  Compl. ¶ 77; *accord id.* ¶¶ 76, 78.  This is the only claim for relief in the Complaint that was not resolved through settlement or summary judgment.  Defendants do not oppose SEC's motion.  Accordingly, pursuant to Federal Rule of Civil Procedure 15(a), the Court deems the Complaint amended to exclude Count VI, and dismisses that claim with prejudice.

### CONCLUSION

For the reasons discussed above, Defendants' Rule 60(b) motions are DENIED, the SEC's turnover motion is GRANTED, the SEC's request to lift the freeze on certain accounts and on the contents of a safe deposit box is GRANTED, and the SEC's request to amend the Complaint to exclude Count VI is GRANTED.  The Court will direct the financial institutions to turn over the funds and will direct the relevant non-parties to release the asset freeze on certain accounts by separate orders.

By no later than **Friday, April 9, 2021**, the SEC must file a proposed amended judgment as to Penn that includes the correct amount of pre-judgment interest owed.

The Clerk of Court is respectfully directed to terminate the open motions at docket entries 350, 381, and 384.

**SO ORDERED.**

Date:   March 31, 2021
      New York, NY
                                         **VALERIE CAPRONI**
                              **United States District Judge**